No. 13-35474; 13-35519

_____
_____

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT
_____

UNITED STATES OF AMERICA; SUQUAMISH INDIAN TRIBE; SAUK-SUIATTLE TRIBE; STILLAGUAMISH TRIBE; HOH TRIBE; JAMESTOWN S'KLALLAM TRIBE; LOWER ELWHA BANK OF KLALLAMS; PORT GAMBLE BAND CLALLAM; NISQUALLY INDIAN TRIBE; NOOKSACK INDIAN TRIBE; SKOKOMISH INDIAN TRIBE; SQUAXIN ISLAND TRIBE; UPPER SKAGIT INDIAN TRIBE; TULALIP TRIBES; LUMMI INDIAN NATION; QUINAULT INDIAN NATION; SUQUAMISH INDIAN TRIBE; PUYALLUP TRIBE; CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION; QUILEUTE INDIAN TRIBE; MAKAH INDIAN TRIBE; SWINOMISH INDIAN TRIBAL COMMUNITY; MUCKLESHOOT INDIAN TRIBE,

     Plaintiffs - Appellees,

  v.

STATE OF WASHINGTON,

    Defendant - Appellant.
_____

BRIEF OF AMICUS CURIAE THE STATE OF OREGON
IN SUPPORT OF APPELLANT STATE OF WASHINGTON AND
SUPPORTING REVERSAL
_____

Appeal from the United States District Court
for the Western District of Washington
_____

*Continued…*

ELLEN F. ROSENBLUM
Attorney General
ANNA M. JOYCE
Solicitor General
MICHAEL A. CASPER
Deputy Solicitor General
STEPHANIE L. STRIFFLER
Senior Assistant Attorney General
1162 Court St. NE
Salem, Oregon 97301-4096
Telephone:  (503) 378-4402
stephanie.striffler@doj.state.or.us

Attorneys for Amicus Curiae
State of Oregon

_____
_____

# TABLE OF CONTENTS

STATEMENT OF THE CASE ....................................................................... 1

INTEREST OF THE AMICUS .................................................................... 1

ARGUMENT............................................................................................... 4

    I.      Introduction ................................................................................ 4

    II.     The District Court Erred in Concluding that the Washington
           Culverts Impaired a Treaty Right. ................................................ 5

    III.    The District Court Abused its Discretion by Ordering
           Washington to Replace Every Culvert in the Case Area............... 7

CONCLUSION ........................................................................................... 17

# TABLE OF AUTHORITIES

## Cases Cited

*Horne v. Flores*,
    557 U.S. 433 (2009).........................................................................8, 16

*Humane Soc'y of the United States v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) ................................................................ 4

*Nat'll Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    839 F.Supp.2d 1117 (D. Or. 2011) ......................................................... 4

*Puyallup Tribe v. Dep't of Game of Washington*,
    391 U.S. 392 (1968)................................................................................ 6

*Stone v. City and County of San Francisco*,
    968 F.2d 850 (9th Cir. 1992).................................................................. 8

*United States v. Oregon*,
    699 F. Supp. 1456 (1988),
    *affirmed* 913 F2d 576 (9th Cir. 1990),
    *cert den. sub nom Makah Indian Tribe v. United States*,
    501 U.S. 1250 (1991).........................................................................2, 3

*United States v. Washington*,
    157 F.3d 630 (9th Cir. 1998)..............................................................2, 3

*United States v. Winans*,
    198 U.S. 371 (1905)................................................................................ 6

*Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*,
    443 U.S. 658 (1979).........................................................................2, 5, 6

## Constitutional & Statutory Provisions

16 U.S.C. § 1536................................................................. 4

HB 3002 (2001) ................................................................. 9

Or. Rev. Stat. § 509.585(3) ............................................... 10

Or. Rev. Stat. § 509.585(4) ............................................... 10

Or. Rev. Stat. §§ 509.580 – 509.910 ................................. 9

## Administrative Rules

Or. Admin. Rules 635-412-0015 (2) ................................. 10

Or. Admin. Rules Division 412........................................... 9

Or. Admin. Rules. 635-412-0015 (1) ................................ 10

## Other Authorities

*Felix S. Cohen, Handbook of Federal Indian Law* (2012) ................................. 2

Fed. R. App. Proc. 29(a) ................................................... 1

http://www.dfw.state.or.us/fish/CRP/lower_columbia_plan.asp...................... 13

http://www.dfw.state.or.us/fish/passage/docs/2013_Statewide_Prioritization_List.pdf ................................................................. 10

http://www.nwr.noaa.gov/protected_species/salmon_steelhead/recovery_planning_and_implementation/recovery_plans_supporting_documents.html ....... 13

http://www.oregon.gov/OPSW/Pages/archives/archived.aspx......................... 12

Treaty of Medicine Creek, 10 Stat 1132 (1854) ................................................ 2

ii

## BRIEF OF AMICUS CURIAE THE STATE OF OREGON IN SUPPORT OF APPELLANT STATE OF WASHINGTON AND SUPPORTING REVERSAL

_____

### STATEMENT OF THE CASE

The State of Oregon submits this brief, pursuant to Fed. R. App. Proc. 29(a), to support appellant State of Washington's position that the district court's judgment should be reversed.[1] In particular Oregon addresses two substantial errors in the district court's order: (1) the court's expansive interpretation of the Stevens Treaties; and (2) the far-reaching injunctive remedy that the court ordered.

### INTEREST OF THE AMICUS

This appeal involves a "subproceeding" of *United States v. Washington*. In this case the district court has, over the course of many years, adjudicated Indian treaty fishing rights under the "Stevens treaties." Those treaties were negotiated by Isaac Stevens, Governor of the Washington Territory. The treaties at issue all share similar language, providing in relevant part:

> [T]he right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses on open and unclaimed lands.

_____

[1]     Fed. R. App. Proc. 29(a) provides, in part, that "a State . . . may file an amicus-curiae brief without the consent of the parties or leave of court."

*Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 674 (1979) ("*Fishing Vessel*") citing Treaty of Medicine Creek, 10 Stat 1132 (1854).

In this subproceeding, the district court found that plaintiff tribes' treaty right "of taking fish at all usual and accustomed grounds" imposes on the State of Washington a duty "to maintain, repair or replace culverts which block passage of anadromous fish." ER 42. The district court further imposed an injunction, ordering Washington to spend nearly two billion dollars to replace hundreds of culverts. *Id.*

The State of Oregon has a significant interest in the interpretation of the fishing clauses of the Stevens treaties because there are treaties applicable to Oregon that contain similar language. Oregon previously appeared as *amicus curiae* in this court in an earlier phase of this case, *United States v. Washington*, 157 F.3d 630 (9th Cir. 1998) ("shellfish decision").[2]

---

[2]    Most of the Pacific Northwest treaties contain essentially identical language concerning off-reservation fishing rights, providing that "[t]he right of taking fish at all usual and accustomed grounds and stations is secured *** in common with all citizens of the Territory. " *See Felix S. Cohen, Handbook of Federal Indian Law* (2012), ch. 18, sec. 4, p. 1179; *see, e,g*., *United States v. Oregon*, 699 F. Supp. 1456 (1988), *affirmed* 913 F2d 576 (9th Cir. 1990), *cert den. sub nom Makah Indian Tribe v. United States*, 501 U.S. 1250 (1991) (applying treaties to Columbia River salmon). *United States v. Oregon* became the forum for allocating the harvest of fish that enter the Columbia River system, while *United*

*Footnote continued…*

Oregon's interest also relates to the specific subject of this subproceeding, because, like Washington, Oregon is addressing fish passage issues, including culverts that block or impede fish passage. And, as discussed below, Oregon is more broadly concerned that the court's decision infringes on the state's efforts to allocate limited fiscal resources in ways that maximize investments in fisheries restoration.

The State of Oregon appears for the above reasons. Oregon does not oppose tribal efforts to protect salmon and salmon habitat. Indeed, Oregon shares with tribes an interest in working together to restore and maintain those fish runs. Rather, Oregon opposes the effort to use the federal courts to direct how limited state restoration resources are prioritized.

The State of Oregon and Columbia River tribes have for many years successfully negotiated the allocation and regulation of salmon through the *United States v. Oregon* process, and are not currently engaged in any dispute regarding that allocation or habitat efforts needed to support the salmon runs. Indeed, Oregon historically has cooperated with tribes to protect Columbia River salmon and salmon habitat in court actions. *See, e.g.*, *Nat'l Wildlife Fed'n v. Nat'l Marine*

---

*(…continued)*
*States v. Washington* became the forum for allocating fishing rights within the jurisdiction of the state of Washington. *United States v. Oregon*, 913 F.2d at 579.

*Fisheries Serv.*, 839 F.Supp.2d 1117 (D. Or. 2011) (seeking to require the federal government to operate the federal Columbia River hydrosystem in ways that avoid jeopardy under Section 7 of the federal Endangered Species Act, 16 U.S.C. § 1536); *Humane Soc'y of the United States v. Locke*, 626 F.3d 1040 (9th Cir. 2010) (concerning authority to take pinnipeds causing mortality among Columbia River salmon).

## ARGUMENT

### I.    Introduction

As construed by the district court, the treaties effectively require the State of Washington to take affirmative actions to correct impediments to the passage of any fish destined for a tribal fishery. Further, the consequence of the district court's decision is to impose on the state a vague and imprecise duty to prevent other kinds of incidental impacts on the tribal fishery. As Washington argues in its brief, such a duty does not arise from the treaty language or the case law interpreting it. Oregon joins Washington in urging this court to reject the district court's expansive interpretation of the treaties and to reverse the district court's order granting summary judgment to the United States and tribes.

Equally problematic from Oregon's perspective is the onerous injunctive relief that the district court ordered. After concluding that the treaties obligated Washington to refrain from building culverts in a manner that affected salmon runs,

the court then also ordered Washington to replace all culverts in the case area that have become impediments to fish passage. While that relief may sound like a simple proposition, and while the district court described the relief as "narrow," it is anything but simple or narrow: complying with that order would require Washington—which is already devoting considerable resources to a complex statewide salmon recovery effort— to divert nearly $2 billion of its state budget to the task of replacing culverts, diverting funding away from other salmon recovery actions. The district court ordered that extraordinary remedy without addressing the state's budgetary constraints or priorities, and without deference to the state's considerable expertise and ongoing efforts in this complex area. In that respect the court's order violates the basic principles of comity and federalism that govern the exercise of a federal court's injunctive authority over states.

## II. The District Court Erred in Concluding that the Washington Culverts Impaired a Treaty Right.

As the Supreme Court has explained, "[b]oth sides have a right, secured by treaty, to take a fair share of the available fish." *Fishing Vessel*, 443 U.S. at 684-85. Consistent with Supreme Court decisions, Oregon agrees with Washington that the treaties create no duty on the part of the state to avoid taking non-discriminatory actions that incidentally affect tribal fisheries.

The Supreme Court case law interpreting the treaty language points to a straightforward standard. First, the state cannot prevent the tribes from exercising

their right to the treaty share by destroying it or denying access to it. *See United States v. Winans*, 198 U.S. 371, 381-82 (1905) (non-Indian landowners could not exclude Indians from access to the river by placing fish wheels in front of their property that prevented the Indians from access to the river to fish); *see also Fishing Vessel*, 443 U.S. at 679 (describing fish wheels in *Winans* as "capable of catching salmon by the ton and totally destroying a run of fish"); *Id.* at 676 (parties did not intend to authorize future settlers "to crowd the Indians out of any meaningful use of their accustomed places to fish.") In addition, as Washington explains, the state cannot engage in conduct that targets or discriminates against the tribal fishery. (Wash. App. Br. 23- 24, 34-35, *citing Fishing Vessel*, 443 U.S. at 682, and *Puyallup Tribe v. Dep't of Game of Washington*, 391 U.S. 392, 398 (1968)).

Thus, the state cannot *exclude* Indians from a usual and accustomed fishing site, or destroy the fishery, or treat the tribal fishery in a discriminatory manner. The district court did not apply those standards here. Instead the district court found that culverts impaired the treaty right without even requiring the plaintiffs to show that barrier culverts actually affected the treaty fishery. [3] Here, there was no

---

[3]      Rather, the court relied only on the "logical inference" that a "significant portion" of the fishery diminishment is due to blocked culverts. ER 50. According to the court's logic, all that the plaintiffs had to show was that: 1) some culverts do not allow free passage of migrating fish, and 2) fish runs have

*Footnote continued…*

claim or evidence that tribal fishers were excluded from the treaty fishery, or that the treaty fishery has been destroyed by Washington culverts. Nor was there a claim or evidence that the culverts were installed or maintained in a manner intended to discriminate against the treaty fishery or that they in fact resulted in any discriminatory impact on the treaty fishery. The district court's conclusion that culverts impaired the treaty right was therefore without basis in the law or record.

## III. The District Court Abused its Discretion by Ordering Washington to Replace Every Culvert in the Case Area.

For the reasons just described, the district court's interpretation of the treaties and determination that Washington's culverts impair a treaty right is without merit. But even assuming that the court's interpretation were correct, the injunctive remedy that the court ordered in this case is itself unlawful. As Washington argues, a federal court granting injunctive relief against a state must carefully consider the extent to which the public interest is served by the injunction and must craft a remedy that with appropriate regard for the principles of federalism. In the context of this case, that means that the court must fashion relief

_____

(*…continued*)

diminished. ER 47. From there, the court concluded that the tribes had made a sufficient showing that the culverts impaired treaty rights. ER 50. The district court thus found a treaty right, and concomitant duty imposed on the State of Washington, based only on the "logical" possibility that barrier culverts diminish the run. The problem with that reasoning is that it could extend just as well to any activity whatsoever that could impact a single fish. *See* Wash. App. Br. at 36-38.

that affords due deference to the state's subject matter expertise in salmon recovery and in particular with due deference to the state's ability to determine how to maximize salmon recovery given finite state funds. The district court's injunction in this case was unlawful because it afforded to Washington no such deference. As Oregon can attest from its own experience, a successful state-wide salmon recovery program requires a careful, comprehensive planning effort coordinated across multiple state agencies and governments. The simplistic injunction imposed by the district court in this case misses that point entirely and should be reversed.

The well-settled principles governing the federal injunctions against states are set forth in Washington's brief and need not be repeated here. Wash. App. Br. at 46 - 49. Suffice it to say that both this court and the Supreme Court have repeatedly recognized the need for courts fashioning such injunctions to tread lightly, and in particular to avoid any unnecessary intrusion into a state's administration of the law or a state's decisions regarding how to most effectively address policy concerns with limited resources. Wash. App. Br. at 48, citing *Horne v. Flores*, 557 U.S. 433 (2009) and *Stone v. City and County of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992). In addition, in crafting the appropriate injunctive relief, the court should defer to the state's institutional competence and subject matter expertise. Wash. App. Br. at 47-48, citing *Stone*, 968 F.2d at 860. The district court's injunction flies in the face of those principles.

As noted, the district court ordered Washington to replace nearly every state-owned barrier culvert within the case area, by specific dates, and using specific technology. ER 3, 4-5. If Washington had unlimited financial resources to devote to replacing culverts, that remedy might not be objectionable. Replacing culverts that impede fish passage is an important part of a comprehensive salmon recovery program. But of course no state has unlimited funds, and the relief that the court imposed here is extraordinarily expensive. In that context, maximizing the benefits of investments in salmon recovery requires making deliberate and informed choices about both the sequencing and the prioritization of actions, not to mention deliberate and informed consideration of how money spent on salmon recovery will divert funds from other budgetary programs and priorities.

Oregon, like Washington, has been actively engaged in identifying and replacing culverts that impede fish passage. Oregon significantly revised its fish passage law in 2001, HB 3002 (2001); *see generally* Or. Rev. Stat. § 509.580 – 509.910; Or. Admin. Rules Division 412. Under the law, persons owning or operating an artificial obstruction in state waters must address fish passage requirements prior to certain triggering events, including not only installation but also changes in permit status (renewals and modifications). The owner or operator must submit a proposal for fish passage to the Oregon Department of Fish and Wildlife (ODFW) if native migratory fish are or historically have been present

there. Or. Rev. Stat. § 509.585(4). The law also gives ODFW emergency authority to require fish passage if a population of native migratory fish is adversely impacted.

To implement the fish passage program, ODFW prioritizes enforcement actions based on the needs of native migratory fish. Or. Rev. Stat. § 509.585(3).[4] ODFW prioritizes fish passage barriers based on a determination of the barriers "at which fish passage would provide the greatest benefit to native migratory fish." Or. Admin. Rules 635-412-0015 (1). The factors that ODFW considers include the quantity and quality of inaccessible habitat, and the biological status of the native migratory fish. Or. Admin. Rules 635-412-0015 (2). As those factors demonstrate, sound policy supports prioritization, even within the arena of fish passage. Culverts are not always the first priority in addressing fish passage challenges.[5]

Consistent with Oregon law, the Oregon Department of Transportation (ODOT) Fish Passage Program promotes salmon recovery by removing fish

---

[4]     Priority list available at: http://www.dfw.state.or.us/fish/passage/docs/2013_Statewide_Prioritization_List.pdf.

[5]     Moreover, by allowing the federal government and tribes to focus on the state, the court fails to account for significant fish passage barriers that are maintained by the United States. In fact, of the top twenty fish passage barriers on ODFW's priority list, fourteen are owned by the federal agencies, primarily the Bureau of Reclamation or the Army Corps of Engineers.

passage barriers on Oregon's highway system. The program uses transportation funds to retrofit and replace culverts that are barriers to native fish movement in the most cost effective way to provide the greatest benefit for native fish for the resources spent. To accomplish that goal, ODOT has partnered with ODFW to inventory, assess and prioritize for repair or replacement, culverts associated with state- and county-owned roadways. ODOT has then used that inventory to prioritize its replacement of fish passage barriers. As a result, many of the relatively high value and low cost ODOT fish passage projects have already been completed. In the last 16 years, ODOT has invested more than $36 million of transportation funds in 142 fish passage projects around the state. Another $16.8 million has been allocated to complete additional fish passage projects during the next four years.

Identifying and replacing culverts that impede fish passage is thus an important part of Oregon's salmon recovery efforts. However, just as in Washington, Oregon's fish passage program is only one facet of much larger statewide habitat protection efforts. Further, habitat protection is only one facet of larger salmon protection and recovery efforts, which address the "three H's": habitat, harvest, and hatcheries.

To illustrate, the "Oregon Plan for Salmon and Watersheds" identifies the major factors contributing to decline, and then prioritizes actions to address them.[6] The "Oregon Plan," established in 1997 to address declining populations of chinook, coho, chum, and steelhead, is a complex and coordinated effort involving state and federal agencies working in concert with citizen and local watershed groups. The diversity of those involved in fish recovery under Oregon's plan reflects the state's recognition that there is no single or simple reason for declining fish runs—there are many contributing factors including changes in habitat, water quality, and fish harvesting practices. For that reason, the Oregon Plan coordinates agency programs addressing water quality, water quantity, and habitat protection, alteration, and restoration activities, as well as fishery harvest management and

---

[6] Available at http://www.oregon.gov/OPSW/Pages/archives/archived.aspx. As the plan notes, the nine critical elements of a conservation plan are:

1. Identify the major factors that have contributed to the decline in the [evolutionarily significant units].
2. Establish priorities for action.
3. Establish objectives and timelines for recovering populations.
4. Establish criteria and standards to measure progress toward objectives.
5. Adopt measures (actions) needed to achieve the explicit objectives.
6. Provide high levels of certainty that actions will be implemented.
7. Establish a comprehensive monitoring program.
8. Integrate activities and projects to recover salmon populations and their habitat.
9. Utilize adaptive management in the recovery process.

production of hatchery fish.  The Oregon Plan also includes substantial resources for monitoring of fish populations.

As another example, the Lower Columbia River Plan provides a multipronged approach to addressing recovery of native anadromous salmonids. [7] The Plan's overarching strategies include focusing on tributary habitat, the hydroelectric system, hatcheries and predation through identifying and prioritizing protection and recovery of high quality and degraded habitat, implementing the federal Columbia River Biological Opinion, and reducing pinniped predation at Bonneville Dam.  Addressing tributary habitat includes addressing irrigation practices, impaired fish passage at dams, and agricultural toxins, just as examples. Similarly, the federal Recovery Plans for fish listed under the Endangered Species Act address culverts and fish passage as just one of multiple actions needed for recovery.  *See, e.g.*, Puget Sound Recovery Plan (noting the top ten actions needed for salmon, including addressing floodplains, water quality and harvest management, in addition to fish access).[8]

---

[7]    Available at: http://www.dfw.state.or.us/fish/CRP/lower_columbia_plan.asp

[8]    Executive Summary, recovery plan and other recovery plans available at http://www.nwr.noaa.gov/protected_species/salmon_steelhead/recovery_planning_and_implementation/recovery_plans_supporting_documents.html

In short, Oregon's experience— like Washington's—demonstrates that effectively preserving and restoring salmon runs requires taking a thoughtful, comprehensive, science-based approach. It requires diverse stakeholders to make careful and deliberate decisions about how and where to devote finite resources. And it requires scientists and policy makers to make those decisions based on experience and data.

The district court's injunctive remedy does none of those things. As Dr. Jeffrey Koenings, former Director of Washington Department of Fish and Wildlife, testified in the district court,

> ***[I] n my opinion, wild salmon can thrive on a sustainable basis only if we support them through their entire lifecycle, in a "gravel-to-gravel," science-based approach to recovery. The public's financial resources are limited *** it would be a mistake to focus narrowly on only one factor affecting salmon, such as state-owned fish-blocking culverts. If juvenile salmon cannot find functional shelter in the estuary as they adapt to salt water, they die – as was determined for the Skagit River. If they cannot find cool, unpolluted freshwater for migration and spawning, they die – as was determined for the Fraser River. If adult salmon are caught in excessive rates, the stock will not recover – as was determined for the Nooksack spring Chinook. If hatchery-origin salmon spawn at excessive rates with wild fish, the stocks suffer genetic harm. Fixing state-owned culverts alone will do little to solve these other, very real, bottlenecks to recovery.
>
> *** In my opinion, our goal should be to address all factors on parallel tracks to the extent we can, including fish passage barriers. If we funnel inordinate amounts of money into fixing state-owned culverts while ignoring how they fit into the whole picture of the salmon life cycle, we will surely create

choke points in other places, possibly prolonging salmon recovery."

ER 737-738.

Considered in the light of the complexities inherent in a state-wide program for salmon recovery, the district court's analysis of the proper remedy in this case was far too simple. The district court concluded that removing barriers to fish passage was "the highest priority for restoring salmon habitat in the case area." ER 28. But the record does not support that finding. More importantly, the court's very reasoning betrays a misapprehension about the complex nature of salmon recovery. Removing particular barriers certainly can be a high priority, but the extent to which any particular barrier is a priority depends entirely on the circumstances, and the extent to which other strategies might be more cost effective. That is precisely why Oregon (like Washington) inventories and assesses particular barriers and prioritizes their removal based on scientific data. For that reason, the district court's conclusion that barrier removal is, or should be, categorically a higher priority than other strategies is fundamentally misguided. Yet because of that misguided approach, the court ordered injunctive relief focused solely on culverts. It ordered that relief heedless of the fact that the cost of the injunction is so expensive that it will inevitably reduce funding available for Washington's other salmon restoration efforts. *See Horne v. Flores*, 557 U.S. at

448 (2009) ("When a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs.").

Oregon, like Washington, is committed to the recovery of salmon populations. As discussed above, scientists and policy makers in both states have been working for many years to research and develop comprehensive state-wide salmon recovery plans, and both states have invested millions of dollars in implementing those plans. Yet the district court's order in this case not only fails to afford any deference to the state's considerable expertise in this complex area; indeed, it also blithely orders Washington to divert hundreds of millions of dollars to the replacement of culverts without any scientific evidence regarding the effect that particular strategy, as opposed to others, will ultimately have on fish runs. By failing to give any deference to Washington's expertise in salmon restoration and without due regard for Washington's sovereign authority to control its budget, the injunctive remedy was an abuse of discretion. Even if this court upholds the district court's interpretation of the Stevens Treaties, therefore, it should reverse the district court's injunction.

## CONCLUSION

The State of Oregon shares in the Tribes' desire to restore and preserve salmon habitat. However, the district court's order misconstrues the treaties and would defeat rather than advance that purpose. The district court's orders should be reversed.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General
ANNA M. JOYCE
Solicitor General


/s/ Stephanie L. Striffler
_____
STEPHANIE L. STRIFFLER
Senior Assistant Attorney General
stephanie.striffler@doj.state.or.us
MICHAEL A. CASPER
Deputy Solicitor General
michael.a.casper@doj.state.or.us

Attorneys for Amicus Curiae
State of Oregon

SLS:bmg/4677846

CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7), Federal Rules of Appellate Procedure, I certify that the Appellee's Brief is proportionately spaced, has a typeface of 14 points or more and contains 3,743 words.

DATED: October 15, 2013

/s/ Stephanie L. Striffler
_____
STEPHANIE L. STRIFFLER
Senior Assistant Attorney General
stephanie.striffler@doj.state.or.us
Attorney for Amicus Curiae

SLS:bmg/4677846

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2013, I directed the Brief of Amicus Curiae the State of Oregon In Support of Appellant State of Washington and Supporting Reversal to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Cristina Carole Cushman
Nisqually Indian Tribe
Office of Tribal Attorney
4820 She-Nah-Num Drive S.E.
Olympia, WA 98513

Raymond G Dodge Jr.
Quinault Indian Nation
Tribal Attorney
P.O. Box 189
Taholah, WA 98587

Connie Sue Martin
Schwabe Williamson & Wyatt, PC
Suite 3400
1420 Fifth Avenue
Seattle, WA 98101

Fawn R. Sharp
Quinault Indian Nation
Tribal Attorney
P.O. Box 189
Taholah, WA 98587

/s/ Stephanie L. Striffler
_____
STEPHANIE L. STRIFFLER
Senior Assistant Attorney General
Attorney for Amicus Curiae

SLS:bmg/4677846