Nos. 13-35474; 13-35519
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

UNITED STATES OF AMERICA, et al.,

*Plaintiffs-Appellees*,

v.

STATE OF WASHINGTON,

*Defendant-Appellant.*
_____

On Appeal from the U.S. District Court for the
Western District of Washington (Ricardo S. Martinez, J.)
Case No. CV-70-9213 401 WJ/LFG
_____

**ANSWERING BRIEF OF THE
UNITED STATES OF AMERICA, APPELLEE**
_____

ROBERT G. DREHER
 Acting Assistant Attorney General

DAVID C. SHILTON
VANESSA BOYD WILLARD
EVELYN S. YING
 Attorneys, U.S. Department of Justice
 Environment & Natural Resources Division
 P.O. Box 7415
 Washington, DC 20044
 (202) 514-4786
 evelyn.ying@usdoj.gov

## TABLE OF CONTENTS

**PAGE**

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF THE ISSUES..........................................................1

STATEMENT OF THE CASE............................................................1

    I.     The Right to Take Fish under the Stevens Treaties ..............................1

    II.    Course of Proceedings...........................................................3

          A.    United States v. Washington.......................................3

          B.    Culverts Subproceeding ...........................................6

                   1.    Waiver and Counterclaims ...........................7

                   2.    Summary Judgment .......................................7

                   3.    Memorandum Order & Injunction...............7

SUMMARY OF ARGUMENT ...........................................................11

STANDARD OF REVIEW .............................................................13

ARGUMENT .......................................................................13

    I.     THE TREATY FISHING RIGHT ENCOMPASSES A DUTY ON THE STATE NOT TO IMPAIR THAT RIGHT BY BUILDING AND MAINTAINING CULVERTS THAT RESTRICT FISH ACCESS AND REDUCE FISH AVAILABLE FOR TRIBAL HARVEST.........................................................13

          A.    The District Court's Declaratory Judgment Properly Gives Meaning and Effect to the Tribes' Reserved "Right of Taking Fish"...............................................14

i

1.   The Tribes understood, and the United States intended, the Treaties to secure the Indians' right to take fish to provide for their livelihood forever .........15

2.   The district court's declaratory judgment is supported by decisions of the Supreme Court and this Court giving meaning to the Tribes' treaty fishing rights ........21

3.   The State's position that the Tribes failed to bargain for necessary protections for their right to take fish finds no support in the Treaties or precedent ..........25

B.   The Treaties Do Not Provide Protection of the Fish Resource Only When the State Discriminates Against the Tribes ...........30

C.   The District Court's Declaratory Judgment Satisfies the Requirements Set by this Court in its *Phase* II *En Banc* Decision ...................................................................................35

II.   THE DISTRICT COURT PROPERLY DISMISSED THE STATE'S WAIVER DEFENSE ........................................................38

III.   THE DISTRICT COURT PROPERLY DISMISSED THE COUNTERCLAIMS ...............................................................42

IV.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY GRANTING RELIEF NECESSARY TO REDRESS INJURY CAUSED BY THE TREATY VIOLATIONS ..................................47

A.   The District Court Has Broad Authority To Assure Treaty Compliance ...........................................................................48

B.   The District Court Did Not Issue an Overbroad Injunction or Otherwise Abuse Its Discretion...........................................52

CONCLUSION.....................................................................................55

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:** **PAGE**

*Agua Caliente Band of Cahuilla Indians v. Hardin*,
  223 F.3d 1041 (9th Cir. 2000) ........................................................38

*Anderson v. Holy See*,
  878 F. Supp. 2d 923 (N.D. Ill. 2012)............................................40

*Arizona v. California*,
  373 U.S. 546 (1963).......................................................................24

*Armstrong v. Schwarzenegger*,
  622 F.3d 1058 (9th Cir. 2010) ......................................................54

*Bell v. Kellogg*,
  922 F.2d 1418 (9th Cir. 1991) ......................................................45

*Berrey v. Asarco, Inc.*,
  439 F.3d 636 (10th Cir. 2006) ...............................................44, 46

*Brown v. Plata*,
  131 S. Ct. 1910 (2011)...................................................................51

*Cayuga Indian Nation of N.Y. v. Pataki*,
  413 F.3d 266 (2d Cir. 2005) .....................................................41, 42

*Choctaw Nation of Indians v. United States*,
  318 U.S. 423 (1943).................................................................17, 26

*City of Sherrill v. Oneida Indian Nation of New York*,
  544 U.S. 197 (2005).................................................................40, 41

*Cramer v. United States*,
  261 U.S. 219 (1923).......................................................................39

*Danning v. United States*,
  259 F.2d 305 (9th Cir. 1958) ........................................................43

iv

*Department of Game of Wash. v. Puyallup Tribe*,
    414 U.S. 44 (1973).............................................................................4, 23, 31

*FDIC v. Hulsey*,
    22 F.3d 1472 (10th Cir. 1994) ....................................................................46

*Frederick v. United States*,
    386 F.2d 481 (5th Cir. 1967) .................................................................43, 47

*Greenwood v. F.A.A.*,
    28 F.3d 971 (9th Cir. 1994) ........................................................................38

*Holloman v. Watt*,
    708 F.2d 1399 (9th Cir. 1983) ....................................................................44

*Idaho v. Coeur d' Alene Tribe of Idaho*,
    521 U.S. 261 (1997)....................................................................................38

*Lee v. Schweiker*,
    739 F.2d 870 (3d Cir. 1984) .......................................................................46

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
    526 U.S. 172 (1999)....................................................................................39

*Muckleshoot v. Hall*,
    698 F. Supp. 1504 (W.D. Wash. 1988) ......................................................22

*Nez Perce Tribe v. Idaho Power Co.*,
    847 F. Supp. 791 (D. Idaho 1994)....................................................29, 32, 33

*Oklahoma Tax Comm'n v. Chickasaw Nation*,
    515 U.S. 450 (1995)....................................................................................29

*Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe*,
    473 U.S. 753 (1985)....................................................................................29

*Pine River Logging and Improvement Co. v. United States*,
    186 U.S. 279 (1902) ...................................................................................39

*Puget Sound Gillnetters Ass'n v. Dist. Court for Western Dist. of Wash.*,
    573 F.2d 1123 (9th Cir. 1978) ...................................................................49

*Puyallup Tribe v. Dep't of Game of Wash.*,
    391 U.S. 392 (1968)...................................................................4, 23, 31

*Puyallup Tribe v. Dep't of Game of Wash.*,
    433 U.S. 165 (1977)...................................................................4, 23

*Seufert Bros. Co. v. United States*,
    249 U.S. 194 (1919)...................................................................4, 17

*Skokomish Indian Tribe v. United States*,
    410 F.3d 506 (9th Cir. 2005) (*en banc*)........................................29

*Stone v. City and County of San Francisco*,
    968 F.2d 850 (9th Cir. 1992) .......................................................51

*Tulee v. Washington*,
    315 U.S. 681 (1942)...................................................................4, 17

*United States v. Adair*,
    723 F.2d 1394 (9th Cir. 1983) .....................................................24

*United States v. Agnew*,
    423 F.2d 513 (9th Cir. 1970) .......................................................44

*United States v. Ahtanum Irrigation Dist.*,
    236 F.2d 321 (9th Cir. 1956) .................................................39, 40

*United States v. City of Tacoma, Wash.*,
    332 F.3d 574 (9th Cir. 2003) .......................................................40

*United States v. Dion*,
    476 U.S. 734 (1986).....................................................................39

*United States v. United States Fidelity & Guaranty Co.*,
    309 U.S. 506 (1940).....................................................................43

*United States v. Washington* (*Washington II*),
    506 F. Supp. 187 (W.D. Wash. 1980) ..............................................................4

*United States v. Washington*,
    157 F.3d 630 (9th Cir. 1998) ..................................................2, 17, 18, 40, 42

*United States v. Washington* (*Washington I*),
    384 F. Supp. 312 (W.D. Wash. 1974) ....................................................passim

*United States v. Washington*,
    520 F.2d 676 (9th Cir. 1975) ...........................................................4, 15, 49

*United States v. Washington*,
    694 F.2d 1374 (9th Cir. 1982) ..................................................................5, 33

*United States v. Washington*,
    759 F.2d 1353 (9th Cir. 1985) (*en banc*)................................................passim

*United States v. Winans*,
    198 U.S. 371 (1905)..............................................................................passim

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) ....................................................................47

*Warth v. Seldin*,
    422 U.S. 490 (1975)....................................................................................45

*Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n.*,
    443 U.S. 658 (1979)...............................................................................passim

*Winters v. United States*,
    207 U.S. 564 (1908).............................................................................16, 24

**STATUTES:**

Administrative Procedure Act:
    5 U.S.C. § 702................................................................................................43

**MISCELLANEOUS:**

Blumm & Swift, The Indian Treaty Piscary Profit and Habitat Protection in
the Pacific Northwest:  A Property Rights Approach, 69 U. Colo. L.
Rev. 407 (1998) ...........................................................................................25

Brief of State of Washington filed in *Washington v. Washington State Commercial
Passenger Fishing Vessel Ass'n*, 1978 WL 223364 (1978) .........................49

# GLOSSARY

| | |
|---|---|
| CL | Conclusions of Law |
| ER | Excerpts of Record for Appellant State of Washington |
| FF | Findings of Fact |
| RFD | Request for Determination |
| State | State of Washington |
| Stevens Treaties or Treaties | Treaty of Medicine Creek, December 26, 1854 (10 Stat. 1132); Treaty of Point Elliott, January 22, 1855 (12 Stat. 927); Treaty of Point No Point, January 26, 1855 (12 Stat. 933); Treaty with the Makah, January 31, 1855 (12 Stat. 939); Treaty of Olympia, July 1, 1855 (12 Stat. 971) |
| Tribes | Confederated Tribes and Bands of the Yakama Indian Nation, Hoh Tribe, Jamestown S'Klallam Tribe, Lower Elwha Bank of Klallams, Lummi Indian Nation, Makah Indian Tribe, Muckleshoot Indian Tribe, Nisqually Indian Tribe, Nooksack Indian Tribe, Port Gamble Band Clallam, Puyallup Tribe, Quileute Indian Tribe, Quinault Indian Nation, Sauk-Suiattle Tribe, Skokomish Indian Tribe, Squaxin Island Tribe, Stillaguamish Tribe, Suquamish Indian Tribe, Swinomish Indian Tribal Community, Tulalip Tribes and Upper Skagit Indian Tribe |
| WDFW | Washington Department of Fish and Wildlife |
| WDNR | Washington Department of Natural Resources |
| WSDOT | Washington State Department of Transportation |

## STATEMENT OF JURISDICTION

The United States agrees with Appellant's Jurisdictional Statement.

## STATEMENT OF THE ISSUES

1.  Whether the district court correctly held that the Tribes' "right of taking fish" at all usual and accustomed fishing areas reserved in the Stevens Treaties imposes a duty on the State to refrain from building or maintaining culverts that block passage of anadromous fish to and from those areas and diminish fish populations available for tribal harvest.

2.  Whether the district court properly dismissed the State's equitable defenses and counterclaims against the United States.

3.  Whether an injunction requiring the timely elimination of State barrier culverts was an abuse of discretion.

## STATEMENT OF THE CASE

**I.      The Right to Take Fish under the Stevens Treaties.**

In 1854 and 1855, the plaintiff Indian Tribes ("Tribes") of what is now western Washington State entered into the Stevens Treaties ("Treaties") under which they relinquished their right to most of their territory in exchange for periodic monetary payments, small parcels of land set aside for their exclusive use, and certain other guarantees, including the reservation of their aboriginal fishing rights throughout their ceded lands in western Washington.  In essentially identical

1

language, each of the Treaties provided: "The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory[.]" ER44-45 (Treaty of Point Elliott, Art. III).

Both the United States and the Tribes viewed the reservation and protection of the Tribes' fishing rights on the ceded lands as essential elements of the Treaties. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n.*, 443 U.S. 658, 669 (1979) ("*Fishing Vessel*"). From time immemorial, the Tribes have used and relied on fish for commercial, subsistence, and ceremonial purposes. *See id.* Fishing was "not much less necessary to the existence of the Indians than the atmosphere they breathed." *United States v. Winans,* 198 U.S. 371, 381 (1905); *United States v. Washington*, 157 F.3d 630, 639 (9th Cir. 1998) ("*Washington Shellfish")*. The United States Treaty negotiators, under the leadership of Governor Stevens, were well aware of "the vital importance of the fisheries" to the Tribes. *Fishing Vessel*, 443 U.S. at 666. Thus, while their objective in entering the Treaties was to extinguish the Tribes' title to the lands in western Washington, the Treaty negotiators recognized the necessity of preserving the Indians' right to take fish and that the Tribes were invited by them "to rely and in fact did rely heavily on the good faith of the United States to protect that right." *Id.* at 667 & n.11 (Stevens assured the Indians that "[t]his paper secures your fish").

2

Fish were exceptionally abundant and were considered inexhaustible at Treaty time. Hence, the United States negotiators believed that preserving the Tribes' off-reservation fishing rights would not interfere with the rights of non-Indians or Indians. There is nothing in the written records of Treaty discussions with the Indians to indicate that "the Indians were told that their existing fishing activities or tribal control over them would in any way be restricted or impaired by the treaty" beyond their obligation to permit non-Indians "to take fish at the Indian fishing locations along with the Indians." *Id.* at 668 n.12.

## II. Course of Proceedings.

As the quantity and availability of fish, in particular salmon and other anadromous fish, have diminished, the meaning of the Indians' Treaty right to take fish under the Treaties has become increasingly critical.

### A. United States v. Washington.

In 1970, the United States, on its own behalf and as trustee for several of the Tribes, sued the State of Washington ("State") in federal district court, seeking declaratory and injunctive relief under the Treaties' fishing rights clause. The district court (Senior Judge Boldt) separated the claims into two phases.

In *Phase I*, the district court established the locations of the Tribes' "usual and accustomed" fishing grounds and held that the Tribes could take up to 50% of the harvestable fish from those grounds. *United States v. Washington,* 384 F.

3

Supp. 312, 327 (W.D. Wash. 1974) ("*Washington I*"), *affirmed,* 520 F.2d 676 (9th Cir. 1975). The court also issued a detailed injunction (*id.* at 423-30) and reserved jurisdiction to hear other unresolved issues arising out of the Treaties, including those it had bifurcated for later determination (*id.* at 328). The court's ruling met substantial resistance from the State and spawned numerous other lawsuits that ultimately reached the Supreme Court where the district court's interpretation of the Treaties and issuance of injunctive relief were affirmed.[1] *Fishing Vessel, supra.*

In 1976, the United States and the Tribes initiated *Phase II*, which involved two components, the "hatchery fish issue" and "the environmental issue." *United States v. Washington (Washington II),* 506 F. Supp. 187 (W.D. Wash. 1980)*; see United States v. Washington,* 759 F.2d 1353 (9th Cir. 1985) (*en banc*). The district court (Judge Orrick) granted declaratory relief on both issues. On the hatchery fish issue, the court held that the Treaty right extends to all fish taken in the Tribes' historic fishing areas, including those released into public waters from State-operated hatcheries. 506 F. Supp. at 195-202. With respect to the environmental

---

[1]     The Supreme Court's decision in *Fishing Vessel*, 443 U.S. 658 (1979), marks the seventh time that the Supreme Court has addressed the fishing clause of the Stevens Treaties. The other six cases, in chronological order, are as follows: *United States v. Winans*, 198 U.S. 371 (1905); *Seufert Bros. Co. v. United States*, 249 U.S. 194 (1919); *Tulee v. Washington*, 315 U.S. 681 (1942); *Puyallup Tribe v. Dep't of Game of Wash.*, 391 U.S. 392 (1968) (*Puyallup I*); *Dep't of Game of Wash. v. Puyallup Tribe*, 414 U.S. 44 (1973) (*Puyallup II*); *Puyallup Tribe v. Dep't of Game of Wash.*, 433 U.S. 165 (1977) (*Puyallup III*).

issue, the court held that the Treaties impose on the State a duty "to refrain from degrading the fish habitat to an extent that would deprive the tribes of their moderate living needs." *Id.* at 208.

Upon appeal, this Court initially upheld the district court's judgment, but modified the court's ruling on the habitat issue. *See United States v. Washington,* 694 F.2d 1374 (9th Cir. 1982). Subsequently, this Court granted rehearing and vacated the *Phase II* panel decision. In a per curiam opinion, the *en banc* panel affirmed the district court's judgment on the hatchery issue, determining that equitable considerations and *Fishing Vessel's* ruling that the Tribes are entitled to an "adequate supply of fish" under the Stevens Treaties support the inclusion of hatchery fish in the Tribes' allocation. 759 F.2d at 1358-60. The *en banc* panel, however, vacated the district court's declaratory judgment on the environmental issue concluding that it was "contrary to the exercise of sound judicial discretion" to declare the existence of a right of habitat protection absent a dispute with concrete facts and a factually specific demand for relief. *Id.* at 1357-58; *see* ER48-49. While this Court did not reject the district court's analysis on Treaty-based rights, it explained that the legal standards that will govern the State's precise duties "will depend for their definition and articulation upon concrete facts which underlie a dispute in a particular case." *Id.* at 1357. The Court further explained:

> The State of Washington is bound by the treaty. If the State acts for
> the primary purpose or object of affecting or regulating the fish supply

5

or catch in noncompliance with the treaty as interpreted by past decisions, it will be subject to immediate correction and remedial action by the courts. In other instances, the measure of the State's obligation will depend for its precise legal formulation on all of the facts presented by a particular dispute.

*Id.; see* ER49 n.5 (noting that neither the per curiam opinion nor any of the concurring or dissenting opinions rejected a right of habitat protection for the fishery resource arising from the Treaties).

### B. Culverts Subproceeding.

In 2001, consistent with this Court's guidance in its *en banc* decision, the Tribes filed a Request for Determination ("RFD") (similar to a complaint) in the instant subproceeding, seeking declaratory and injunctive relief against the State for its actions in noncompliance with the Treaties. The Tribes, joined by the United States, sought to enforce a Treaty-based duty on the State to "refrain from diminishing, through the construction or maintenance of culverts under State owned roads and highways, the number of fish that would otherwise return to or pass through the tribes' usual and accustomed fishing grounds and stations, to the extent that such diminishment would impair the tribes' ability to earn a moderate living from the fishery." ER1013-14; *see* ER1008-21 (Tribes' RFD); 1002-07 (US' Response to Tribes' RFD).[2]

---

[2] The United States' Response further explained that those "culverts that are designed, built, and maintained consistent with the current best available design and engineering standards relating to the passage of fish under highways would not

6

**1. Waiver and Counterclaims.** In 2001, the United States moved to dismiss counterclaims and defenses asserted by the State. The district court granted judgment, striking the defenses alleged by the State. ER69-82. The court originally denied the motion to dismiss the State's cross-request alleging counterclaims against the United States, but upon reconsideration, granted the motion. ER80-82, 69-79. The State then moved for leave to file an amended answer asserting the same and additional counterclaims against the United States. The court denied the State's motion. ER55-59.

**2. Summary Judgment.** The parties then filed cross motions for summary judgment on the Treaty-rights issue. On August 23, 2007, the district court ruled on the motions, finding in favor of the Tribes and declaring that "[t]he right of taking fish secured to the Tribes in the Stevens Treaties, imposes a duty upon the State from building or operating culverts under State-maintained roads that hinder fish passage and thereby diminish the number of fish that would otherwise be available for Tribal harvest" and that "the State of Washington currently owns and operates culverts that violate this duty." ER54.

**3. Memorandum Order & Injunction.** The district court held a seven-day bench trial on the appropriate remedy in October 2009, heard final argument in

_____

be subject to the injunction as they would not appreciably degrade the fishery, thereby limiting the ability of the plaintiff-Tribes to earn a moderate living from the fishery." ER1006.

June 2010, and issued its final memorandum order and permanent injunction on March 29, 2013. ER1 (Injunction); ER8 (Memorandum and Decision).

The district court's findings of fact ("FF") describe how the State has for many years recognized the critical importance to salmon recovery efforts of addressing culverts that block fish passage. ER16-23, 27-28. Improperly designed culverts have resulted in the loss of spawning and rearing habitat, both by blocking actual passage of fish and by causing other negative effects on streams. ER30-31. The court found that "[c]orrection of fish passage barrier culverts is a cost-effective and scientifically sound method of salmon habitat restoration" that "provides immediate benefit in terms of salmon production * * *." ER34, FF38. However, while the Washington Department of Fish and Wildlife ("WDFW") and Washington Department of Natural Resources ("WDNR") had determined to correct barrier culverts in their respective jurisdictions by July 2016, "[t]he State currently has set no deadline for the Washington State Department of Transportation ("WSDOT") to correct all of its barrier culverts." ER22, FF3.91; *see also* ER23. At the rate the State was addressing those barrier culverts, "it would take the State more than 100 years to replace the 'significantly blocking' WSDOT barrier culverts that existed in 2009." ER32, FF28; *see also* ER36, FF45 ("Only four of the twenty-four fish passage barriers corrected by WSDOT in 2009-2011 were among the 163 culverts identified by the State for priority correction").

8

The district court also issued conclusions of law ("CL"), including that: (1) "[w]here culverts block passage of fish such that adult salmon cannot swim upstream to spawn and juveniles cannot swim downstream to reach the ocean, those blocked culverts are directly responsible for a demonstrable portion of the diminishment of the salmon runs," ER40, CL9; (2) "[t]he depletion of salmon stocks and the resulting diminished harvests have harmed the Tribes and the individual members economically, culturally, and personally," and that "[t]he Tribes have demonstrated, as set forth above in Findings of Fact 6-14, that they have suffered irreparable injury in that their Treaty-based right of taking fish has been impermissibly infringed," ER40-41, CL10, 14; (3) "[d]espite past State action, a great many barrier culverts still exist, large stretches of potential salmon habitat remain empty of fish, and harvests are still diminished," ER41, CL15; (4) "State action in the form of acceleration of barrier correction is necessary to remedy this decline in salmon stocks and remove the threats which face the Tribes," noting also that "[t]he State has the financial ability to accelerate the pace of barrier correction" and that "[u]nder state and federal law, barrier culverts must be corrected in any case," ER41, CL17; and (5) that it was in the public interest to accelerate the pace of barrier corrections, because all fishermen will benefit from the increased production of salmon and the general public will benefit from the

9

enhancement of habitat, as well as the increased economic return from fishing, ER42, CL18.

The court accordingly found it appropriate to grant the permanent injunction requested by the Tribes and the United States. The injunction requires the State to prepare a list of culverts under State-owned roads within the case area that are salmon barriers, using methodology compiled by WDFW. ER2 ¶2. It requires that WDFW, WDNR and Washington State Parks shall provide fish passage in accordance with the standards set out in the injunction at each barrier culvert on the list located on lands owned or managed by those agencies by October 31, 2016. ER3 ¶5. WSDOT is enjoined to provide fish passage "[w]ithin 17 years of the date of this injunction," though it may defer correction of some culverts that would otherwise be subject to the injunction if certain conditions are met. ER3, ¶6. The standards for fish passage, which are based on a generally-recognized methodology described in a WDFW publication, are found at paragraph 9, while paragraph 10 sets out "rare circumstances" where the State may deviate from those standards. ER4-5. The district court retained continuing jurisdiction over the matter "for a sufficient period to assure that the Defendants comply with the terms of this injunction." ER5, ¶14.

10

## SUMMARY OF ARGUMENT

Almost thirty years after this Court's *Phase II* decision, this case addresses the question of how the Stevens Treaties, insofar as they reserved off-reservation fishing rights, should be implemented where State culverts block the passage of anadromous fish to and from the Tribes' usual and accustomed fishing places and significantly reduce salmon populations available for tribal harvest. Looking to the historical evidence and tribal dependence on fishing, both for subsistence and commercial purposes, the Supreme Court found it inconceivable that either party to the Treaties agreed to authorize future settlers to crowd the Indians out of any meaningful use of their accustomed places to fish. The "right of taking fish" in the Treaties, well established as a reservation of the Tribes' pre-existing rights, requires that Indian fishing at these places be given special protection, which cannot be reconciled with State barrier culverts impermissibly interfering with the Tribes' right of taking fish and ability to sustain a livelihood from their fisheries. The district court's declaration of the Treaty right imposing a duty on the State to refrain from building or maintaining fish-blocking culverts is wholly consistent with the Treaty language, the historical intent and understanding of the signatory parties, and the many decisions of the Supreme Court and this Court addressing the Treaties' fishing rights clause.

11

The State's attempt to assert a defense of waiver to the claims of Treaty violations was properly rejected, because it is well established that when the United States sues in its capacity as a trustee for Tribes it is not subject to a defense of waiver based on the actions of its agents purportedly approving the Treaty violations. Likewise, the State's counterclaims against the United States were properly dismissed because they sought affirmative relief without a waiver of sovereign immunity, and plainly did not qualify as claims for recoupment.

The State does not question that some injunctive relief would be appropriate to redress the injury caused by the Treaty violations, but challenges the scope of the relief granted, claiming that the district court failed to consider federalism principles and granted relief that was broader than necessary. Prior decisions in this case by the Supreme Court and this Court show that the State is mistaken in contending that the district court was required to analyze federalism principles before issuing injunctive relief to redress the State's violations of the Stevens Treaties. Those cases also show that the district court has wide latitude to craft an effective remedy for the Treaty violations. The relief granted here was not overly intrusive in any event. It simply requires the State to address the matter of barrier culverts, which the State itself recognizes is a serious problem in need of attention, on a reasonable schedule necessary to ensure that the State acts expeditiously to correct a situation that violates the Treaty promises.

12

## STANDARD OF REVIEW

The State's and Tribes' briefs adequately set forth the applicable standard of review for the issues on appeal.

## ARGUMENT

## I. THE TREATY FISHING RIGHT ENCOMPASSES A DUTY ON THE STATE NOT TO IMPAIR THAT RIGHT BY BUILDING AND MAINTAINING CULVERTS THAT RESTRICT FISH ACCESS AND REDUCE FISH AVAILABLE FOR TRIBAL HARVEST.

In this subproceeding, the Tribes, joined by the United States, sought judicial relief from State actions infringing Treaty fishing rights in a particular factual context as directed by this Court in its *Phase II* decision. Contrary to the State's claims, the Tribes and the United States did not seek a new and broad right of habitat protection implied by the Treaties, but simply a declaration of the State's obligations with respect to the Tribes' Treaty-secured "right of taking fish" in the context of concrete facts presented by State barrier culverts blocking fish passage to and from the Tribes' usual and accustomed fishing places.

More specifically, the Tribes sought a declaration that: (1) so long as they are not attaining a moderate living from their fisheries, the Stevens Treaties prohibit the State from constructing and maintaining culverts that restrict fish access and reduce the number of fish available for tribal harvest; and (2) State barrier culverts as currently designed, built and operated have violated their fishing rights under the Treaties.

13

As we explain below, the district court's interpretation of the Treaty right to impose a duty on the State to refrain from degrading the fishery resource with its barrier culverts is fully supported by the historical context and understanding of the parties during the negotiation of the Treaties, well-established treaty interpretation principles, and the decisions of the Supreme Court and this Court over the decades which have given meaning and effect to the Tribes' "right of taking fish" bargained for, and secured, in the Treaties.

**A.      The District Court's Declaratory Judgment Properly Gives Meaning and Effect to the Tribes' Reserved "Right of Taking Fish."**

The State contends (Br. 25-32) that the Treaty right "finds no basis in the plain language or historical interpretation of the treaties" and that absent an express reservation that prohibits the State from blocking fish runs with its culverts, the Treaties cannot be "rewritten or expanded" beyond their plain terms to remedy the claimed injustice in this case. The State's arguments lack merit.

As the district court recognized, the source of the declared right in this case is the Treaty language assuring a "right of taking fish" to the Indians at all usual and accustomed fishing grounds. ER47, 54. "[I]importance should be given to the Indians' likely understanding of the * * * words in the treaties and especially the reference to the "'right of *taking* fish,'" *Fishing Vessel,* 443 U.S. at 678 (emphasis in original). As the Supreme Court explained:

14

> This language is particularly meaningful in the context of anadromous fisheries—which were not the focus of the common law—because of the relative predictability of the "harvest." In this context, it makes sense to say that a party has a right to "take"—rather than merely the "opportunity" to catch—some of the large quantities of fish that will also certainly be available at a given place at a given time.

*Id.* Fishing was "not much less necessary to the existence of the Indians than the atmosphere they breathed," and therefore this right was reserved by the Treaties, pursuant to which the Indians retained all rights not expressly granted. *Winans,* 198 U.S. at 381 ("the treaty was not a grant of right to the Indians, but a grant from them—a reservation of those not granted").

As this Court held in affirming *Washington I,* "neither the treaty Indians nor the state on behalf of its citizens may permit the subject matter of these treaties to be destroyed." *United States v. Washington*, 520 F.2d 676, 685 (9th Cir. 1975); *see Washington I*, 384 F. Supp. at 401. Here, the district court properly concluded that the right of taking fish secured in the Treaties and "assurances [made to the Tribes] would only be meaningful if they carried the implied promise that neither the negotiators nor their successors would take actions that would significantly degrade the resource." ER53.

### 1. The Tribes understood, and the United States intended, the Treaties to secure the Indians' right to take fish to provide for their livelihood forever.

The State articulates (Br. 27-29) the principal purpose of the Treaties as opening up the land to settlement, citing only to the cession clause of the Treaties,

and then proposing that the right declared by the district court is contrary to that single purpose and the plain language of the Treaties. The State's argument is based on a one-sided, narrow interpretation of the Treaties that is inconsistent with well-established principles of treaty interpretation involving Indians and with the intent of the signatory parties, as well as inconsistent with the nature of reserved tribal rights. It also fails to recognize a century of Supreme Court precedent beginning with *Winans* that the pre-existing fishing right reserved in the Treaties continues against the State and its grantees, as well as the United States, 198 U.S. at 381-83.

As the district court recognized, the Supreme Court has long held that "it is the intention of the parties" that controls the interpretation of treaties and "[w]hen Indians are involved, this Court has long given special meaning to this rule." *Fishing Vessel,* 443 U.S. at 675; see ER50. Among other things, the State's argument disregards canons of Indian treaty construction that dictate that in construing the Treaties, one must eschew technical rules and consider how the Indians naturally would have understood the promise made, resolving doubts in their favor. *Id.* at 676; *Winans,* 198 U.S. at 380-81; *Tulee,* 315 U.S. at 684-85; *see also Winters v. United States*, 207 U.S. 564, 576-77 (1908). In other words, "treaties are construed more liberally than private agreements, and to ascertain their meaning [courts] may look beyond written words to the history of the treaty,

16

the negotiations, and the practical construction adopted by the parties." *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431-32 (1943). Accordingly, the courts have refused to adopt a restrictive reading of Indian treaty language to the prejudice of the Tribes. *See, e.g., Seufert Bros. Co. v. United States,* 249 U.S. 194, 199 (1919) (refusing to adopt view of treaty language which "would greatly restrict the comprehensive language of the treaty"); *Tulee v. Washington*, 315 U.S. 681, 684-85 (1942) (emphasizing that the court "must not give the treaty the narrowest construction it will bear"). "Courts have uniformly held that treaties must be liberally construed in favor of establishing Indian rights." *Washington Shellfish*, 157 F.3d at 643.

Contrary to the State's single-minded focus on extinguishment of the Tribes' title to land as the motivation for entering the Treaties, Governor Stevens and the other Treaty negotiators recognized the necessity of preserving the Indians' right to take fish, and the Tribes were invited by them "to rely and in fact did rely heavily on the good faith of the United States to protect that right." *Fishing Vessel,* 443 U.S. at 667. "During the negotiations, the vital importance of the fish to the Indians was repeatedly emphasized by both sides, and the Governor's promises that the treaties would protect that source of food and commerce were crucial in obtaining the Indians' assent." *Id.* at 676.

17

Indeed, as the district court found here, Stevens "assured the Tribes of their continued access to their usual fisheries" and "that they would be able to feed themselves and their families forever." ER9. "I want that you shall not have simply food and drink now but that you may have them forever." *Id.;* ER53; *see* ER969-70; *see also* 443 U.S. at 666-68 & n.9. Stevens told the Tribes that "this paper secures your fish." 443 U.S. at 667 n.11. During the negotiations, the United States repeatedly assured the Indians that they would continue to enjoy a permanent right to fish as they always had in the places where they always had, and there is no indication in any written records that the Indians were ever told that they would be excluded from any of their ancient fisheries. *See Washington Shellfish,* 157 F.3d at 649. As the district court found, the Tribes understood, and the United States intended, that with their reserved fishing right, the Treaty Indians would be able to meet their continuing needs for subsistence and trade from fisheries forever and not become a burden on the treasury. ER51-52; *see* ER9-10, 963-77; *Washington I*, 384 F. Supp. at 355-58.

After analyzing this historical context and the parties' intentions and understanding, Judge Boldt in *Washington I* aptly summed up the meaning of the Stevens Treaties' right of taking fish:

> The right secured by the treaties to the Plaintiff tribes is a reserved right, which is linked to the marine and freshwater areas where the Indians fished during treaty times, and which exists in part *to provide a volume of fish which is sufficient to the fair needs of the tribes*. The

18

right is to be exercised in common with non-Indians, who may take a share which is fair by comparison with the share taken by the tribes. *Neither the Indians nor the non-Indians may fish in a manner so as to destroy the resource or to preempt it totally*.

384 F. Supp. at 401 (emphasis added). The Supreme Court in *Fishing Vessel* conducted a similarly detailed analysis of the Treaty right and came to essentially the same conclusion:

> The purport of our cases is clear. *Nontreaty fishermen may not rely on property law concepts, devices such as the fish wheel, license fees, or general regulations to deprive the Indians of a fair share of the relevant runs of anadromous fish in the case area.* Nor may treaty fishermen rely on their exclusive right of access to the reservations to destroy the rights of other "citizens of the Territory." *Both sides have a right, secured by treaty, to take a fair share of the available fish.* That, we think, is what the parties to the treaty intended when they secured to the Indians the right of taking fish in common with other citizens.

443 U.S. at 684-85 (emphasis added). As the Court recognized in *Fishing Vessel*, the Indians are entitled not only to a share of the fishery, but that share must satisfy the demands of fundamental fairness. *See id.* at 682-85. The Court went on to hold that a "fair share" of the fish meant that the Indians were entitled to a maximum of 50% of the available harvest to provide them with "a livelihood—that is to say, a moderate living," with that share subject to reduction if tribal needs could be satisfied by a lesser amount. *Id.* at 685-87.[3]

---

[3] The State did not raise any defense here that the Tribes are not entitled to any relief because they are exceeding a moderate living from fishing. As the district court properly concluded, there is no need to define the term "moderate

Therefore, as this Court acknowledged in its *Phase II* decision, *Fishing Vessel* concluded that the Tribes are entitled under the Treaties to an "adequate supply of fish" so long as necessary to provide them with a moderate living. *See* 759 F.2d at 1358. The "purpose and language of the treaties are unambiguous; they secure the Indians' right to take a share of each run of fish that passes through tribal fishing areas." *Fishing Vessel,* 443 U.S. at 679.

In light of the historical record, and the tribal dependence on fishing, it is inconceivable that the Tribes would have agreed to the authorization of "future settlers to crowd the Indians out of any meaningful use of their accustomed places to fish." *Id.* at 676. Meaningful use of the Tribes' fishing areas cannot be reconciled with actions by the State to block salmon runs with barrier culverts and deny the Indians their right of taking fish for their livelihood. The understanding of the Treaty parties was that the Tribes were reserving, and the United States was securing against encroachment, the right of taking fish to meet present and future tribal needs, and not "merely the chance" for them to "dip their nets" into Treaty waters and net "virtually no catch at all." *Fishing Vessel*, 443 U.S. at 679, 677

---

living" in this case. ER49-50. Indeed, the State conceded below that there is no genuine issue of material fact that the Tribes are not achieving a moderate living from fishing, s*ee* Dkt. 287 at 17 n.75; Dkt. 311 at 5, and the State has not raised on appeal any issue regarding its application to the Treaty right. In any event, the quantity of fish required for a moderate living and the tribal allocation may change, but the right to earn a moderate living from fishing is constant as an essential element of the Treaty right as interpreted by the Supreme Court.

n.22. Thus, the district court's declaration that the State cannot build or maintain culverts that block the movement of anadromous fish and diminish salmon stocks that would otherwise be available for tribal harvest is necessary to fulfill the Treaty promise that the Indians would continue to enjoy their vital fishing rights forever.[4]

> ### 2. The district court's declaratory judgment is supported by decisions of the Supreme Court and this Court giving meaning to the Tribes' Treaty fishing rights.

In reaching its conclusion regarding the Tribes' right to a fair share of fish, the Supreme Court in *Fishing Vessel* rejected the State's argument that the Treaties had guaranteed the Tribes no more than an "equal opportunity" to harvest fish with non-Indians and considered the issue to be virtually a "matter decided" by the Court's prior holdings in *Winans* and other decisions. *Id.* at 679.

---

[4]    The State misreads (Br. 28-29) this Court's statement in the *Phase II* decision that the Tribes are not "entitled to any particular minimum allocation of fish," 759 F.2d at 1359. This Court plainly did not imply by this statement that the State may leave no fish for Treaty Indians through actions that "incidentally" destroy their fisheries. To the contrary, this Court's reference to a minimum *allocation* was made in the context of *Fishing Vessel's* ruling on apportionment that the Treaties provide the Tribes with up to 50% of the harvestable fish, subject to a downward revision if moderate living needs can be met with less; the statement does not address any question regarding protection of fish under the Treaties. *See id.* The State's reliance on the *Fishing Vessel's* reference to a right to "take a fair share of the available fish," 443 U.S. at 685, is similarly misplaced. Contrary to the State's view, the Supreme Court's use of the word "available" cannot be read reasonably to mean that the State is authorized to destroy, or otherwise take, up to 100% of the fish or whatever is left over in waters rendered virtually fishless by State or non-Indian activities. Rather, the Court likely used "available" interchangeably with "harvestable" to cover fish not needed for conservation purposes. *Id.* at 670 n.15; *see* 759 F.2d at 1359.

The Court first addressed the Stevens Treaties' fishing clause in *United States v. Winans,* 198 U.S. 371 (1905). *Winans* involved a private landowner who prevented Treaty Indians from entering his land to fish in the Columbia River and who monopolized the fishery by catching salmon through the use of a State-licensed fish wheel. *See Muckleshoot v. Hall*, 698 F. Supp. 1504, 1512 (W.D. Wash. 1988) (noting that a fish wheel is "a device which would catch salmon by the ton and destroy the Indians' right to fish from one of their 'usual and accustomed' places"). The Supreme Court upheld the Indians' pre-existing reserved right of access to private property, but also confronted the "fish wheels" that effectively gave non-Indians "exclusive possession of the [tribal] fishing places," 198 U.S. at 382, as the placement of the wheel left the Tribes without any fish to catch. While the Indians had a right to fish in the area, the State-sanctioned removal of fish left that right meaningless, and therefore the Court remanded the case for the court below to devise some "adjustment and accommodation" that would protect the Indians from exclusion from the fishery. *Id.* at 384.

Similar to the circumstances in *Winans,* the barrier culverts significantly reduce salmon populations available for harvest by blocking fish movement on runs that would otherwise pass through tribal fishing areas. The culverts are structures or devices similar to the fish wheels, hindering the Tribes' access to fish needed to fulfill Treaty purposes in their traditional fishing grounds. As in *Winans,*

22

this Court should give meaning to the Treaty right by holding that the State may not "construct and use a device" that violates the purpose of the Treaties to assure the Indians their fair share of the fish. To do otherwise would render the fishing right meaningless.

The *Puyallup* cases, addressed in *Fishing Vessel,* also support the principle that the State may not frustrate Treaty rights by reducing the resource supply or limiting its availability to the Indians. In *Puyallup I,* the Court upheld the State's authority to impose nondiscriminatory regulations on Treaty fishermen only if necessary to conserve the fish. 391 U.S. at 398. In *Puyallup II,* the Court held that the State could not impose a total ban on commercial net fishing for steelhead, the manner of fishing favored by the Indians, because such regulation was not a "reasonable and necessary conservation measure" and would deny the Indians their fair share of the fishing runs, 414 U.S. at 45, 48, but also recognized that the Treaty does not allow the Tribes an untrammeled right "to pursue the last living steelhead" into their own fishing nets that would deny the non-Indians their fair share. *Id.* at 49; *see Puyallup III,* 433 U.S. at 173-77.

In giving meaning to the Treaty rights, the Court in *Fishing Vessel* also turned to decisions involving the well-established reserved water rights doctrine that sufficient water to fulfill the purposes of a reservation are impliedly reserved even where no express provision exists in a treaty. *See Fishing Vessel,* 443 U.S. at

23

684, *citing Winters v. United States*, 207 U.S. 564, 576 (1908) and *Arizona v. California,* 373 U.S. 546, 598-01 (1963). In *Winters,* the Supreme Court held that express reservation of land for the Fort Belknap Indian Reservation impliedly reserved sufficient water from the river to fulfill the purposes of the Reservation. 207 U.S. at 576-77. Accordingly, the Court upheld an injunction barring non-Indians from diverting water upstream that was required to irrigate lands on the Reservation. *Id.; see also Arizona v. California,* 373 U.S. at 598-601 (documents creating the reservations implied intent that sufficient water be reserved "to satisfy the future as well as the present needs of the Indian Reservations"); *United States v. Adair,* 723 F.2d 1394, 1408-15 (9th Cir. 1983) (treaty right to fish implied reservation of water to support tribal fisheries). Just as non-Indians may not use fish wheels to divert fish from fishing runs, nor build ditches to divert water required to fulfill the purposes of a reservation, the State cannot, consistent with the Treaties, use culverts that bar fish from their spawning and rearing grounds, leaving too few to provide Tribes a livelihood from their fisheries. The reasoning of *Winters* supports finding that a duty not to obstruct streams and exclude fish required to fulfill the purposes of the Treaties can be implied from the Treaties.[5]

---

[5]     A right of this nature would not have been a foreign concept at Treaty time. The common law has long recognized a "piscary profit a prendre," which enabled one to go on another's property and take and remove fish, and which carried with it concomitant obligations not to degrade the subject matter of the profit or to interfere with the exercise of such profit. *See generally* Blumm & Swift, The

24

3.     **The State's position that the Tribes failed to bargain for necessary protections for their right to take fish finds no support in the Treaties or precedent.**

The State contends that since fish were considered inexhaustible when the Treaties were executed, the Tribes' failure to obtain through negotiations an express restriction on future actions that might hinder or destroy fish runs precludes relief.  There is no merit to the State's claim (Br. 30-31) that because the parties failed to "negotiate for a contingency plan" should fish stocks diminish, "the treaties . . . do not guarantee protection of the resource."

First, this argument ignores the historical evidence and intent of the parties to preserve in the Treaties the Tribes' pre-existing right to take an adequate supply of fish at their usual and accustomed fishing places to maintain their livelihood. There is nothing in the written records of the Treaty proceedings indicating "'that the Indians were told that their existing fishing activities or tribal control over them would in any way be restricted or impaired by the treaty.'"  *Fishing Vessel,* 443 U.S. at 668 n.12 (quoting *Washington Phase I*, 384 F. Supp. at 357).  Rather, the only limitation on tribal fishing rights "that could be implied from the treaty context" was that the abundant supply be shared with the non-Indians.  *Id.*

Indian Treaty Piscary Profit and Habitat Protection in the Pacific Northwest:  A Property Rights Approach, 69 U. Colo. L. Rev. 407, 412 (1998) (considering habitat issue in terms of "recogniz[ing] the treaty piscary profit a prendre as a property right which includes two components:  a right to access historic tribal fishing sites and a right to have sufficient fish to provide the tribes with a moderate living").

25

Second, the State's argument again ignores well-established canons dictating that, in ascertaining the meaning of treaties, courts "may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties," *Choctaw Nation of Indians,* 318 U.S. at 431-32, and must liberally construe such treaties in favor of establishing Indian rights," *Washington Shellfish,* 157 F.3d at 643. More fundamentally, the State fails to acknowledge that the "treaty is not a grant of rights to the Indians, but a grant of rights from them—a reservation of those not granted," *Winans,* 198 U.S. at 381, and thus silence implicates a reservation of rights.

When the Treaties were executed, the parties considered the fish supply to be abundant and inexhaustible and while "[t]he contingency of the future ownership of the lands * * * was foreseen and provided for," 443 U.S. at 680, the parties did not realize that as a result of extensive development, aided by discriminatory regulation of the State, the Indian share, as well as the actual amount of fish taken by the Tribes, would decline to relative insignificance. *Id.* at 668-76, 677 n.22. Those developments, although unforeseen, cannot alter the nature of the reserved Treaty rights or the promises made to the Indians. The Tribes were promised that, in return for ceding their aboriginal lands and with it a nomadic way of life which included unlimited hunting and fishing, they could continue to make a living through the taking of fish. The only restraints placed on

26

the exercise of the right were the necessity of sharing, and later, as a result of

modern conditions, the necessity that the resource could be regulated for

conservation. *See Washington I,* 384 F. Supp. at 401 ("The passage of time and the

changed conditions affecting the water courses and the fishery resources in the

case area have not eroded and cannot erode the right secured by the treaties but

have merely affected the limits which may be placed upon its exercise in order to

preserve the fish resources which are necessary to the continued and future

enjoyment of the right.")

Most significantly, the Supreme Court and this Court have consistently

rejected similar arguments made by the State in this case that the signatory parties'

failure to contemplate "future conditions" because of unforeseen circumstances

forecloses relief regarding the Treaty right. In *Fishing Vessel*, the Supreme Court

recognized that, at the time the Treaties were negotiated, the parties did not

contemplate that the Treaties would determine how fish would be allocated

between Indians and non-Indians. 443 U.S. at 669 (noting that "it is fair to

conclude that when the treaties were negotiated, neither party realized or intended

that their agreement would determine whether, and if so how, a resource that had

always been thought inexhaustible would be allocated between the native Indians

and the incoming settlers when it later became scarce"). Yet, the Court, giving

27

meaning to the Treaty right, set forth the apportionment or "moderate living" standard in determining the appropriate allocation for the Indians' share.

Moreover, this Court in its *Phase II* decision upheld the inclusion of hatchery fish, though entirely unforeseen at the time of the Treaties, in the Tribes' Treaty allocation. 759 F.2d at 1358-60. The Court considered the hatchery fish programs as mitigation for the Indians' once abundant and seemingly inexhaustible resource having grown scarce. *See id.* at 1359-60. This Court thus held that it would be "inconsistent with the Treaty" not to include hatchery fish in the allocation as replacement of "natural fish lost to non-Indian degradation of the habitat and commercialization of the fishing industry." *Id.* at 1360.

That the existence of barrier culverts restricting salmon runs was unforeseen is no more relevant to interpretation of the Treaty rights today than the fact that the need for hatcheries to replace lost fish and the need for allocation of fish were unforeseen. As with prior decisions in this case, giving meaningful effect to the reserved right of taking fish depends, in part, on the original understanding of those who executed the Stevens Treaties in the mid-nineteenth century, and in part, on the circumstances prevailing today.

For similar reasons, cases relied upon by the State (Br. 26-27) as allegedly supporting a restrictive reading of the Treaties are inapposite. Both *Oregon Department of Fish & Wildlife v. Klamath Indian Tribe,* 473 U.S. 753 (1985), and

28

*Oklahoma Tax Commission v. Chickasaw Nation,* 515 U.S. 450 (1995), involved the question of whether treaty rights reserved within an Indian reservation could be extended to off-reservation areas by implication. In *Klamath,* the treaty language at issue, unlike the language of the Stevens Treaties, confirmed that the tribal rights in question were meant to exist only "within the limits of the reservation." 473 U.S. at 766; *see id.* at 766-68. Similarly, in *Oklahoma Tax Commission,* the treaty, by its plain terms, applied only to persons and property "within [the reservation's] limits" and therefore even liberal construction could not support the tribe's claim. 515 U.S. at 465-66. Here, the Treaties expressly reserved fishing rights on- and off-reservation.

The State's reliance on *Skokomish Indian Tribe v. United States,* 410 F.3d 506 (9th Cir. 2005) (*en banc*), is misplaced. In *Skokomish,* this Court rejected only an implied cause of action by the Tribes against third parties for monetary damages for violation of fishing rights reserved by treaty. *Id.* at 514. The Court recognized, however, that this question was quite different from that considered in the *United States v. Washington* cases involving Treaty violations enforceable by injunctive relief ensuring compliance. *Id.* at 512-14. Similarly, in *Nez Perce Tribe v. Idaho Power Co.,* 847 F. Supp. 791 (D. Idaho 1994), the district court refused to imply a right to damages for alleged past violations of the Treaty right of taking fish.

29

Hence, the result is not inconsistent with the district court's holding here, which is limited to prospective equitable relief.

**B.     The Treaties Do Not Provide Protection of the Fish Resource Only When the State Discriminates Against the Tribes.**

There is no merit to the State's claim (Br. 33) that having an incentive to preserve salmon "to the greatest extent reasonably possible" negates a need to protect a Treaty-reserved right.  Nor is there any merit to the State's argument (Br. 34-35, 40), that this Court should read a "non-discrimination standard" into tribal fishing rights and immunize State actions that adversely affect Treaty fisheries unless they discriminate against the Tribes.

To begin with, the State recognizes the importance of habitat to healthy fisheries.  As the district court found, the State has acknowledged for many years that fixing barrier culverts could help fish runs.  ER46-47.  Recognizing this, the State has taken some steps to fix culverts that block fish passage.  *See* Br. 14-18, 33.  The question, however, of whether the State has effectively implemented its programs in fixing barrier culverts to restore salmon runs was one appropriately addressed at the remedy stage, as it does not relate to the meaning of the Treaties.

By arguing for an application of a "non-discrimination standard" to the Treaty right, the State essentially concedes that the Tribes' "right of taking fish" does preclude some habitat degradation by the State under the Treaties. The State recognizes that "the Supreme Court has made clear that *Tribes do have some*

30

*protection from harm to salmon runs under the treaties*." Br. 34 (emphasis added). The State admits that "*if the State had concentrated barrier culverts in the case area* while building only non-barrier culverts outside the case area, *then the Tribes might be entitled to relief*." Br. 35 (emphasis added).

While conceding that the Treaties do impose some right to the protection of the fish runs,[6] the State argues that the right extends only to protect against State actions that *discriminate* against the Tribes. The State's argument finds no support in the Supreme Court cases relied upon. As explained in *Fishing Vessel* and *Puyallup I*, the Supreme Court has used a non-discrimination standard as a limitation on the State's authority to regulate off-reservation fishing by Treaty Indians when such regulations were required for the conservation of the species. *Fishing Vessel*, 443 U.S. at 682-84 (explaining that in "*Puyallup I*, the Court sustained the State's power to impose nondiscriminatory regulations on treaty fishermen so long as they were 'necessary' for the conservation of the various species"); *see Puyallup I*, 391 U.S. at 395; *Puyallup II*, 414 U.S. at 45, 48; *see also Washington I*, 384 F. Supp. at 401-02 (explaining that State's authority to regulate

---

[6] The State also acknowledged in its brief in support of summary judgment that the court has the authority "in egregious cases" to "enjoin actions that would have the effect of destroying the res" and therefore, the Tribes are not without a remedy should actions, including fish habitat degradation, "threaten to destroy their fisheries." State's SJ Memo, Dkt. 287 at 2; *see also id.* at 21 (noting that the court has "power to prevent destruction of the fishery" and "may, in an extreme case, enjoin imminent destruction of the fish or order emergency protective measures").

the Indians' off-reservation fishing activities does not include the authority "to impair or qualify the treaty" except as such regulation "may be necessary for preservation of the resource").

Thus, while the Supreme Court has imposed a "non-discrimination standard" as a limitation on State regulatory actions required for preservation of the fisheries, the Court has not used such a standard to limit the State's substantive *duties* under the Treaties or otherwise limit the Treaty right of the Tribes. The decisions plainly recognize the State's authority and duty to *conserve* the fisheries so long as they are not discriminatory in effect to the Tribes, but not the power to *destroy or diminish* them so long as the activity affects the Indians and non-Indians alike. *See* 520 F.2d at 685 ("[N]either the treaty Indians nor the State . . .may permit the subject matter of these treaties to be destroyed.")

Nor is there any precedent supporting a conclusion that duties of the State under the fishing clause can be limited to actions that actually discriminate against the Treaty Indians. The State relies (Br. 34) on *Nez Perce Tribe,* claiming that the district court there held that a "violation would occur only if the adverse effects of development were concentrated on treaty fish runs." *See* 847 F. Supp. at 809. But, as we noted *infra,* the holding in *Nez Perce Tribe* turned on whether the court could award monetary damages to the tribe for alleged past violations of the Treaty fishing right, unlike in this case. *See infra* at 29-30. In dicta, the *Nez Perce Tribe*

32

court cited this Court's earlier vacated decision in *Phase II*, suggesting that, based on the panel's reasoning, the State may proceed with an action that could adversely affect the supply of fish in tribal fisheries so long as such action does not discriminate against Treaty fishermen.  847 F. Supp. at 808-09.  But, as the court in *Nez Perce Tribe* acknowledged, the *Phase II* panel also makes clear that the Treaty fishing clause imposes a duty on the State to take "reasonable steps commensurate with the resources and abilities" to preserve and enhance the fishery, even absent any discriminatory animus.  694 F.2d at 1386-89; *see* 847 F. Supp. at 809.  Hence, while this opinion was vacated,[7] its reasoning supports the view that the State's obligation under the Treaties regarding the need to avoid adversely affecting fish runs is not limited to avoiding discriminatory actions.

Moreover, the State's argument again ignores that the Supreme Court has consistently rejected arguments that the Treaties reserved to the Indians no more fishing rights than that enjoyed by non-Indians.  "Whatever opportunities the treaties assure Indians with respect to fish are admittedly not 'equal' to, but are to some extent greater than, those afforded other citizens."  *Fishing Vessel,* 443 U.S. at 676-77 n.22; *see id.* at 678-79 (Treaty right reserved to the Indians more than "merely the chance, shared with millions of other citizens" to "dip their nets" into

---

[7]     As noted *supra*, this Court vacated this decision, 694 F.2d 1374, on grounds that it was judicially imprudent to decide the "environmental issue" in the absence of concrete facts.  *See* 759 F.2d at 1357.

the waters); *Winans*, 198 U.S. at 381. Hence, the State's non-discrimination

argument ignores the bargain that the Tribes struck, which was to reserve their

right to take fish, not for equal treatment. 443 U.S. at 676-77; 759 F.2d at 1366 n.2

(Nelson, concurring in part and dissenting in part).

The State also contends (Br. 31-32) that the district court's declaration of

Treaty rights impinges on its "primary and traditional land use authority." As the

district court has recognized, the Tribes do not seek "to dictate how the state

legislature shall act," ER72-73, or to restrain all development that might impact

salmon or fish runs, ER54. Rather, they seek only to prevent the State from

impermissibly interfering with their right of taking fish by building or maintaining

fish-blocking culverts that significantly deplete their fisheries. Thus, as the court

concluded, and the prior decisions in this case have stressed, where the State is

"forced to act in a particular manner in order to comply with its treaty obligations,

that compelled action is no constitutional infringement" nor "unprecedented

intrusion" into "traditional land use powers," given that treaties are part of the

supreme law of the land. ER73; *see Washington I,* 384 F. Supp. at 402 ("[b]ecause

the right of each treaty tribe to take anadromous fish arises from a treaty with the

United States, that right is reserved and protected under the supreme law of the

land * * * and may not be qualified by any action of the state"); *see also Fishing*

*Vessel*, 443 U.S. at 682 ("neither party to the treaties may rely on the State's regulatory powers or on property law concepts to defeat" rights under the Treaties).

In short, the State's maintenance and operation of culverts that directly interfere with salmon runs and thwart tribal harvest are inconsistent with precedent upholding the Tribes' right of taking fish secured in the Treaties. Thus, this Court should reject the State's argument that its obligation to honor Treaty-reserved fishing rights extends only to actions which discriminate against the Tribes.

### C. The District Court's Declaratory Judgment Satisfies the Requirements Set by this Court in its *Phase II* En Banc Decision.

Finally, the State attempts (Br. 35-39) to discredit the district court's declaration giving meaning to the Treaty right by characterizing it as "imprecise in definition" and not based "on all the facts," contrary to this Court's prior *Phase II* decision, as well as threatening endless liability for "any actions that might incidentally reduce fish runs" by the State and others.

Contrary to the State's contentions, the district court's declaration of the Treaty-based right is consistent with this Court's *Phase II* decision and based upon concrete facts. In that decision, this Court explicitly recognized that:

> The State of Washington is bound by the treaty. * * * In other instances [when the state does not act with the primary purpose of regulating fish supply], the measure of the State's obligation [to avoid environmental degradation] will depend for its precise legal formulation on all of the facts presented by a particular dispute.

ER78 (citing 759 F.2d at 1357). As the district court aptly noted, the Court's language "clearly presumes some obligation on the part of the State" with respect to environmental issues, but requires "a duty which could be defined by concrete facts presented in a particular dispute." ER49. The instant dispute is limited to "only those culverts that block fish passage under State-owned roads," *id.,* which is capable of resolution, and which the district court properly resolved here, based "upon concrete facts" underlying the case. *See* 759 F.2d at 1357. The court found a significant harm to the Tribes' fisheries caused by State barrier culverts and correctly held that the State violated its duty under the Treaties.

The State's assertions (Br. 37) regarding the district court's lack of precise baselines for measuring the "significant" diminishment of fish harvests and causation are simply attempts to confuse factual issues that are applicable, if at all, only to determining the appropriate scope of the remedy, not to the meaning or terms of the Treaty right. The State overlooks that the facts applicable to the determination of the Tribes' Treaty rights were not in genuine dispute during the summary judgment stage. That is, there was no genuine dispute that: (1) some State-owned culverts blocked fish passage; (2) fish would be more plentiful once culverts were fixed; and (3) the Tribes were not making a moderate living from fishing. State barrier culverts significantly reduce salmon populations and

36

impermissibly interfere with tribal harvest and the district court ultimately issued an injunction appropriate to redress the injury caused by the Treaty violations.

Essentially, the State's complaint regarding the allegedly dire consequences of the district court's declaration regarding the Treaty fishing right ignores that courts have great latitude to fashion equitable relief to effectuate the right based on facts presented by a particular dispute. *See infra* at 48-54. Courts take into account equitable considerations in selecting or shaping the remedy that ensures that the Tribes' rights and the State's interests are both accommodated based on detailed findings made in a specific case. That has been done on several occasions in the *United States v. Washington* proceedings, and it was done here.

In this case, based on the particular facts before it, this Court is asked to review only the district court's judgment regarding the State's duty to repair or replace barrier culverts for which there is technology available to protect fisheries and the Treaty right. In other words, the district court's declaration of a Treaty-based duty on the State is limited to State culverts that block the passage of salmon returning to and from the Tribes' usual and accustomed fishing grounds in the case area, *see Fishing Vessel,* 443 U.S. at 670 n.15, and that significantly diminish salmon populations for tribal harvest. The extent to which exercise of the Treaty right will actually result in imposing duties on the State or other entities for any other future actions that might impact the fishery resource and harm tribal fisheries

37

"will depend upon concrete facts which underlie a particular case" and is simply

not before this Court at this time.

## II. THE DISTRICT COURT PROPERLY DISMISSED THE STATE'S WAIVER DEFENSE.

In its Answer, the State alleged that because agencies of the federal

government had approved some actions of the State relating to culverts, the State

"reasonably concluded" that the United States had determined that the State was

meeting its Treaty obligations.  ER987-93.  The Answer asserted therefore that

"the United States and the Tribes are barred by principles of waiver and/or estoppel

from seeking any relief related to culverts * * *."  ER995-96.[8]

---

[8]     The State does not here assert that the Tribes' claims are subject to waiver. It does suggest (Br. 40 n.11) that if the claims of the United States are barred, the Tribes' claims must be dismissed on grounds of sovereign immunity.  The district court held (ER40, CL12) that the Eleventh Amendment "does not bar the Plaintiffs' claims for injunctive relief against the State of Washington," and the State has not specifically challenged that ruling on appeal.  Hence, the State is in no position to claim that this Court must assume that the Tribes' injunctive relief claims against the State must be dismissed.  *See Greenwood v. F.A.A.,* 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are argued specifically and distinctly in a party's opening brief").

In any event, the case cited by the State to support the argument that the Tribes' claims must be dismissed, *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997), makes clear that resolving the sovereign immunity issue would require analysis of many complex considerations such as "the effect of the Tribe's suit and its impact on [the State's] special sovereignty interests."  *Id.* at 281; *see also Agua Caliente Band of Cahuilla Indians v. Hardin*, 223 F.3d 1041, 1045-49 (9th Cir. 2000) (refusing to give broad reading to *Idaho v. Coeur d'Alene Tribe*).  It is clearly premature to consider in this appeal the extent to which the Tribes' claims could proceed in the absence of the United States.

The district court struck the State's waiver/estoppel defense, as well as other affirmative defenses. ER69-79. The court cited both Supreme Court and Ninth Circuit cases holding that the acts of government officials cannot waive the rights of Indians, and found that this "binding authority * * * forecloses Washington's attempt to use waiver or estoppel defenses in this case." ER70. That conclusion is plainly correct.

Only Congress can abrogate or limit rights reserved under an Indian treaty. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999); *United States v. Dion*, 476 U.S. 734, 738-740 (1986); *Fishing Vessel*, 443 U.S. at 690. Accordingly, a defense to a suit by the United States to enforce rights under treaties cannot be based on actions of government officials allegedly waiving the rights of the Indians under treaties. *See Cramer v. United States*, 261 U.S. 219, 234 (1923) (where Indians had rights of occupancy to land, "no officer or agent of the government had authority to deal with the land upon any other theory" and "[t]he acceptance of leases for the land from the defendant company by agents of the government was, under the circumstances, unauthorized and could not bind the government; much less could it deprive the Indians of their rights"); *see also Pine River Logging and Improvement Co. v. United States*, 186 U.S. 279, 291 (1902) (government agents had no authority to waive terms of Indian timber contracts and their actions cannot estop the government); *United States v. City of Tacoma,*

39

*Wash.*, 332 F.3d 574, 581 (9th Cir. 2003) ("when the government acts as a trustee for an Indian tribe, it is not at all subject to that defense [of estoppel]"); *United States v. Ahtanum Irrigation Dist.*, 236 F.2d 321, 334 (9th Cir. 1956) (no defense of laches or estoppel available against Government acting as trustee for Indian Tribe).

There is no merit to the State's contention (Br. 42) that these authorities are distinguishable because they dealt with estoppel and laches and "never addressed the separate defense of waiver." "Equitable estoppel is closely related to waiver * * *." *Anderson v. Holy See*, 878 F. Supp. 2d 923, 935 (N.D. Ill. 2012). Indeed, the State's Answer characterized its affirmative defense in terms of the United States being "barred by principles of waiver and/or estoppel." ER995-96. The State suggests no principled basis for concluding that "waiver" can be asserted to bar the United States from protecting the rights of Indians when "estoppel" cannot.

The State contends (Br. 42-43) that *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005), calls for a reexamination of case authority holding that equitable defenses like waiver and estoppel cannot be used to divest tribes of Treaty rights. It does not.[9] *Sherrill* did not address actions by federal

---

[9] This is not the first time in this case that a party has asked this Court for a fundamental change in the well-established principles described above. In *Washington Shellfish*, shellfish growers asserted that the equitable defense of laches should be applied to tribal claims, because the tribes had waited some 135 years to assert them. This Court found that "current law precludes" that argument,

officials allegedly "waiving" rights under treaties with Indians. The Court considered whether the Oneida Tribe could bring a claim that its 1795 cession of 100,000 acres to the State of New York violated the Nonintercourse Act and did not terminate the Oneidas' right to possession. Given the longstanding, distinctly non-Indian character of central New York and its inhabitants, the regulatory authority over the area constantly exercised by that State and its counties and towns for 200 years, and the Oneidas' long delay in seeking judicial relief, the Court found that standards of federal Indian law and equity practice precluded the Tribe from unilaterally reviving its "ancient sovereignty" over the parcels at issue. 544 U.S. at 202-03. *Sherrill* turned on the uniquely disruptive effect on the governance of counties and towns of allowing the revival of a sovereignty claim that had lain dormant for some 200 years. *Id.* at 214-20. The Court did not purport to rule on the general availability of equitable defenses against claims of tribes, let alone claims by the United States.

The State also relies on *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 277 (2d Cir. 2005). In that case as well, the court did not consider the question posed here of whether claims can be subject to a defense of waiver based on the actions of federal employees allegedly waiving the rights of Indian tribes under a treaty. Instead, the majority in that case found in factual circumstances

---

noting in particular that "treaties enjoy a unique position in our law." 157 F.3d at 649.

41

similar to *Sherrill* that the doctrine of laches could be applied to the United States, at least in "egregious instances" involving very long delay and where relief would be highly disruptive. *Id.* at 278-79. The *Cayuga* majority's application of laches is incorrect and not required by *Sherrill*, for reasons well explained by the dissent in that case, *id.* at 280-291. But whatever the law may be in the Second Circuit, the law of this Circuit would not permit a laches defense barring claims by Indians under treaties in circumstances like those presented here. *See Washington Shellfish,* 157 F.3d at 649 (in upholding tribal rights under the Stevens Treaties, court finds that "laches or estoppel is not available to defeat Indian treaty rights") (citation omitted). Moreover, the majority's holding in *Cayuga* is limited to laches, and does not suggest that the court there would have accepted a defense based on waiver due to the actions of federal officials. The district court's dismissal of the State's waiver defense should accordingly be upheld.

## III. THE DISTRICT COURT PROPERLY DISMISSED THE COUNTERCLAIMS.

In its Answer, the State asserted that if it were declared to have violated any treaty-based duty relating to its culverts, the United States also should be declared to have also violated those duties (ER998-99), should be enjoined "from constructing and maintaining any culverts that reduce the number of fish that would otherwise return to or pass through the usual and accustomed grounds and stations," (ER999) and that other injunctive relief against the United States should

42

be ordered regarding maintenance of culverts (ER1000). The district court ruled that the United States had not waived its sovereign immunity to these counterclaims, either by instituting this suit or otherwise.[10] While recognizing that "when the United States institutes an action, it waives immunity as to the counterclaims of the defendant which assert matters in recoupment," the court noted that "[s]uch waivers are limited to the extent of reducing or defeating the government's claim." ER63, *citing Frederick v. United States,* 386 F.2d 481, 488 (5th Cir. 1967). The court agreed with the United States that the State "'does not merely claim that its own liability should be reduced to account for alleged conduct by the United States, but seeks affirmative relief against the United States.'" ER64 (quoting US Memorandum at 3).

The district court's ruling is correct. In *Danning v. United States*, 259 F.2d 305, 310 (9th Cir. 1958), this Court noted that "we are bound by a long line of cases to hold that an affirmative judgment against the United States cannot be entered on a counterclaim without specific statutory authorization for affirmative relief against the government on the counterclaim as such." *Id.* at 309-10, *citing inter alia United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 511 (1940). The party seeking to establish a waiver of the United States' immunity

---

[10]     In the district court, the State also contended that the United States' sovereign immunity to these counterclaims was waived by the Administrative Procedure Act, 5 U.S.C. § 702. The district court rejected that contention. ER65-66; ER58. The State does not challenge those rulings on appeal.

43

to suit bears the burden of showing an unequivocal waiver of immunity. *Holloman v. Watt*, 708 F.2d 1399, 1401 (9th Cir. 1983). The institution of an action by the United States may constitute a limited waiver of sovereign immunity to counterclaims "by way of set off or recoupment to defeat or diminish the sovereign's recovery." *United States v. Agnew*, 423 F.2d 513, 514 (9th Cir. 1970).[11] As the State concedes, however, "a recoupment counterclaim must (1) arise from the same transaction as the plaintiff's suit; (2) seek the same kind of relief as the plaintiff's suit; and (3) seek an amount not in excess of plaintiff's claim." Br. 45, *citing Berrey v. Asarco, Inc.*, 439 F.3d 636, 645 (10th Cir. 2006).

The State contends that its counterclaims meet the tests for recoupment against the United States because they allegedly seek the same kind of relief as the United States (*i.e.,* injunctive and declaratory relief relating to ownership, funding or approval of fish-blocking culverts) and allegedly arise from the same transactions as the United States' suit. Br. 45. There are multiple flaws in this argument.

To begin, the counterclaims fail to state an actionable claim against the United States at all, let alone a claim that qualifies as recoupment. The counterclaims attempt to assert the rights of the Tribes, not the State. They allege that: "the executive branch of the United States government has violated its duty to

---

[11]     The State does not claim that setoff applies.

ensure that the Tribes' treaty rights are not abrogated or impinged upon by funding, authorizing, approving, or otherwise participating in the state actions that are the subject" of the suit, and that "the United States has violated its duty to the Tribes in failing to protect fish habitat on federally-owned lands." ER998, ¶¶7.2, 7.3. But the State does not have standing to assert the Tribes' rights under the treaties. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"); *Bell v. Kellogg*, 922 F.2d 1418, 1422 (9th Cir. 1991) (same). Other averments of the counterclaim assert that the State is being asked to bear "a disproportionate burden of meeting any such treaty-based duty" (ER998 ¶7.4; ER999 ¶8.6), but the State has never explained how, even if true, that could form the basis for a legal claim against the United States.

Second, the State's counterclaims, however understood, do not arise from the same transactions as the United States' suit. The counterclaims arise from various unspecified actions of the United States relating to culverts that it owns, as well as actions allegedly approving, funding or permitting culverts owned by the State. This suit, however, challenges culvert actions by the State that have resulted in diminished fish runs. The fact that other parties, including federal agencies, may have taken actions that impact fish runs does not mean that those actions arise from the same transactions as those that form the basis for this suit. "The fact that

45

the same two parties are involved, and that a similar subject matter gave rise to

both claims, however, does not mean that the two arose from the 'same

transaction.'"  *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984).

In *Berrey v. Asarco Inc.*, 439 F.3d 636, 645-46 (10th Cir. 2006), the court

explained that "[c]ounterclaims arise from the same transaction or occurrence if

they are compulsory counterclaims under Rule 13(a) of the Federal Rules of Civil

Procedure."

> "A counterclaim is compulsory if: (1) the issues of fact and law raised by the
> principal claim and the counterclaim are largely the same; (2) res judicata
> [i.e., claim preclusion] would bar a subsequent suit on defendant's claim; (3)
> the same evidence supports or refutes the principal claim and the
> counterclaim; and, (4) there is a logical relationship between the claim and
> counterclaim."

*Id.* at 645, *quoting FDIC v. Hulsey*, 22 F.3d 1472, 1487 (10th Cir. 1994).  The

State's claims here regarding alleged actions by federal agencies relating to

culverts would not meet the tests for compulsory counterclaims.  The issues of fact

and law they would turn upon are not largely the same as the issues raised by the

United States' claims, and claim preclusion would not bar the State from bringing

those claims (if they could be brought at all) apart from this suit.

Third, as the district court found, the counterclaims seek affirmative relief

against the United States and thus cannot qualify as recoupment.  The relief sought

by the State—enjoining the United States to identify, fix and maintain culverts

(ER999-1000)—would not reduce or defeat the United States' claim against the

State, but instead would provide affirmative relief against the United States.  *See Frederick,* 386 F.2d at 488.  The counterclaims were properly dismissed.

## IV.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY GRANTING RELIEF NECESSARY TO REDRESS THE TREATY VIOLATIONS.

The State does not contend that the Tribes failed to show that they would suffer irreparable injury without injunctive relief.  Unchallenged findings of fact support the conclusion that the Tribes are suffering substantial irreparable harm from precipitous declines in salmon abundance (FF6-16, ER28-29).  Nor does the State show any error in the district court's conclusion (ER41) that "efforts by the State to correct the barrier culverts have been insufficient," or in its finding that "[c]orrection of fish passage barrier culverts is a cost-effective and scientifically sound method of salmon habitat restoration [that] provides immediate benefit in terms of salmon production * * *."  FF38, ER34.  The State has not claimed that the Tribes have an adequate remedy at law.

Instead, the State challenges the scope of the injunction as allegedly overbroad and insufficiently sensitive to the State's determinations regarding the best means to repair and replace fish-blocking culverts.  This Court reviews the scope of the injunction only for an abuse of discretion, *see Walters v. Reno,* 145 F.3d 1032, 1047 (9th Cir. 1998)*,* and the State has not shown any such abuse.

47

The State contends (Br. 46) that the district court abused its discretion by allegedly granting "sweeping relief that significantly intrudes into operations of State Government without adequate evidentiary support."  As we show below, this attack is based on a failure to recognize binding law regarding the district court's broad equitable power in this area.  The Tribes' brief demonstrates that the relief granted was strongly supported by the evidence at trial, and we will not repeat that showing here.

### A.  The District Court Has Broad Authority To Assure Treaty Compliance.

The State contends that in granting injunctive relief to remedy the Treaty violation, the district court "disregard[ed]" certain "federalism principles," including alleged requirements that the court "give deference to the State's institutional competence" and "not substitute its budgetary judgment for that of the State * * *."  Br. 21.[12]  This argument ignores the prior holdings of this Court and the Supreme Court in this case.

In *Washington I,* the district court granted extensive injunctive relief relating to the State's regulation of off-reservation fishing.  384 F. Supp. at 413-20.  This

---

[12]     The other equitable principles cited by the State (Br. 21) – that a court in equity should fashion the least intrusive remedy possible and should provide relief that is no broader than necessary to address any treaty violations – are appropriate general principles, but as we show below, and as developed more fully in the Tribes' brief, the district court in the exercise of its equitable discretion did not contravene these principles.

Court affirmed and recognized that the broad scope of injunctive relief was

appropriate in order to redress Treaty violations. *See United States. v. Washington*,

520 F.2d 676, 687, 693 (9th Cir. 1975). On remand, due to difficulties enforcing

the decree, the district court took over direct management of fisheries in

Washington. The State and other parties appealed the scope of the district court's

injunctive relief, but this Court again affirmed.

> We held in *United States v. Washington*, 520 F.2d at 687-90, that the district
> court had discretion in its allocation of the fishery; we now extend that
> holding to recognize its broad discretion in managing the fishery. Further,
> none of the district court's actions now before us constitutes an abuse of that
> discretion.

*Puget Sound Gillnetters Ass'n v. Dist. Court for Western Dist. of Wash.,* 573 F.2d

1123, 1129 (9th Cir. 1978).

The State and private fishing associations pursued review in the Supreme

Court. The State complained that "[t]he decisions of the District Court and Ninth

Circuit in this case, however, have arrogated the state's traditional management

authority in this area and have substituted the District Court as the manager of the

fish resource in state territorial waters." Brief of Washington in *Fishing Vessel* at

100, 1978 WL 223364 (1978). The Supreme Court disagreed, emphasizing that

under the Supremacy Clause, the Treaties must prevail over any State law barriers

to compliance and noting that "[i]t is therefore absurd to argue, as do the fishing

associations, both that the state agencies may not be ordered to implement the

49

decree and also that the District Court may not itself issue detailed remedial orders as a substitute for state supervision." *Fishing Vessel,* 443 U.S. at 695-96.[13]

The remedies ordered in that earlier phase of the case, including taking over management of the fishery and requiring the State to submit regulations to the court for approval, were much more intrusive than the requirements of the injunction here, which simply put the State on a schedule to identify and repair or replace fish-blocking culverts. Yet, neither this Court nor the Supreme Court has ever suggested that the broad injunctions issued earlier in this case raised problems of federalism, nor suggested that the district court must defer to the State's institutional competence, as the State argues here (Br. 47-49). Instead, this Court and the Supreme Court have stressed that the Treaties are the supreme law of the land, and that the district court has discretion to issue detailed remedial orders against the State if necessary to provide the Tribes with meaningful relief under those Treaties.

The State (Br. 47-48) relies on general language from cases involving reform of state institutions, where federal court injunctions have involved the courts in the day-to-day management of state institutions, particularly prisons.

---

[13] We recognize that "state recalcitrance" was one factor noted by the Supreme Court as supporting the broad injunctive relief granted in *Phase I.* 443 U.S. at 695. While that has not been identified as a factor in this case, the Supreme Court's and this Court's confirmation of the wide scope of the district court's equitable powers in the context of enforcing the Treaties was plainly not limited to situations where recalcitrance or obstructionism was a factor.

50

Even in that very different situation, broad federal court injunctions have been upheld. *See, e.g., Brown v. Plata,* 131 S. Ct. 1910, 1944 (2011); *Stone v. City and County of San Francisco,* 968 F.2d 850, 861 (9th Cir. 1992).  Moreover, the injunction here bears no resemblance to the relief in the institutional reform cases cited by the State.  The injunction is largely based on the State's own identification of barrier culverts as a significant problem in need of remediation for the sake of a fishery that is important to non-Indian citizens as well as to the Tribes.  FF27-37, 44-47, ER31-34, 36.  The injunction defers to State expertise where appropriate; for instance, in compiling the list of salmon-blocking culverts, the State is directed to use the barrier assessment methodologies in its own Department of Fish and Wildlife's Assessment Manual.  ER2, ¶2.  The relief ordered does not enmesh the district court in the day-to-day operations of any State institution or agency, but simply puts the State on a schedule to meet certain objective standards for fish passage at culverts that now block such passage.  ER2-5.  While the court retained jurisdiction "for a sufficient period to assure that the Defendants comply with the terms of this injunction" (ER5), there is no indication that the court intends to oversee day-to-day decisionmaking by the State agencies.  In short, the injunction does not contravene federalism principles.

51

**B.     The District Court Did Not Issue an Overbroad Injunction or Otherwise Abuse Its Discretion.**

While the State is correct as a general matter that injunctive relief should be tailored to the particular harm and avoid overbreadth, the district court here did not abuse its discretion in finding that the relief granted was appropriate in light of the Treaty violations.  While the State complains on the one hand that the relief is too narrow, because allegedly "a comprehensive approach to preserving and restoring salmon runs is the most productive and cost-effective" (Br. 54), it complains on the other hand (Br. 52) that the injunction is too broad "by ordering relief throughout the entire case area" when "the health of salmon stocks varies widely throughout the case area * * *."  Neither complaint is warranted.  The injunction provides a reasonable path toward addressing a significant source of direct harm to the Tribes' vital fisheries resource.  While the injunction imposes standards aimed at assuring that culverts will effectively pass all species of salmon at all life stages, it also gives the State a reasonable amount of flexibility in choosing particular designs (*see* ER4, ¶9), and includes a provision (¶10) allowing deviations in case of emergency or extraordinary site conditions.  *See also* ER3-4, ¶8 (allowing WSDOT to defer correction of a percentage of culverts).  A reasonable amount of time (17

years) is provided for WSDOT to provide fish passage in accordance with the standards of the injunction.  ER3, ¶6.[14]

The State's contention (Br. 55-57) that there are other reasons for the depletion of salmon runs is beside the point; an injunction does not have to address all sources of injury to be valid.  The district court found that the State's barrier culverts were a significant source of harm to the fisheries relied on by the Tribes. *See* FF27, ER31 ("State-owned barrier culverts are so numerous and affect such a large area that they have a significant total impact on salmon production").  The State recognizes the importance of replacing barrier culverts if restoration of salmon runs is to have any chance of success.  *See* FF3.131, ER27.

The State also errs in claiming that the district court "substituted its budgetary judgment for that of the State and impermissibly ignored costs concerns."  Br. 65.  The court simply made clear what actions the State needs to take to address barrier culverts to be in compliance with the Treaties.  All budgetary judgments involved in funding the necessary actions are left to the State. As this Court has stated:

---

[14]    The district court did not abuse its discretion by not requiring the Tribes and the United States to prove a need for relief on a culvert-by-culvert basis, as the State suggests at Br. 64.  Such a high standard of proof has never been required in this case; the earlier injunctions upheld by this Court and the Supreme Court were based on harm occurring generally throughout the case area, and required area-wide remedial action.

A demonstration that an order is burdensome does nothing to prove that it was overly intrusive. * * * [T]he question is not whether the relief the court ordered to vindicate those rights is expensive, or difficult to achieve, but whether the same vindication of federal rights could have been achieved with less involvement by the court in directing the details of defendants' operations.

*Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1071-72 (9th Cir. 2010).[15]

Here, the rights of the Tribes are recognized in binding Treaties and the question is not whether the relief ordered to vindicate those rights is expensive or difficult to achieve, but whether the same vindication "could have been achieved with less involvement by the court in directing the details of [the State's] operations." *Id.* The relief here in no way enmeshes the district court in directing the details of the State's compliance. The injunction should be affirmed.

---

[15] The State cites (Br. 65) a portion of the 1974 district court injunction in this case, ordering the State to undertake certain tasks "immediately and expeditiously, consistent with availability of funds." *Washington I,* 384 F. Supp. at 417. This was the only provision in the extensive 1974 injunction that includes the "consistent with available funds" qualifier, and hardly suggests that the district court believed that such a proviso was generally required.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

ROBERT G. DREHER
Acting Assistant Attorney General

_s/Evelyn S. Ying_
DAVID C. SHILTON
VANESSA BOYD WILLARD
EVELYN S. YING
  Attorneys, U.S. Department of Justice
  Environment & Natural Resources Division
  P.O. Box 7415
  Washington, DC 20044
  (202) 514-4786
  evelyn.ying@usdoj.gov

January 21, 2014
90-2-0-670/1

55

## STATEMENT OF RELATED CASES

The United States is unaware of any related cases within the meaning of

Ninth Circuit Rule 28-2.6 that are pending in this or any other court.


## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
## LIMITATION, TYPEFACE REQUIREMENTS,
## AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B). The brief contains 13,964 words, excluding parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief also complies with the

typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements

of Fed. R. App. P. 32(a)(6).  The brief has been prepared in Times New Roman, 14

point font, using Microsoft Word 2007.

*s/Evelyn S. Ying*
EVELYN S. YING

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2014, I electronically filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users who will be served electronically by that system.

_s/David C. Shilton_
DAVID C. SHILTON
United States Department of Justice
Environment & Natural Resources Div.
P.O. Box 7415
Washington, DC 20044
(202) 514-5580

January 21, 2014
90-2-0-670/1