No. 13-35474

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA, et al.

*Plaintiffs-Appellees,*

v.

STATE OF WASHINGTON,

*Defendant-Appellant.*

_____

On Appeal from the U.S. District Court for the
Western District of Washington (The Hon. Ricardo S. Martinez)
Case No. CV-70-9213-RSM

_____

**AMICI CURIAE BRIEF OF PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATIONS AND INSTITUTE FOR FISHERIES
RESOURCES IN SUPPORT OF APPELLEES AND TO AFFIRM**

_____

AMANDA W. GOODIN
JANETTE K. BRIMMER
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA 98104
(206) 343-7340 | Phone
(206) 343-1526 | Fax
agoodin@earthjustice.org
jbrimmer@earthjustice.org
*Attorneys for Amici Curiae*

## TABLE OF CONTENTS

IDENTITY AND INTERESTS OF AMICUS CURIAE ...........................................1

SUMMARY OF ARGUMENT .................................................................2

ARGUMENT ....................................................................................3

    I.    REMOVING BARRIER CULVERTS IS IN THE PUBLIC
        INTEREST. ........................................................................3

        A.  Salmon Runs in Washington Support Commercial Fishing
            Jobs, Recreational Opportunities, Local Culture, and
            Healthy Ecosystems. ........................................................3

        B.  The District Court Properly Held That the Public Interest
            Supports Injunctive Relief. ................................................9

    II.   INJUNCTIVE RELIEF IS NECESSARY TO ENSURE
        TIMELY REMOVAL OF BARRIER CULVERTS..........................12

        A.  Barrier Culvert Removal Is Necessary to Increase Salmonid
            Runs and Other Salmonid Recovery Efforts Cannot
            Substitute for Culvert Removal.........................................12

        B.  The State's Efforts to Elevate the Standard for Injunctive
            Relief Are Unfounded. .....................................................17

CONCLUSION ..................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ............................................................10, 11, 19

*High Sierra*, *Hikers Ass'n v. Blackwell*,
    390 F.3d 630 (9th Cir. 2004) ...........................................................................12

*Monsanto Co. v. Geertson Seed Farms, Inc.*,
    130 S. Ct. 2743 (2010)......................................................................................9

*Nat'l Wildlife Fed'n v. NMFS*,
    422 F.3d 782 (9th Cir. 2005) ..........................................................................20

*Small v. Avanti Health Systems*,
    LLC, 661 F.3d 1180 (9th Cir. 2011).................................................................18

*Wash. Toxics Coal. v. EPA*,
    413 F.3d 1024 (9th Cir. 2005) .........................................................................20

**STATUTES**

16 U.S.C. § 1531 .......................................................................................................12

**OTHER AUTHORITIES**

70 Fed. Reg. 69903 (Nov. 18, 2005)..........................................................................9

73 Fed. Reg. 4176 (Jan. 24, 2008) .............................................................................9

Fed. R. App. P. 29 ......................................................................................................1

IDENTITY AND INTERESTS OF AMICUS CURIAE[1]

Amicus Pacific Coast Federation of Fishermen's Associations ("PCFFA") is a U.S. west coast-based commercial fishing industry trade association representing the interests and fishing heritage of approximately 1,000 commercial fishing families, many of whom depend on healthy salmon runs for all or a portion of their livelihoods. PCFFA is a federation of 15 smaller commercial fishermen's associations, vessel owners' associations, port associations, and marketing associations, with member associations in most U.S. ports on the west coast, including in Washington State. PCFFA also has fishermen members "at-large" who are unaffiliated with any particular fishermen's association, but who have become individual members of PCFFA. PCFFA's port and member associations and at-large members represent commercial fishing families who are small and mid-sized commercial fishing boat owners and operators conducting their own commercial fishing operations. PCFFA's members have a collective investment in their mostly family-owned commercial fishing operations of well in excess of a billion dollars. In Washington State, PCFFA's member association, Washington Trollers Association, operates in every Washington port and is Washington's

---

[1] Pursuant to Federal Rule of Appellate Procedure 29, the undersigned represent that (1) all parties consented to the filing of this brief, (2) no counsel for any party authored this brief in whole or in part, and (3) no person or entity other than the above-named amici curiae and their counsel made a monetary contribution to the preparation or submission of this brief.

1

oldest organization of commercial salmon troll (i.e., hook and line gear) fishermen, with individual members from all Washington ports. The newly-formed Coastal Trollers Association also works with PCFFA. The Coastal Trollers Association also operates primarily in Washington State and is comprised of primarily small and mid-sized family fishing businesses. It may soon become a PCFFA member group. The economic importance of Washington salmon is enormous for PCFFA's members and other fishing families in the State.

Amicus Institute for Fisheries Resources ("IFR") is the marine resource protection and conservation affiliate of PCFFA, working to restore valuable west coast salmon fisheries and the aquatic habitats they rely upon.

Amici's economic interests are directly affected by the state of Washington's maintenance of barrier culverts, making inaccessible key salmon spawning and rearing habitat and jeopardizing fishing industry jobs and communities.

## SUMMARY OF ARGUMENT

Salmon are tremendously important to Washington's commercial and recreational fishermen, local communities and culture, and ecosystems throughout the state. The State's barrier culverts block access to vast areas of salmon habitat, decreasing salmon runs and economically harming Washington's fishing men and women. The district court properly found that its injunction ordering expeditious

2

replacement and repair of these barrier culverts is strongly in the public interest.

Moreover, the district court properly found that removal of the State's barrier culverts will increase the numbers of salmon available for harvest, and that injunctive relief was necessary to address the harm imposed by the State's culverts. The court properly tailored the relief to ensure the harm would be addressed. The State's arguments to the contrary ignore both the facts and the law.

The district court had wide latitude in fashioning injunctive relief to remedy the substantial harm caused by the State's barrier culverts. The court did not abuse its discretion in fashioning the injunction, and amici respectfully submit that it should be affirmed in all respects.

## ARGUMENT

I.    REMOVING BARRIER CULVERTS IS IN THE PUBLIC INTEREST.

    A.    <u>Salmon Runs in Washington Support Commercial Fishing Jobs, Recreational Opportunities, Local Culture, and Healthy Ecosystems.</u>

Salmon are so important to Washington and its residents that they have achieved iconic status, bound tightly with many Washington citizens' commercial and cultural identities. Nary a telecast of a professional football game from Seattle can pass without footage of the "flying salmon" at Pike Place Market; salmon figure prominently in advertising and artistic renderings throughout the state; salmon iconography is omnipresent in souvenir shops in every tourist location; restaurant menus, grocery stores, and farmers markets abound with salmon of

many varieties. It is the stuff of life for the Indian Tribes that are part of this litigation, but also for the entire state, including the commercially-fishing families that are part of PCFFA and IFR. Healthy salmon runs are also a cornerstone of a well-functioning ecosystem throughout Washington. Indeed, the State itself agrees that salmon are an invaluable resource. *See* State Br. at 33 ("Salmon are vital to Washington's economy, its culture, its diet, and its recreation"). In the State's own words:

> Salmon fishing has played an important role in the economy and culture of the Pacific Northwest for centuries. Today, salmon fisheries contribute approximately $175 million per year to Washington's economy, provide recreational opportunities for more than 150,000 anglers and sustain timeless tribal traditions.

Washington Dep't of Fish & Wildlife, Conservation Information, https://fortress. wa.gov/dfw/score/score/harvest/harvest.jsp (visited Jan. 23, 2014). The importance of restoring healthy salmonid populations for the state of Washington cannot be overstated.

Commercial salmon fisheries play a critical role in Washington's economy. According to the most recent NOAA statistical publication, commercial salmon landings in Washington State for 2012 were about 19.5 million pounds valued (at *ex vessel* wholesale prices) at $27.8 million (decreased from 2011). National Marine Fisheries Service, *Fisheries of the United States* (2012), pp. x, *available at* www.st.nmfs.noaa.gov/Assets/commercial/fus/fus12/FUS2012.pdf, attached as

4

Exhibit A to the Declaration of Janette K. Brimmer, served and filed with this brief. Salmon processing also represents significant added value to Washington's and the U.S. economy. *See* data regarding salmon steaks and fillets and canned products, Brimmer Decl., *id.* at 53 and 55 and data regarding Washington processors and wholesalers, *id.* at 102. Data from the Pacific Fishery Management Council, comprised of representatives of various government and tribal fish resource agencies, similarly demonstrates the enormous economic importance of the salmon fishery to Washington's waterfront communities. *See* "Review of 2012 Ocean Salmon Fisheries" (Feb. 2013), Brimmer Decl., Ex. B, pp. 92, 95, 90 and tables.

The Pacific Fishery Management Councils' 2013 report also plainly demonstrates that reduced salmon runs harm Washington's commercial fishing men and women. The report shows that active management of the salmon fishery depends on escapement numbers—in other words, the number of fish available to commercial and recreational fisheries in Washington depends, almost entirely, on the number of fish that are counted as returning from the ocean to Washington's streams to spawn. *See, e.g.,* discussions of management and escapement counts in Brimmer Decl., Ex. B, a pp. 2, 46, 48, 52 and 54. As such, increasing these numbers of returning fish directly impacts the livelihoods of entire communities and PCFFA's members, because greater numbers of returning fish translate to

5

higher catch limits and/or longer seasons for the fishery. Conversely, decreasing numbers of returning fish translate to lower catch limits, shorter seasons, and a reduced ability for commercial fishing men and women to earn an adequate living. Unfortunately this latter scenario is the one that has recently predominated; the Council's 2013 report plainly demonstrates the sharp and steady overall declines in salmon catch, especially coho (which are tributary spawners).

A study commissioned by the State itself echoes these findings and underscores the tremendous value of salmon to Washington's economy. *See* Final Report: Economic Analysis of the Non-Treaty Commercial and Recreational Fisheries in Washington State (Dec. 2008), *available at* Wash. Dep't of Fish & Wildlife Publications, http://wdfw.wa.gov/publications/00464/, Brimmer Decl., Ex. C. As found in Washington's study, "[s]almon is a major contributor to the Washington commercial fishing industry. In 2006, salmon landings from Washington waters totaled 11.0 million pounds and $9.5 million in ex-vessel value . . . ." *Id.* at 8. In addition to the value of the commercial fisheries themselves, Washington's salmon fisheries generate significant employment opportunities in vessel, processing, and industry-support businesses. In 2006 alone, "employment generated by seafood harvesting and processing attributable to catch from Washington waters is estimated to total 3,524 full and part-time jobs." *Id.* at 12. "Salmon species accounted for about 14 percent of total income and

jobs." *Id.* While these economic effects are a small percentage of Washington's economy as a whole, they are "important at the community level along the Washington Coast, the Strait of Juan de Fuca, and the Puget Sound areas." *Id.* If Washington's salmon runs were not so severely depleted and continuing to decrease, the economic benefits of the fishery to Washingtonians could be far more significant.

Recreational fisheries, and their associated industries, are also an important part of Washington's economy. In 2006, 824,000 anglers fished recreationally in Washington State. *Id.* at 15. Of these, 142,000 fished for salmon, accounting for $129,419,300 in net economic value in 2006, and another 113,000 fished for steelhead, accounting for an additional $51,260,500 in net economic value. *Id.* at 18. Moreover, anglers in 2006 "generated an estimated $355 million in trip-related spending and $549 million in equipment expenditures. Direct impacts of this spending on the state economy include supporting an estimated 7,950 jobs and $165.7 million in personal income. Accounting for the multiplier effect (indirect and induced impacts) increases the total statewide number of jobs to 12,850 and $392.9 million in personal income." *Id.* at 20. *See also* 2013 Pacific Fishery Management Council Report, Brimmer Decl. Ex. B, at 21, 25, and 44 (concluding that the recreational fishery is an important component of Washington's economy. Recreational fish harvest in Washington in 2012 was 947,000 pounds. 48,000

7

pounds were catch and release.  Salmon are a portion of that catch.).  As with the commercial fishery, depleted runs limit this important sector of Washington's economy.

Finally, the State's study confirms that Washington's salmon fisheries provide value above and beyond the numeric value attached to the many jobs and income they produce:

> Lastly, it must be recognized that, in addition to the employment and personal income contributions to the regional and state economy, these fisheries contribute in other important ways to Washington's economy and the quality of life of its residents. . . .  [T]he working waterfronts that serve both Washington and distant water fisheries are an integral part of many communities.  These waterfronts attract visitors wanting to experience and see lively commerce activities in a backdrop of expansive harbor views.  Although this economic study is more narrowly focused on the economic values to commercial fishers and sport anglers, the broader social and economic values supported by the commercial and recreational fisheries must be acknowledged.

Brimmer Decl. Ex. C, 2008 Washington State Report at 25; *see also id.* at 2 ("protecting fishery resources, particularly those resources that may be threatened or endangered, has value to persons who don't directly use (or even consume) fishery resources. . . .  Although [these values] are not included in this study, it is important to acknowledge them and to understand that a more comprehensive accounting of all of the social and economic values of Washington fisheries would attempt to address them more thoroughly.").

Restoring natural, healthy salmon populations is also ecologically important

8

in Washington. To give just one example of the way that healthy salmon populations are integral to healthy ecosystems, chinook salmon are a critical prey species for Southern Resident Killer Whales (*Orcinus orca*). The National Marine Fisheries Service identified prey availability issues with reduced salmon populations as a factor in listing orcas as endangered in 2005 (70 Fed. Reg. 69903, 69906, 69908 (Nov. 18, 2005)) and has identified salmon recovery efforts as a priority in the recovery plan for orcas. *See* Recovery Plan for southern Resident Killer Whales (*Orcinus orca*) at pp. iv, I-2, II-17-18, II-21, 73 Fed. Reg. 4176 (Jan. 24, 2008) (which estimates that an adult Southern Resident orca must consume 28-34 adult salmon daily and the juvenile whales need 15-17 salmon daily to maintain energy requirements).

For all of these reasons, salmon are vital to Washington's economy, culture, and environment. Harm to salmon harms Washington citizens, communities, and the State as a whole. Conversely, increases in salmon substantially benefit those same populations.

B.   The District Court Properly Held That the Public Interest Supports Injunctive Relief.

It is well-established that courts must consider the public interest in deciding whether to grant a request for injunctive relief. *See, e.g.*, *Monsanto Co. v. Geertson Seed Farms, Inc.*, 130 S. Ct. 2743, 2756 (2010). The district court properly considered the public interest and correctly held that it would be served

by its grant of injunctive relief:

> 18. The public interest will not be disserved by an injunction. To the contrary, it is in the public's interest, as well as the Tribes' to accelerate the pace of barrier correction. All fishermen, not just Tribal fishermen, will benefit from the increased production of salmon. Commercial fishermen will benefit economically, but recreational fishermen will benefit as well. The general public will benefit from the enhancement of the resource and the increased economic return from fishing in the State of Washington. The general public will also benefit from the environmental benefits of salmon habit restoration.

Memorandum and Decision, Dkt. No. 20383 (filed Mar. 29, 2013) at p. 35 ¶ 18.

The district court was correct to rely on each of these public interest considerations in deciding to grant injunctive relief. The Ninth Circuit has held that "[t]he effect on the health of the local economy is a proper consideration in the public interest analysis." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011). While economic harm alone cannot outweigh irreparable harm to the environment where these factors cut in opposite directions, here economic and environmental considerations *both* support injunctive relief. As discussed above, commercial salmon fishing supports thousands of Washington jobs and many Washington communities, and increases in salmon available for harvest create additional economic opportunities in the local fishing economy. *See supra.* Recreational fishermen—and the industry surrounding recreational fishing—will benefit substantially from increases in salmon populations as well. *See supra.* These substantial benefits strongly support the district court's finding

10

that removal of Washington's barrier culverts serves the public interest.

Moreover, the Ninth Circuit has long recognized "the well-established 'public interest in preserving nature and avoiding irreparable environmental injury.'" *Alliance for the Wild Rockies*, 632 F.3d at 1138 (quoting *The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008). Here, the district court's injunction helps preserve salmon and steelhead, a valuable natural resource in and of themselves. In turn, restoring salmonids will serve the ecosystem as a whole given the reliance on salmonids of so many species, from eagles and osprey to endangered whales. Culvert removal also helps restore salmon streams to a more natural flow, likewise preserving and restoring important natural ecosystems. *See id.* Conversely, allowing these species and the ecosystems that depend on them to decline would be to condone irreparable environmental injury, contrary to this Court's clear precedent. *See id.*

While allowing any of Washington's salmon runs to continue to decline constitutes irreparable injury, this is particularly true for the many runs that are already on the brink of extinction. Indeed, it is hard to conceive of any harm more "irreparable" than permanent extinction of these iconic species—once gone, they would be gone forever. Likely gone forever too would be the Southern Resident Killer whales and other species that rely on them. Indeed, Congress has explicitly recognized the strong public interest in the preservation of endangered species in

the Endangered Species Act. 16 U.S.C. § 1531; *see also High Sierra*, *Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 (9th Cir. 2004) (considering the specific public interest articulated by Congress in the Wilderness Act as supporting a grant of injunctive relief).

Both economic and environmental public interest factors weigh strongly in favor of the injunctive relief granted by the district court. The district court did not abuse its discretion in granting injunctive relief to the Tribes.

II. **INJUNCTIVE RELIEF IS NECESSARY TO ENSURE TIMELY REMOVAL OF BARRIER CULVERTS.**

    A. <u>Barrier Culvert Removal Is Necessary to Increase Salmonid Runs and Other Recovery Efforts Cannot Substitute for Culvert Removal.</u>

Salmon, steelhead, and cutthroat trout (all salmonids) are disappearing from Washington and the Pacific Northwest at alarming rates. Once too numerous to count, these fish today persist at a very small fraction of their historic abundance. The collapse of what were once the world's largest runs of salmon, steelhead, and cutthroat has led the National Marine Fisheries Service to protect 28 different salmonid populations as either threatened or endangered under the federal Endangered Species Act. Many other runs are already extinct. The charts and graphs included with and appended to the Pacific Fishery Management Council report tell the story—overall declines in numbers and value of coho and chinook caught by Washington and west coast fishing fleets, with coho practically

disappearing in some of the statistics. *See, e.g.,* Brimmer Decl. Ex. B, p. 125 and Tables. Many once abundant salmonid runs are now simply too weak to allow any fishing. *Id.* The elimination and degradation of available salmon habitat has been a major factor in this decline. No party disputes these basic and disturbing facts. *See* Memorandum and Decision, Dkt. No. 20383 (filed Mar. 29, 2013) at p. 7 ¶ 3.28 ("Today, while some salmon stocks in the Case Area are healthy, others are depressed, in danger of extinction, or already extinct.") (facts admitted by all parties); *id.* at p. 4 ¶ 3.10 ("Since Treaty time, overharvest, habitat alteration, poor hatchery practices, and hydropower development are some of the human-caused factors that have greatly reduced the abundance of salmon available for tribal harvest in the Case Area.") (facts admitted by all parties).

While it openly acknowledges the precarious status of these remaining salmon runs, the State nonetheless argues that the district court's injunction was improper because the State allegedly will do an adequate job of protecting salmon without interference from the court:

> Even absent a treaty-based obligation to preserve salmon runs, the State has every incentive to protect this vital natural resource to the greatest extent reasonably possible. Salmon are vital to Washington's economy, its culture, its diet, and its recreation, and the State has spent hundreds of millions of dollars over the last two decades—since long before the district court's injunction—to preserve and restore salmon runs.

*See* State Br. at 33. The State argues that it has "spent years developing and

13

implementing a comprehensive plan aimed at all categories of human activity that affect salmon," and that "the plan is working." *See* State Br. at 54.

The State's argument is contrary to the evidence and in fact underscores the need for the injunctive relief ordered by the district court. While amici agree that the State *should* have every incentive to protect this valuable resource, actual recovery measures have lagged far behind good intentions, and the district court correctly noted that the steps taken thus far have not led to recovery of these imperiled species. *See* Memorandum and Decision, Dkt. No. 20383 (filed Mar. 29, 2013) at p. 27-28, ¶ 40 (summarizing status report findings that salmon are declining and habitat degradation is a primary cause). While the State may feel that its efforts to protect salmon are "working," State Br. at 54, the facts tell a different story. The district court correctly rejected the State's efforts to explain away the need for barrier culvert removal by pointing to its alleged "success" in its other salmon recovery efforts. Simply ordering the state to 'keep doing what it's doing' will plainly lead to continuing diminishment of salmon.

Similarly, the State's argument that it should be allowed to allocate resources between barrier culvert removal and other salmon recovery efforts as it sees fit likewise cannot withstand scrutiny. The State repeatedly emphasizes that there are multiple causes for the decline in salmon runs. *See, e.g.,* State Br. at 50, 54-55. The State then leaps from this undisputed fact to the conclusion that barrier

culvert repair will not have *any* effect on salmon runs. *See* State Br. at 60 (arguing that culvert repair will have "little to no ultimate benefit"). But the State's leap bypasses both logic and fact. It does not follow that because barrier culverts are not the *only* cause of the decline of salmon runs, their repair and removal cannot lead to significant increases in salmon populations. To the contrary, because barrier culverts block access to habitat entirely, barrier removal is frequently the most effective recovery measure (and often the measure with the most <u>immediate</u> positive impact) when compared with other habitat recovery efforts, such as reforestation, repairing stream-straightening or channelization, or increasing flows. And obviously, other habitat restoration efforts will be futile if salmon are unable to access the restored habitat.

The district court properly concluded that opening up additional habitat by removing barrier culverts will have a significant positive effect on salmon populations. *See* Memorandum and Decision, Dkt. No. 20383 (filed Mar. 29, 2013) at p. 27, ¶ 38 (Removing barrier culverts "provides immediate benefit in terms of salmon production, as salmon rapidly re-colonize the upstream area and returning adults spawn there.); *id.* at p.23, ¶ 20 ("Fish passage barrier culverts have a negative impact on spawning success, growth and survival of young salmon, upstream and downstream migration, and overall production."); *id.* at p.24 ¶ 27 ("State-owned barrier culverts are so numerous and affect such a large area that

15

they have a significant total impact on salmon production.").  Indeed, the State itself apparently agrees, and has recently represented to the State Legislature in concert with amicus Association of Counties, that the removal of barrier culverts "reduces maintenance costs, increases public safety, <u>increases fish habitat=increased fish populations=fishing opportunities</u>, and helps local community."  *See* Brimmer Decl. Ex. D, portions of fish barrier presentation by Washington Dep't of Fish and Wildlife and Association of Counties (emphasis added).

Finally, while the State argues that injunctive relief was improper because the State was already working to replace its barrier culverts, again the evidence tells a different story.  The district court estimated that at the State's current pace, it will take more than 100 years to correct the barrier culverts that block significant habitat.  Memorandum and Decision, Dkt. No. 20383 (filed Mar. 29, 2013) at p. 25, ¶ 28.  Even more telling, the number of barrier culverts has <u>increased</u> since the State's initial inventory, *see id.* p. 25 ¶ 29, so at this pace the State will <u>never</u> finish the task of correcting the barrier culverts, *see id.* p. 26 ¶ 31.  This is not success, nor even progress, and the State's argument that it has adequate incentive to correct the problem without interference from the court cannot be squared with the facts and the State's own actions, even since the inception of this case.

At bottom, the State's arguments that it should be given the deference to

conduct salmon recovery efforts as it sees fit, prioritizing between barrier culvert removal and other efforts as its experts determine is appropriate, is simply an argument for the status quo, a status that is plainly harming salmon and the citizens of the state. The State has been attempting to recover salmon, with limited barrier culvert removal as a component of its efforts, for years—with little to show by way of actual recovery of these species or significant reduction in the number of barriers. The State has not and cannot produce any credible evidence that measures that have thus far fallen short will suddenly and inexplicably produce different results. Accordingly, the district court properly rejected the State's efforts to substitute other salmon recovery efforts for barrier culvert removal. The district court's intervention was necessary and warranted to ensure timely removal of culverts that entirely block access to and eliminate vast areas of salmon habitat.

B.    The State's Efforts to Elevate the Standard for Injunctive Relief Are Unfounded.

The State's arguments that injunctive relief is improper find as little support in the law as they do in the facts. The State's various objections all seek to create an elevated and novel standard for injunctive relief, despite clear Ninth Circuit precedent to the contrary. These efforts must fail.

The State turns the standard for injunctive relief upside down and repeatedly argues, contrary to its own representations, that the district court abused its discretion because the Tribes did not prove it is certain that salmon runs will

17

improve by some specific, quantifiable amount if barrier culverts are removed. *See, e.g.*, State Br. at 50-51. The State overlooks or dismisses the substantial evidence—much of it the State's own statements—supporting the findings that removing barrier culverts will improve salmon runs. *See also*, Brimmer Decl., Ex. D; ER 38, 31-32, 559, 1094-95; SER 11-13, 15.

The State misstates the Tribes' burden as well. Neither the Ninth Circuit nor the Supreme Court has ever held that parties must demonstrate the certainty of irreparable harm to be awarded injunctive relief. To the contrary, as the Ninth Circuit has recently reaffirmed, "[a]fter *Winter*, a district court cannot grant an injunction unless [the plaintiff] has shown that irreparable harm is 'likely' . . . . Of course, while 'likely' is a higher threshold than 'possible,' the [plaintiff] need not prove that irreparable harm is certain or even nearly certain." *Small v. Avanti Health Systems*, LLC, 661 F.3d 1180, 1191 (9th Cir. 2011) (internal citations omitted) (emphasis added). The State demands far more than this Court requires by insisting that the Tribes show that removal of barrier culverts will certainly lead to a precise quantity of additional fish.

The State misses the mark again when it argues that the precise quantity of an increase in fish must also attain some unidentified level of significance; that even if its own experts are correct that removal of barrier culverts could lead to an increase of approximately 200,000 adult salmon annually, this increase would be

"miniscule" because it represents only a 5% increase over recent harvest levels.
*See* State Br. at 51-52. The State is simply wrong. The Tribes need not show that
the increase in salmon runs would reach some particular threshold in relationship
to the size of the runs as a whole. Indeed, the Ninth Circuit recently rejected a
similar argument that a logging project that would only affect 6% of a burned area,
and an even smaller portion of the National Forest as a whole, was too small to
truly injure the plaintiffs. *See Alliance for the Wild Rockies*, 632 F.3d at 1135. A
potential 5% increase in salmon runs is hardly "de minimus" to the Tribes, or to
the commercial fishermen that depend on these fish for their livelihoods. *See*
*supra* Brimmer Decl., Ex. B (the number of returning salmon can directly affect
the harvest). The lack of fish caused by the State's barrier culverts is an
irreparable injury that warrants injunctive relief.

Finally, the State argues that there are factors other than the State's barrier
culverts that degrade salmon habitat, and so culvert replacement on its own may
not lead to increased salmon runs. *See* State Br. at 53 ("habitat can be highly
degraded and fish may be unable to use it for reasons unrelated to barrier
culverts"). By the State's rationale, no cause of salmon decline would ever be
actionable or worth fixing because fixing any one would not recover salmon and
would leave others untouched. This "death by a thousand cuts" is not the law.
Indeed, with respect to some of these very same species, the Ninth Circuit has

found that reducing one form of habitat degradation (pesticide runoff) supports injunctive relief, while citing agency findings that pesticide use is only one of many forms of habitat degradation that harms salmon. *See Wash. Toxics Coal. v. EPA*, 413 F.3d 1024 (9th Cir. 2005) (citing 65 Fed. Reg. 42,422, 42,473 (2000) (agency findings listing numerous sources of likely harm to Pacific salmon)); *cf. Nat'l Wildlife Fed'n v. NMFS*, 422 F.3d 782, 796-98 (9th Cir. 2005) (upholding injunction that would reduce, but not eliminate, harm to salmon from hydrosystem operations). Removing barrier culverts will fix one major piece of the problem and will lead to increases in salmon runs, even if other factors continue to limit runs. A problem with multiple causes necessarily requires multiple fixes with no one being the magic bullet. The State's arguments in this regard are again simply an attempt to preserve the degraded status quo. The district court properly found it had ample authority to order a remedy that would ameliorate a problem that stems from multiple causes.

## CONCLUSION

For the foregoing reasons, amici respectfully submit that the district court's injunction is plain in the public interest protecting all Washington citizens, that it was not an abuse of discretion, and amici ask that it be affirmed.

Respectfully submitted this 29th day of January, 2014.


s/  Janette K. Brimmer
AMANDA W. GOODIN
JANETTE K. BRIMMER
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340 | Phone
(206) 343-1526 | Fax
agoodin@earthjustice.org
jbrimmer@earthjustice.org
*Attorneys for Amici Curiae, Pacific Coast Federation of Fishermen's Associations and Institute for Fisheries Resources*

STATEMENT OF RELATED CASES

Amici Curiae Pacific Coast Federation of Fishermen's Associations and Institute for Fisheries Resources are unaware of any related cases within the meaning of Ninth Circuit Rule 28-2.6 that are pending in this or any other court.

Respectfully submitted this 29th day of January, 2014.

s/ Janette K. Brimmer
AMANDA W. GOODIN
JANETTE K. BRIMMER
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA 98104
(206) 343-7340 | Phone
(206) 343-1526 | Fax
agoodin@earthjustice.org
jbrimmer@earthjustice.org
*Attorneys for Amici Curiae, Pacific Coast Federation of Fishermen's Associations and Institute for Fisheries Resources*

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS,
AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).  The brief contains 4,745 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  The brief has been prepared in Times New Roman, 14 point font, using Microsoft Word 2010.

Respectfully submitted this 29th day of January, 2014.


s/  Janette K. Brimmer
AMANDA W. GOODIN
JANETTE K. BRIMMER
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340 | Phone
(206) 343-1526 | Fax
agoodin@earthjustice.org
jbrimmer@earthjustice.org
*Attorneys for Amici Curiae, Pacific Coast Federation of Fishermen's Associations and Institute for Fisheries Resources*

CERTIFICATE OF SERVICE

I am a citizen of the United States and a resident of the State of Washington. I am over 18 years of age and not a party to this action. My business address is 705 Second Avenue, Suite 203, Seattle, Washington 98104.

I hereby certify that on January 29, 2014, I electronically filed the foregoing Amici Curiae Brief of Pacific Coast Federation of Fishermen's Associations and Institute for Fisheries Resources with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users who will be served electronically by that system.

I, Catherine Hamborg, declare under penalty of perjury that the foregoing is true and correct. Executed on this 29th day of January, 2014, at Seattle, Washington.

Catherine Hamborg

1