NO. 13-35474

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA, et al.,

Appellees,

v.

STATE OF WASHINGTON,

Appellant.

On Appeal From The United States District Court For The Western District Of Washington

No. CV 70-9213
The Honorable Ricardo S. Martinez
United States District Court Judge

## REPLY BRIEF OF APPELLANT STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General

NOAH GUZZO PURCELL, WSBA #43492
*Solicitor General*
LAURA J. WATSON, WSBA #28452
*Deputy Solicitor General*
JESSICA E. FOGEL, WSBA #36846
*Assistant Attorney General*
PO Box 40100
Olympia, WA 98504-0100
(360) 664-0869

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................1

II.   ARGUMENT .......................................................................3

    A.  The Stevens Treaties Contain No Habitat Protection Right. ....................3

        1.  Treaty Canons of Construction Cannot Create a Right Where None Exists. .....................................................................4

        2.  Plaintiffs' Cases Interpreting the "Right of Taking Fish" Have Required Apportionment, Not Restoration, of Fish. .................8

        3.  The District Court's Open-Ended Standard Contravenes *Phase II* and Invites Future Lawsuits. ................................10

    B.  The District Court's Conclusion That State-Owned Culverts Significantly Diminish Salmon Quantity Lacks Evidentiary Support. .......................................................................15

    C.  The Injunction Is an Abuse of Discretion Because It Is Overbroad, Relies on Erroneous Factual Findings, and Impermissibly Intrudes Into State Government. .....................................18

        1.  The Injunction Is Overbroad Because It Requires Replacing Culverts Even Where Doing So Would Be Futile and Even in Watersheds Where Culverts Are Not a Problem. .........................18

        2.  The District Court Ignored Undisputed Cost Evidence Presented by the State and Substituted Its Budgetary Judgment for That of State Policymakers. ..........................23

        3.  The District Court Impermissibly Substituted Its Judgment for That of State Engineers. ..........................................26

        4.  The District Court's Errors Together Led to an Injunction That Impermissibly Intrudes Into State Government. ......................28

D.   The United States Should Be Held Responsible for Its Role in
     Designing, Funding, and Approving Barrier Culverts. ...........................30

     1.   The District Court Erroneously Dismissed the State's
          Waiver Defense. .................................................................................31

     2.   The State Should Be Permitted to Pursue Its Counterclaims. ...........33

     3.   Equity Should Have Factored Into Any Relief the District
          Court Granted. ....................................................................................36

III.   CONCLUSION ............................................................................................38

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Abbott*,
  560 U.S. 1 (2010) ............................................................................ 3

*Berrey v. Asarco, Inc.*,
  439 F.3d 636 (10th Cir. 2006) .................................................. 33, 34

*Brooks v. Nez Perce County*,
  670 F.2d 835 (9th Cir. 1982) .......................................................... 37

*Cappaert v. United States*,
  426 U.S. 128 (1976) ......................................................................... 9

*Choctaw Nation of Indians v. United States*,
  318 U.S. 423 (1943) ...................................................................... 3, 7

*City of Sherrill v. Oneida Nation of New York*,
  544 U.S. 197 (2005) .................................................................. 31, 32

*Cobell v. Norton*,
  428 F.3d 1070 (D.C. Cir. 2005) ............................................... 23, 28

*Horne v. Flores*,
  557 U.S. 433 (2009) .................................................................. 23, 24

*Dep't of Game v. Puyallup Tribe*,
  414 U.S. 44 (1973) ........................................................................... 9

*In re Pegasus Gold Corp.*,
  394 F.3d 1189 (9th Cir. 2005) ........................................................ 35

*John v. United States*,
  720 F.3d 1214 (9th Cir. 2013) .......................................................... 9

*Lebron v. National R.R. Passenger Corp.*,
  513 U.S. 374 (1995) ........................................................................ 37

*Nez Perce Tribe v. Idaho Power Co.*,
  847 F. Supp. 791 (D. Idaho 1994) ................................................................. 14

*Oneida Indian Nation of New York v. County of Oneida*,
  617 F.3d 114 (2d Cir. 2010) .......................................................................... 32

*Pochiro v. Prudential Ins. Co. of America*,
  827 F.2d 1246 (9th Cir. 1987) ....................................................................... 35

*Pyramid Lake Paiute Tribe of Indians v. Dep't of the Navy*,
  898 F.2d 1410 (9th Cir. 1990) ....................................................................... 33

*Rizzo v. Goode*,
  423 U.S. 362 (1976) ....................................................................................... 28

*Solem v. Bartlett*,
  465 U.S. 463 (1984) .......................................................................................... 4

*Stone v. City and County of San Francisco*,
  968 F.2d 850 (9th Cir. 1992) ......................................................................... 30

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009) ....................................................................... 18

*Thomason v. Aetna Life Ins. Co.*,
  9 F.3d 645 (7th Cir. 1993) ............................................................................. 31

*Tulee v. Washington*,
  315 U.S. 681 (1942) ..................................................................................... 7, 8

*United States v. Adair*,
  723 F.2d 1394 (9th Cir. 1983) ....................................................................... 10

*United States v. Fowler*,
  913 F.2d 1382 (9th Cir. 1990) ....................................................................... 31

*United States v. Park Place Associates, Ltd.*,
  563 F.3d 907 (9th Cir. 2009) ......................................................................... 35

*United States v. Washington (Phase II)*,
  759 F.2d 1353 (9th Cir. 1985) (en banc)...................................... 6, 7, 9, 10, 13

*United States v. Washington*,
  157 F.3d 630 (9th Cir. 1998) ......................................................... 31

*United States v. Washington*,
  573 F.3d 701 (9th Cir. 2009)................................................... 12, 29

*United States v. Winans*,
  198 U.S. 371 (1905) ...................................................................... 8, 9

*Washington Environmental Council v. Bellon*,
  732 F.3d 1131 (9th Cir. 2013)................................................. 15, 18

*Washington v. Washington State Commercial Passenger Fishing Vessel
  Ass'n (Fishing Vessel)*,
  443 U.S. 658 (1979) ......................................... 3, 5, 6, 7, 9, 10, 14

*Winters v. United States*,
  207 U.S. 564 (1908) ......................................................................... 8

*Wyler Summit Partnership v. Turner Broadcasting System, Inc.*,
  235 F.3d 1184 (9th Cir. 2000)....................................................... 28

## Statutes

28 U.S.C. § 2202....................................................................... 34, 35

## Rules

Fed. R. Civ. P. 13(a) ......................................................................... 35

## Other Authorities

Michael C. Blumm & Jane G. Steadman, *Indian Treaty Fishing Rights
  and Habitat Protection:  The Martinez Decision Supplies A Resounding
  Judicial Reaffirmation*, 49 NAT. RESOURCES J. 653, 700-01 (2009)....... 12

## I.   INTRODUCTION

The Tribes and United States admit that when they signed the Stevens Treaties, both sides believed salmon runs "inexhaustible."  They nonetheless claim that they intended the treaties to prohibit something they never contemplated: development that impacts salmon runs.  Nothing in the language or history of the treaties suggests such a prohibition, and neither this Court nor the Supreme Court has ever interpreted them to contain such a prohibition. Recognizing such a prohibition now would expand the treaties far beyond their terms and impose a new servitude on the very land as to which the Tribes "cede[d], relinquish[ed], and convey[ed] . . . all of their right, title, and interest."  The Court should reject this radical claim.

Plaintiffs also admit that they have not proven the impact of state-owned culverts on salmon runs.  Dkt. 55-1 at 29 n.9.  Instead, they claim a right to injunctive relief because harm should be inferred.  But injunction based on inference is not the law.  The duty fashioned by the district court allows inferences to substitute for evidence and provides no guidance as to the threshold quantum of "diminishment" that constitutes a breach.  Accepting this rule would give the Tribes a right to block any activity or remove any

development where a "logical inference" suggests impacts on salmon. The Court should reject this sweeping test as well.

Plaintiffs next argue that the district court's injunction was reasonable and "as deferential to the State as possible." Dkt. 55-1 at 2. Not so. The district court ordered the State to replace nearly every state-owned barrier culvert in the case area, even where doing so will have no benefit for salmon. The court also ordered the State to use the most expensive culvert design, at exorbitant total cost. Plaintiffs argue that the State can afford it. But the State cannot afford it without diverting money from other vital needs. The court erred by substituting its preferred approach to salmon recovery for the State's.

The court also erred by refusing to hold the United States responsible for its role in designing, funding, and approving state-owned barrier culverts. The court should not have dismissed the State's waiver defense and counterclaims.

In short, this Court should decline to create a treaty-based duty that finds no support in the treaties themselves. The Court should reverse the summary judgment decision in favor of Plaintiffs and direct summary judgment for the State. If the court concludes there is a duty, the case should be remanded for consideration of the State's defenses and claims against the United States, and a narrowing of the injunction.

## II.    ARGUMENT

### A.    The Stevens Treaties Contain No Habitat Protection Right.

Treaties are interpreted first through their plain language. *Abbott v. Abbott*, 560 U.S. 1, 10 (2010). The Stevens Treaties are assumed to have been negotiated with the Tribes "as equals at arm's length." *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n (Fishing Vessel)*, 443 U.S. 658, 675 (1979). Although ambiguous treaty provisions are typically interpreted to the benefit of tribes, treaties cannot be "expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties." *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943).

Plaintiffs ask this Court to expand the clear terms of the Stevens Treaties to reverse a decline in salmon, saying that a duty to prevent such a decline "can be implied from the Treaties." Dkt. 54 at 24. Nothing in the treaty language supports such a duty, however, and prior decisions interpreting the treaties have been grounded in the treaty language itself, not in an expansion of that language. Moreover, Plaintiffs' argument that the treaties must include such a duty has no basis in the parties' understanding or in the case law. And the

open-ended test applied by the district court ignores precedent, imposes new burdens on land title, and would lead to an unending stream of future litigation.

### 1. Treaty Canons of Construction Cannot Create a Right Where None Exists.

Plaintiffs ignore the treaties' language and jump immediately to the canons of construction. But neither the treaty language nor the canons of construction provide a habitat protection right to ban actions on the ceded lands that incidentally impact fish.

The treaties' negotiating history confirms this point. As the district court recognized, "It was not deemed necessary to write any protection for the [fish] into the treaty because nothing in any of the parties' experience gave them reason to believe that would be necessary." ER 53.

Plaintiffs respond by arguing that the parties *believed* the fish would be inexhaustible, so the treaties' silence must mean that a habitat protection right is implied. Dkt. 55-1 at 32-35; Dkt. 54 at 15, 24. In fact, this belief supports the opposite conclusion: why would the parties have negotiated an implied right to habitat protection when neither party believed such a right was needed? Moreover, courts have consistently refused to turn incorrect assumptions into binding intentions. *See, e.g.*, *Solem v. Bartlett*, 465 U.S. 463, 468-69 (1984) ("[W]e have never been willing to extrapolate from this [mistaken] *expectation*

a specific congressional *purpose* . . . .") (emphasis added). In this very case, the Supreme Court refused to turn Plaintiffs' assumption that the Tribes would always be able "to make a living" by fishing, Dkt. 54 at 26, into a binding intention. Had the Court accepted that approach in *Fishing Vessel*, it would have allocated to the Tribes whatever portion of the fish was necessary to make a living, rather than capping their share at fifty percent. *Fishing Vessel*, 443 U.S. at 686 ("[T]he 50% figure imposes a maximum but not a minimum allocation.").

Put another way, there is a big difference between the parties *expecting* the Tribes always to have enough fish and *intending* to grant the Tribes veto power over third-party actions that incidentally impact fish quantity. Transforming the parties' mistaken assumption into an altogether different alleged intention, as Plaintiffs propose, would expand the treaties beyond anything the parties could reasonably have intended. Countless aspects of modern life may impact salmon runs—from paved roads to agricultural runoff to hydroelectric dams. On the Plaintiffs' reading, the treaties implicitly grant Tribes authority to bar any such activities. The parties plainly did not understand the treaties to grant such authority when the Tribes "cede[d], relinquish[ed], and convey[ed] to the United States all their right, title, and

interest in and to the lands," and where the federal government's primary purpose in negotiating the treaties was to extinguish Indian land claims. *Id.* at 661-62. To hold now that lands in which the Tribes ceded "all their right, title, and interest" are encumbered by an implied right of habitat protection is contrary to the treaties' plain language and is unsupported by negotiating history.

Plaintiffs nevertheless insist that the treaties guarantee some unspecified volume of fish. *See, e.g.,* Dkt. 55-1 at 17. Courts have not so held. Rather, courts have recognized the Tribes' right to a fair share of the *available* fish. *Fishing Vessel*, 443 U.S. at 684-85. Contrary to Plaintiffs' argument, the Supreme Court did not sloppily use the word "available" to describe the tribal allocation. Dkt. 55-1 at 26-27; Dkt. 54 at 21. Rather, the Court's explicit holding was that available fish be fairly apportioned. This Court confirmed as much when it explained that *Fishing Vessel* "did not hold that the Tribes were entitled to any particular minimum allocation of fish." *United States v. Washington (Phase II)*, 759 F.2d 1353, 1359 (9th Cir. 1985) (en banc).

Plaintiffs also argue that the Treaties would be meaningless without a habitat protection right. Not so. The State cannot deprive Tribes of their fair share of the "available fish," and the State has every incentive to maximize the

number of fish available. Salmon are vital to the State's economy and culture, and the State has spent hundreds of millions of dollars to preserve and restore salmon runs. Thus, there is no need to expand the treaties beyond their terms to achieve Plaintiffs' asserted but unsupported intention, even if such a reading were allowed. *See, e.g.*, *Choctaw Nation*, 318 U.S. at 432 (holding that treaties cannot be "expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties").

Next, the Tribes argue that they relinquished land in exchange for valuable fishing rights, so the fishing right must guarantee them some volume of fish. Dkt. 55-1 at 18-19. "But because the Indians obtained something of value, it does not necessarily follow that they received everything of value pertaining to taking fish[.]" *Phase II*, 759 F.2d at 1358. The Tribes are not entitled to a certain volume of fish, but "have a right to at most one-half of the *harvestable* fish in the case area." *Id.* at 1359 (emphasis added).

The cases cited by the Tribes do not support their position on how to apply the canons, as each relied on express language in the treaties. *Fishing Vessel* interpreted the express "right of taking fish in common with other citizens" as conferring to Indians and non-Indians fair shares of the available fish. *Fishing Vessel*, 443 U.S. at 684-85. *Tulee* interpreted the express right of

taking fish in Tribes' "usual and accustomed places" as prohibiting state regulations that directly infringed that right. *Tulee v. Washington*, 315 U.S. 681, 683-85 (1942). *Winters* did not involve an off-reservation fishing right at all, but instead dealt with an agreement creating an Indian Reservation. *Winters v. United States*, 207 U.S. 564 (1908). And *Winans* held that the treaty clause guaranteeing "the right of taking fish at all usual and accustomed places" plainly included a right to access those places, a requirement that "was foreseen and provided for" by the treaties. *United States v. Winans*, 198 U.S. 371, 381 (1905).

In short, no case or canon of construction supports reading the treaties as containing an enormously broad implied right the parties never contemplated.

### 2. Plaintiffs' Cases Interpreting the "Right of Taking Fish" Have Required Apportionment, Not Restoration, of Fish.

The Tribes argue that the right they seek is but "one small step" beyond existing treaty rights. Dkt. 55-1 at 12. Yet they admit that they seek "prospective restoration" of a diminished resource. *Id.* at 29 n.9. No case has ever suggested that the treaties require the State to restore fish to prior levels. Such a result marks not "one small step" but a colossal and unprecedented leap.

Plaintiffs cite *Winans* as support for this new treaty right. Dkt. 55-1 at 23; Dkt. 54 at 22. *Winans* held that non-Indian fishers cannot operate a fish

8

wheel that "gives them exclusive possession of the fishing places." *Winans*, 198 U.S. at 382. It also prohibited non-Indian fishers from taking all of the fish in the stream. *Fishing Vessel*, 443 U.S. at 681. *Winans*, thus, was a case involving access to tribal fishing areas and apportionment of existing fish. It had nothing to do with an obligation to restore fish.

Plaintiffs next cite *Puyallup II*. Dkt. 55-1 at 23; Dkt. 54 at 23. *Puyallup II* also involved apportionment of an existing supply of fish, not restoration of a prior supply. *Dep't of Game v. Puyallup Tribe*, 414 U.S. 44, 48-49 (1973). Likewise with *Fishing Vessel*, 443 U.S. at 684-85. And the *Phase II* decision cited by Plaintiffs simply required that hatchery fish be included in the tribal apportionment. Dkt. 55-1 at 23; Dkt. 54 at 28.

Plaintiffs also try to support their new right with cases applying the "implied-reservation-of-water" doctrine. Dkt. 55-1 at 24-25: Dkt. 54. at 23-24. The doctrine recognizes that certain federal land reservations, including Indian reservations, impliedly include a water right sufficient to carry out the reservation's purpose. *Cappaert v. United States*, 426 U.S. 128, 138 (1976). There is no basis for expanding "this narrow rule," *John v. United States*, 720 F.3d 1214, 1226 (9th Cir. 2013), beyond implied reservation of water for federal land to the restoration of fish for treaty fishing purposes.

Even if the doctrine did apply, it would not help Plaintiffs. *Adair*, the principal case Plaintiffs cite, dealt with apportionment of an existing water resource between Indian and non-Indian users. *United States v. Adair*, 723 F.2d 1394, 1408-09 (9th Cir. 1983); *Fishing Vessel,* 443 U.S. at 686 (implied reservation of water cases involved water apportionment). Nothing in *Adair* or any other reserved water case suggests a responsibility to restore water to a stream system diminished through a variety of causes, such as climate change or aquifer depletion. By contrast, here it is undisputed that salmon have diminished through a variety of natural and human causes. ER 11. Plaintiffs seek not to reallocate the fish, but rather to force the State to dramatically accelerate culvert replacement based on the unsubstantiated theory that it will lead to an unspecified increase in salmon available for treaty harvest. Neither the treaty language nor precedent supports reading this duty into the treaties.

### 3. The District Court's Open-Ended Standard Contravenes *Phase II* and Invites Future Lawsuits.

In *Phase II*, this Court held that if a habitat protection right exists, the legal standards governing it must be precisely defined. *Phase II*, 759 F.2d at 1357. This was not an invitation to couple an imprecise legal standard with an injunction about a specific topic, such as culverts. Yet that is what the district court did in holding the State liable based on no more than a "logical inference

that a significant portion of [fish] diminishment" can be attributed to state-owned culverts. ER 50.

Plaintiffs offer two responses to this fundamental flaw in the district court's opinion. First, they misconstrue the State's concern. Plaintiffs assert that the State's complaint is that the district court failed to provide "a general rule applicable to all future cases." Dkt. 55-1 at 41. To the contrary, the State's complaint is that the district court *did* formulate a general rule that is utterly unworkable if applied in future cases.

In holding that state-owned culverts violate the treaties based solely on a "logical inference that a significant portion of [fish] diminishment" can be attributed to such culverts, ER 50, the district court formulated a boundless rule. Barriers are a relatively minor contributor to degraded habitat when compared to other human-caused factors. ER 860, 872-73; SSER 21-26. If the court can rely on a mere logical inference that state-owned culverts are responsible for a "significant portion" of fish diminishment, then the court could also infer that these other factors are responsible for a significant portion of diminishment, and presumably could regulate them as well. As summed up by one of the Tribes' amicus supporters:

> [T]he tribes have established a winning strategy . . . pick one of
> the myriad activities that degrade salmon habitat, connect the

degradation to the depressed salmon populations . . . cite the prior treaty cases and the canons of treaty interpretation, and assert that diminished salmon numbers prohibit the tribal harvest from providing tribal members a "moderate living."[1]

Plaintiffs' second defense of the district court's unworkable standard is that procedural rules will prevent this standard from being used to challenge the many other third-party activities that impact salmon. Dkt. 55-1 at 41-42. This is flimsy consolation in a case that has been ongoing for over 40 years and where the district court long ago abandoned normal rules of procedure and effectively became "a regulatory agency perpetually to manage fishing." *United States v. Washington*, 573 F.3d 701, 709 (9th Cir. 2009). Plaintiffs also contend that equitable considerations will limit application of this standard, but that is again little comfort where the district court has ordered the State to spend nearly $2 billion on culverts, when the expenditures may produce little result and where salmon recovery money is often better spent elsewhere.

The bottom line is that, under the district court's approach, any number of longstanding activities or developments of the State and other third parties are subject to challenge. Under the court's reasoning, if development along a river—such as the longstanding development along the Duwamish River in

---

[1] Michael C. Blumm & Jane G. Steadman; *Indian Treaty Fishing Rights and Habitat Protection: The Martinez Decision Supplies A Resounding Judicial Reaffirmation*, 49 NAT. RESOURCES J. 653, 700-01 (2009).

Seattle (home to Boeing, the Port of Seattle, and countless others)—impacts habitat in a manner that has some unquantified relationship to the number of salmon in the ecosystem, the court can control the activities of all the third parties along the river, requiring them to restore the salmon run by forcing them to change anything from what areas of their property they develop to rebuilding of substantial structures already there. Plaintiffs present no reason for drawing the line between the fish restoration they seek here and this more extreme example. In fact, the district court's reasoning does not allow that line to be drawn.

As a workable alternative, the State proposed the non-discrimination standard previously applied by the Supreme Court and other courts. Dkt. 55-1 at 36-38; Dkt. 54 at 30-34. Plaintiffs reject this alternative, arguing that it is akin to saying that tribal fishers are equal to non-tribal fishers whereas the Tribes struck a bargain for better-than-equal treatment. Dkt. 55-1 at 37; Dkt. 54 at 33-34. But the non-discrimination standard gives Tribes powers non-tribal fishers lack, as this Court long ago explained. "If the State acts for the primary purpose or object of affecting or regulating the fish supply or catch in noncompliance with the treaty," the Tribes may sue to block such actions, whereas non-tribal fishers could not. *Phase II*, 759 F.2d at 1357. Moreover,

even if the Tribes were correct that the non-discrimination standard placed them on equal footing with non-tribal fishers as to a habitat protection right, there are other respects in which tribal and non-tribal fishers are accorded equal treatment under the treaties. *Fishing Vessel*, 443 U.S. at 684-85 (treaties confer to tribal and non-tribal fishers a fair share of fish).

Unlike the district court's standard, the non-discrimination standard is workable and well-grounded in precedent. Dkt. 25 at 34-35. As reasoned by the *Idaho Power* court, "losses arising from reasonable development should be borne fifty/fifty by treaty and non-treaty fishermen. . . . A pattern of development which concentrated the adverse effects of growth on treaty fish runs, and spared non-treaty runs, of course, would violate the treaty right. No special environmental right . . . need be created to remedy such a violation, however." *Nez Perce Tribe v. Idaho Power Co.*, 847 F. Supp. 791, 809 (D. Idaho 1994) (*citing United States v. Washington (Phase II Panel)*, 694 F.2d 1374, 1382 (9th Cir. 1982)).

In sum, the district court erred first by creating a new treaty right and second by placing no sideboards on the new right. This Court should reverse the summary judgment decision and direct summary judgment for the State.

**B.    The District Court's Conclusion That State-Owned Culverts Significantly Diminish Salmon Quantity Lacks Evidentiary Support.**

Central to the district court's grant of summary judgment to Plaintiffs and its eventual injunction was the court's inference that state barrier culverts have caused "a significant portion of [fish] diminishment."  ER 50.  This crucial inference lacked evidentiary support, requiring reversal of both the summary judgment order and the injunction.

The Tribes acknowledge that their burden was to show that the state actions being challenged "proximately caused a violation of the treaty fishing right."  Dkt. 55-1 at 42.  In this regard, they failed.  It is undisputed that multiple natural and human causes have contributed to the decline in salmon. ER 11, 288, 717-18.  The Tribe's own expert testified that he did not know how much of the decline in salmon could be attributed to state-owned culverts. ER 1116.  It was not enough for the Tribes to simply assert that state-owned culverts contribute to the problem in "some undefined way and to some undefined degree."  *Washington Environmental Council v. Bellon*, 732 F.3d 1131, 1143 (9th Cir. 2013).  But that is all they did.

Plaintiffs offer four responses to these fatal flaws in the evidence they presented to the district court.  All fail.

First, the Tribes repeatedly assert that state-owned culverts have reduced salmon production by "hundreds of thousands of fish." *E.g.*, Dkt. 55-1 at 5, 11, 29, 40. But simply repeating something over and over doesn't make it true. To support this claim, the Tribes rely almost exclusively on a 1997 report to the Legislature, but as the State has explained, that report was never intended to represent how many salmon would return if WSDOT's culverts were replaced. Dkt. 25 at 51. Indeed, when the Tribes sought to introduce expert evidence that relied on the 1997 report to estimate the impact of state-owned culverts, the district court excluded the evidence as too speculative and not meeting *Daubert* standards. SER 2-4; SSER 1-12 (State's motion in limine). The Tribes initially cross-appealed the court's decision, but then voluntarily dismissed their appeal. Case 13-35519, Dkt. 47. Yet the Tribes still rely on that report to argue the impact of state culverts.

Second, Plaintiffs point to the court's findings that barriers generally impact fish quantity. *See, e.g.,* ER 30, ¶ 20 (salmon production negatively impacted by all barriers, such as dams, culverts, tide gates, and dikes); 31, ¶ 25 (loss of salmon production in Skagit River watershed attributed to barrier culverts); *but see* ER 428-29, 433-34 (majority of barriers in the Skagit River watershed are owned by non-state entities). The State has never disputed this.

16

But that does not prove that state-owned culverts themselves have any meaningful impact on salmon runs, especially when state culverts are vastly outnumbered by other culverts, such as those owned by the federal government, tribes, counties, and cities. *E.g.,* ER 196-209, 428, 469, 511, 514-515, 537-38.

Third, Plaintiffs try to characterize state culverts as "destroying" fish. Dkt. 54 at 21, 25, 31-32. But the problem with culverts is not that they destroy fish. Rather, fish numbers have diminished in part because of habitat degradation, and barriers are just one facet of degraded habitat. ER 1037. Again, Plaintiffs produced no evidence of the extent to which state culverts have contributed to this degradation.

Fourth, recognizing the flaws in their other arguments, the Tribes make the remarkable assertion that they "are not seeking to recover some previously lost quantity of salmon that must be measured." Dkt. 55-1 at 29 n.9. Instead, they claim, the State should have to replace all of its barrier culverts, and then we will see what impact they were having. *Id.* That circular reasoning turns the law on its head.

In short, Plaintiffs failed to prove, and the court erred in concluding, that state-owned culverts have caused a significant part of fish diminishment. Once

that error is corrected, neither the summary judgment order nor the injunction can stand.  *See Bellon*, 732 F.3d at 1144 (no causation when a "multitude of independent third parties" are responsible for plaintiff's injuries).

**C.    The Injunction Is an Abuse of Discretion Because It Is Overbroad, Relies on Erroneous Factual Findings, and Impermissibly Intrudes Into State Government.**

The district court made other fundamental errors in issuing its injunction. First and foremost, the injunction is overbroad because it orders replacement of every state barrier culvert even where replacing culverts will be futile because of other barriers or in watersheds where culverts are not a problem.  Second, the court impermissibly dictated the State's budget priorities and substituted its technical judgment for that of state engineers.  Finally, the court did all of this in disregard of federalism principles that should have guided its decision.  For each of these reasons, the injunction is an abuse of discretion.

**1.    The Injunction Is Overbroad Because It Requires Replacing Culverts Even Where Doing So Would Be Futile and Even in Watersheds Where Culverts Are Not a Problem.**

"An overbroad injunction is an abuse of discretion."  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009) (citation omitted) (internal quotation marks omitted).  The injunction here is overbroad because the State must replace nearly all of its culverts in the case area even when doing so

would yield little benefit because of non-state-owned barriers on the same stream. ER 847 (benefits of fixing state-owned culverts will not be fully realized if other barriers are present). In response, the Tribes argue that many of the non-state barriers are located upstream rather than downstream of state barriers. Dkt. 55-1 at 48. But that is largely irrelevant. A fish that gets through a state culvert only to "butt up" against an upstream barrier is still barred from the upstream habitat. ER 1092-93, 1075-76.

The Tribes then argue that the State itself disregards other barriers when calculating its "priority index." Dkt. 55-1 at 48. The Tribes neglect to mention, however, that the priority index does not dictate the order in which culverts are improved; rather, the State typically focuses its efforts on improving culverts in streams with no other barriers. ER 630-31, 671.

The Tribes also incorrectly argue that hundreds of non-state barriers are already being replaced. Dkt. 55-1 at 48. But the exhibit they cite describes repair of both non-state *and* state-owned barriers. SER 17. From other evidence, we know that most of the barriers fixed have, in fact, been state-owned. ER 576-77, 635, 677; SSER 27. And the evidence showed that the United States is well behind the State in replacing its own barriers. ER 579-80,

1104.  Indeed, Washington State is recognized by the United States and others as a national leader in addressing fish passage.  ER 117, 879-80.

The injunction also ignores the other factors that eliminate or decrease the benefit of replacing each and every state-owned culvert.  For example, because half of the state's barriers are partial, ER 1077, fish are already getting through in these locations, and the upstream habitat might be fully "seeded" with spawning fish.  ER 847.  Also, if upstream habitat is degraded, fish may not use it.  ER 848, 1075-76.  And as the Tribe's expert noted, it is bad restoration strategy to open up certain habitat without first addressing issues related to hatchery fish.  ER 1099.  The court ignored these factors in ordering the State to replace nearly all of its barrier culverts in the case area.

The court also ordered the state to replace barrier culverts in all watersheds throughout the case area.  But as both tribal and state experts noted, barrier culverts are not a problem in certain watersheds.  ER 1129, 1037.  Of the twenty-three "water resource inventory areas" that comprise the case area, fish access is ranked "good" in all or part of seven areas, fair in all or part of four areas, and poor in all or part of eight areas.[2]  ER 872-73.  In light of these

---

[2] Data gaps exist for seven areas.

differences, it makes no sense to shift salmon recovery money to replacing every state-owned culvert in every watershed. ER 1040-44.

Instead, each party's experts testified that what is needed is a watershed-by-watershed approach that uses multiple restoration strategies. *E.g.,* ER 1096 (Sekulich: "you need the comprehensive approach that addresses various limiting factors in specific watersheds"); 1031 (Roni: it is better to focus on a variety of restoration approaches in individual watersheds rather than disperse restoration throughout the landscape); 1110 (Rawson: salmon recovery will only occur through action on many fronts); 1127 (McHenry: various complex factors must be addressed to restore salmon populations).

Despite the unanimity of the experts, the court erroneously found that "correction of human-caused barriers is recognized as the highest priority for restoring salmon habitat in the Case Area." ER 28. Based on this error, the court disregarded the State's institutional competence in salmon restoration and ordered it to prioritize culvert replacement above all other strategies.

The Tribes claim that this finding is not erroneous, but they cannot point to any witness who actually testified that correction of barriers is the highest priority. ER 54-55. Mr. McHenry simply testified that, *in one instance*, it made sense to address some of the barriers first. ER 1105-06. But even then,

that tribe fixed only seventeen of thirty-one barriers before moving onto other habitat projects that it deemed more important than the remaining fourteen barriers, ER 1102, an approach that is consistent with the State's own experience that the amount of habitat recovered through each culvert repair will rapidly decline as the State moves down its prioritization list. ER 119. And Dr. Roni did not testify that "the first focus is on reconnecting habitats isolated by culverts," as the Tribes allege. Dkt. 55-1 at 55. Rather, he testified that this should be the second focus *in the absence of a "limiting factors" analysis*. SER 177. Here, the State did a limiting factors analysis and concluded that fish access is not of high concern in a number of watersheds.[3] ER 856-77.

The court disregarded the experts and prioritized culvert repair above all other salmon restoration strategies, even in watersheds where culverts are not a problem and even when replacing culverts would be futile. This constitutes an abuse of discretion.

---

[3] The Tribes also allege that it is "absurd" for the State to claim that Dr. Roni testified that culvert corrections will have no measurable benefit. Dkt. 55-1 at 46. But the State simply cited Dr. Roni's testimony about his own modeling, which showed that replacing barriers was estimated to result in 3% of overall smolt recovery, an undetectable level. SSER 35-36; ER 181.

### 2. The District Court Ignored Undisputed Cost Evidence Presented by the State and Substituted Its Budgetary Judgment for That of State Policymakers.

Federalism concerns are heightened when a federal court dictates state budget priorities. *Horne v. Flores*, 557 U.S. 433, 448 (2009). Choices that require "judgment about the allocation of scarce resources" are "classic reasons for deference" to government administrators. *Cobell v. Norton*, 428 F.3d 1070, 1076 (D.C. Cir. 2005). When ordering injunctive relief, a court cannot disregard relevant information about the injunction's costs. *See id.* at 1077.

The court here disregarded relevant information about the injunction's costs. WSDOT's expert testified that future culvert replacements would average $2.3 million apiece. ER 1069-70. Under the court's order, this equates to approximately $117 million annually for culvert replacement, about $100 million more per year than the State has spent to date. Dkt. 25 at 58.

Plaintiffs did not present their own cost evidence in rebuttal. Instead, they claim that the district court rejected the State's cost estimate and "accepted the historic costs" of 12 stream-simulation projects as an accurate estimate of the State's costs going forward. Dkt. 55-1 at 56-57; ER 36 (citing SSER 15-20, showing costs of twelve stream-simulation culverts built between

23

2000 and 2006). But the district court never explicitly rejected the State's estimate or adopted the "historic costs" average. ER 36. Had it done so, it plainly would have abused its discretion, for those 12 projects included no bridges, the district court's preferred (and far more expensive) alternative, and there was undisputed evidence that the cost of construction materials had increased by over fifty percent within a five-year period. ER 654. Moreover, the district court never discussed or disputed evidence showing that WSDOT's culvert projects are becoming more complex and costly as WSDOT moves down its project list. ER 1070-71. For these reasons, historical costs are a poor proxy for future costs.

The prioritization of limited state funds "is a zero-sum budget exercise . . . . [I]if funding is used for a particular purpose, that necessarily means that other needs will have less funding or may have to be eliminated." ER 606; *see also Horne*, 557 U.S. at 448. Other priorities that could be affected by diverting more funds to culvert replacements include safety and mobility transportation projects, ER 652, 606, projects that benefit salmon, ER 609, 737-39, and education and social services, ER 655-56.

The Tribes argue that the injunction's cost is no big deal because it represents just "a sliver" of the State's transportation budget. Dkt. 55-1 at 58.

24

It is undisputed, however, that almost the entire transportation budget is allocated to specific projects and cannot be used for culvert replacement. ER 603-04, 647-48. The small part of the budget that is not already allocated must fund safety and maintenance projects in addition to culvert replacement. ER 605. As it currently stands, the transportation budget faces significant shortfalls. ER 602-03. Critical safety projects have been deferred because there are not enough unallocated dollars to go around. ER 606, 654. Add to this tens of millions of dollars for increased culverts funding and it is clear that, at a minimum, safety and maintenance projects would have to yield to the court's injunction.

The Tribes argue that such cuts are speculative, citing the testimony of former State budget director Victor Moore. Dkt. 55-1 at 58. But the Tribes misstate Moore's testimony. He simply testified that it would be speculative to assume that the Legislature might increase taxes to cover increased costs of culvert repair. SER 168. Mr. Moore is correct, because state law restricts the Legislature's ability to raise new sources of revenue. ER 648-49. In any event, Mr. Moore's refusal to speculate about tax increases does not undermine his key point that "any increases in culvert work would come at the expense of other programs." SER 169.

The Tribes also challenge Mr. Moore's testimony that health care, children's services, or higher education could be impacted if money is taken from the general fund for culvert repair. ER 656; Dkt. 55-1 at 59. They argue that this will not happen because the general fund has historically not been used for transportation purposes. But in the end, the Tribes cannot rebut the State's key point—the amount allocated between the general and transportation funds is largely a matter of legislative prioritization such that an unanticipated steep increase in required funding for culvert repair could impact either fund. Dkt. 25 at 59-60. Nor did they rebut that court-ordered prioritization for culverts will come at the expense of other state programs, transportation-related or otherwise. The district court erred in reaching a contrary conclusion.

### 3. The District Court Impermissibly Substituted Its Judgment for That of State Engineers.

The court also erred in ignoring the State's engineering judgment and requiring the State to replace its culverts with costly full-span bridges or stream-simulation culverts. ER 4-5. This, despite the fact that the State's engineers testified that other culvert designs can effectively pass fish. ER 890-92, 901, 932-44, 951, 569-70. The United States agrees, because the National Marine Fisheries Service also approves of well-designed hydraulic and no-

slope culverts, ER 241-44, which are much less costly than bridges or stream-simulation culverts.[4]

The Tribes try to dismiss the high costs of such designs by citing the average costs for the Department of Natural Resources to replace culverts on forest roads. Dkt. 55-1 at 52-53. But it is undisputed that highway culverts are much more expensive to replace than forest road culverts. ER 1049, 1029. The comparison, therefore, is unhelpful.

The Tribes also cite witnesses who are not involved with funding to argue that the added cost of stream simulation is relatively small once a decision is made to replace a culvert. Dkt. 55-1 at 52. The witness with competence to testify about funding, however, testified that bridges and stream simulation culverts are much more costly than the other design options. ER 673-74, 1067-68, 1048. And the Tribes do not even attempt to rebut the State's testimony that bridges are extremely expensive, ranging into millions of dollars. ER 674. Yet the district court ranked bridges as the first-choice design option, even above stream-simulation culverts. ER 4.

---

[4] The only contrary evidence cited by the Tribes is the declaration of Martin Fox, where he states that no-slope culverts "could produce conditions unfavorable to fish passage and habitat." Dkt. 55-1 at 53; SER 39. Dr. Fox is employed as a fisheries biologist, not an engineer, and has no experience designing culverts. SSER 14, 32.

In the end, the court signed the exact injunction presented by the Tribes, even though this Court has "frowned upon the practice of adopting counsel's proposed orders verbatim." *Wyler Summit Partnership v. Turner Broadcasting System, Inc.*, 235 F.3d 1184, 1196 (9th Cir. 2000). Although Plaintiffs prefer the most expensive culvert designs, "the preference of a party that will bear none of the monetary costs can't sweep the cost issue off the table." *Cobell*, 428 F.3d at 1078. The court erred by doing exactly that and substituting its judgment for the technical judgment of state engineers.

### 4. The District Court's Errors Together Led to an Injunction That Impermissibly Intrudes Into State Government.

Before issuing an injunction, the court was required to give "appropriate consideration . . . to principles of federalism[.]" *Rizzo v. Goode*, 423 U.S. 362, 379 (1976); Dkt. 25 at 47-49. "Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *Rizzo*, 423 U.S. at 378 (citation omitted). This Court has already emphasized this point in this case, saying: "Judges in the Western District of Washington have now been regulating fishing in the Puget Sound for 35 years," even though "[t]he

Constitution does not establish the district courts as permanent administrative agencies." *U.S. v. Washington*, 573 F.3d at 709.

The district court failed to apply federalism principles when it issued its sweeping order against the State. Plaintiffs try to excuse the court's failure by arguing that the sweeping injunction was necessary "to vindicate federal Indian treaty rights." Dkt. 55-1 at 43. But they cite no authority for their inference that federalism principles become less important when plaintiffs seek to vindicate Indian treaty rights as opposed to other federally protected rights.

The Tribes then argue that the injunction does not violate federalism principles because it gives the State "significant flexibility." Dkt. 55-1 at 51. As evidence of this "flexibility," the Tribes argue that the injunction allows WSDOT to defer replacing a certain number of culverts as long as certain conditions are met and that the State can defer replacement of all culverts that individually block less than 200 meters of habitat. Actually, only one agency, WSDOT, can defer replacement of culverts that block less than 200 meters of habitat; all of the other agencies are required to replace such culverts by 2016 even though the habitat opened up will be minimal. ER 3. At any rate, the State has to replace hundreds of culverts on a short timeline, including in watersheds where culverts are not a problem and including culverts that are

surrounded by non-state-owned barriers. This is not exactly the flexibility the Tribes proclaim.

The Tribes then argue that the injunction provides flexibility as to culvert design. But as explained above, it does not. In most instances, it requires the State to use one of two costly options, with the most costly option (bridge) at the top of the list. And on top of that, the court made the State's obligations perpetual by requiring the State to re-replace any replaced culvert that fails in the future. ER 4-5.

The court did not fashion the least intrusive remedy, as it was required to do. *See Stone v. City and County of San Francisco*, 968 F.2d 850, 864 (9th Cir. 1992). The injunction was an abuse of discretion and must be vacated.

**D.    The United States Should Be Held Responsible for Its Role in Designing, Funding, and Approving Barrier Culverts.**

The United States designed, funded, and issued permits approving the very culverts it now claims are illegal. The United States seeks to evade its responsibility, however, by foreclosing the State's equitable defenses and counterclaims. The district court unfortunately sided with the United States. It erred in doing so.

At a minimum, the court should have factored the United States' role into the final injunction, as it promised but failed to do. ER 67 ("equitable

30

principles will no doubt play a role in whatever relief the court fashions"). Equitable considerations can limit relief where the requested relief would result in unfairness. *United States v. Washington*, 157 F.3d 630, 651-53 (9th Cir. 1998) (applying equitable principles to prevent Tribes from harvesting fifty percent of the shellfish in private growers' shellfish beds). The result here was unfair because the court fashioned relief without fully considering the equities.

### 1. The District Court Erroneously Dismissed the State's Waiver Defense.

The district court improperly dismissed the State's waiver defense by relying on cases involving estoppel. ER 70-71. The United States defends the court's dismissal by also relying on estoppel cases. Dkt. 54 at 39-40. However, "waiver and estoppel are conceptually distinct defenses with separate proof requirements." *United States v. Fowler*, 913 F.2d 1382, 1386 n.3 (9th Cir. 1990). Waiver is the voluntary, intentional relinquishment of a known right, while estoppel involves inducing another to rely on a promise to his detriment. *Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 647-48 (7th Cir. 1993). The district court erred in concluding, based on estoppel cases, that the State's waiver defense is barred as a matter of law.

Even if the estoppel cases are relevant, they must be analyzed in light of *City of Sherrill v. Oneida Nation of New York*, 544 U.S. 197 (2005), wherein

the Supreme Court recently applied equity principles to bar a tribe's claim for control over land long ago ceded. The Court recognized that longstanding observances and settled expectations are prime considerations in equitable defenses, and concluded that the disruptive practical consequences of the tribe's claim weighed in favor of applying the government's equitable defense. *Id*. at 218.

The Second Circuit subsequently relied on *City of Sherrill* to preclude relief for non-possessory claims based on the disruptive nature of the tribe's and the United States' request. *Oneida Indian Nation of New York v. County of Oneida*, 617 F.3d 114 (2d Cir. 2010). The Court explained that the equitable defense recognized in *Sherrill* "*does not focus on the elements of traditional laches* but rather more generally on the length of time at issue between an historical injustice and the present day, on the disruptive nature of claims long delayed, and on the degree to which these claims upset the justifiable expectations of individuals and entities far removed from the events giving rise to the plaintiff's injury." *Id*. at 127 (emphasis added).

The same factors weigh in favor of allowing the State to pursue its equitable defense here. At the same time the United States was funding, designing, and issuing permits for barrier culverts, the United States was under

a fiduciary obligation to the Tribes to ensure that federal actions did not impinge on the Tribes' treaty rights. *Pyramid Lake Paiute Tribe of Indians v. Dep't of the Navy,* 898 F.2d 1410, 1420 (9th Cir. 1990) (fiduciary obligations to tribes apply to all federal actions). The State justifiably relied on its expectation that the United States was complying with its fiduciary obligation when it funded, designed, and approved the culverts over the course of many decades. This justifiable reliance should entitle the State to assert its equitable defense against the United States.[5]

### 2. The State Should Be Permitted to Pursue Its Counterclaims.

The district court also erroneously dismissed the State's recoupment counterclaims against the United States. The State's counterclaims satisfy the requirements for recoupment because they: (1) arise from the same transaction as the original claims; (2) seek the same kind of relief; and (3) seek an amount not in excess of that sought by the United States. *Berrey v. Asarco, Inc.*, 439 F.3d 636, 645 (10th Cir. 2006). The United States' arguments to the contrary fail.

---

[5] The United States argues that, if the case is remanded, it would be premature for this Court to rule that sovereign immunity bars the Tribes' claims. Dkt. 54 at 38 n.8. The State agrees that the question of whether sovereign immunity bars the Tribes' claims should be resolved first by the district court on remand.

First, the United States argues that the counterclaims are not actionable because they assert the rights of the Tribes, not the State. Dkt. 54 at 44-45. That is incorrect. The State seeks a declaration that, if the State has breached a treaty-based duty not to maintain barrier culverts, then the United States largely caused that breach by designing, funding, and approving those culverts. ER 998-99. In terms of relief, the State alleges that "[t]he United States has a duty to pay all costs incurred by the State" to replace culverts that the United States designed, funded, or authorized. ER 993. These allegations constitute counterclaims for declaratory judgment, with a corresponding request for an equitable remedy. 28 U.S.C. § 2202 ("Further necessary or proper relief based on a declaratory judgment or decree may be granted . . . against any adverse party whose rights have been determined by such judgment."). The State faces an injury-in-fact of $1.88 billion in costs to replace culverts, an injury that was caused largely by the federal government's actions and that would be redressed by reducing the State's liability. The State asserts its own rights.

As for the three-part test articulated in *Berrey*, the State's counterclaims meet the first part because they arise out of the same transaction as the original claims. Plaintiffs allege that the State should be required to replace state

34

barrier culverts, and the State counterclaims that the United States is responsible for those same culverts.

The United States argues that "same transaction" means that the State's counterclaims must constitute compulsory counterclaims under Civil Rule 13(a). Dkt. 54 at 45-46 (citing *Berrey*, 439 F.3d at 645-46). It is not clear that this is the rule in the Ninth Circuit. *See United States v. Park Place Associates, Ltd.*, 563 F.3d 907, 932 n.16 (9th Cir. 2009) ("[W]hen the United States files suit it may subject itself to various compulsory *and permissive* counterclaims for recoupment or set-off.") (emphasis added). Regardless, the State's counterclaims *are* compulsory.

The Ninth Circuit applies the "logical relationship" test in determining whether a counterclaim is compulsory. *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1195-96 (9th Cir. 2005). Under that test, a counterclaim is compulsory if it "arises from the same aggregate set of operative facts as the initial claim," *id.* at 1196, meaning that the counterclaim is "sufficiently related to subject matter of the original action," *Pochiro v. Prudential Ins. Co. of America,* 827 F.2d 1246, 1251 (9th Cir. 1987). This rule is interpreted liberally in favor of finding counterclaims to be compulsory. *Id.* at 1252.

The State's claim, that the United States is responsible for the same culverts that are the subject of the United States' lawsuit, meets this liberal test.

The second part of the recoupment test is also met because the State seeks declaratory and injunctive relief, same as the United States. And the third part of the test is met because the State seeks an amount that does not exceed the United States' claims. As the district court noted, the State simply requests "that its own liability should be reduced because of the alleged federal actions." ER 65.

In sum, the State's counterclaims are recoupment claims from which the United States is not immune. This matter should therefore be remanded for consideration of the State's counterclaims as well as its waiver defense.

### 3. Equity Should Have Factored Into Any Relief the District Court Granted.

Even if this Court concludes that the counterclaims and equitable defenses were properly dismissed, the case should still be remanded for the district court to consider the equity of forcing the State to shoulder the entire cost of culvert replacement when the United States provided the design for and approved the construction of most of the State's barrier culverts.

"Lack of diligence by the [United States] in exercising its role as trustee" is appropriately factored into remedies, especially when state taxpayers must

bear the cost of the United States' indolence. *Brooks v. Nez Perce County*, 670 F.2d 835, 837 (9th Cir. 1982). Here, equity suggests the State should not be required to replace those culverts designed or approved by the United States unless the United States is obligated to partially fund the replacements.

The Tribes argue that the United States does fund the State's culvert corrections, Dkt. 55-1 at 49, but that is an exaggeration. The State expects to receive no more than $22 million in funding from the United States over a six-year period. ER 37. Since the injunction is anticipated to cost the State about $117 million each year, the United States' paltry contribution can scarcely be considered equitable.

The Tribes also allege that the State waived this equitable argument by opposing any injunction. Dkt. 55-1 at 48. But the court had already promised that "equitable principles will no doubt play a role in whatever relief the court fashions." ER 67. The State was under no obligation to ask again for something the Court had accepted as required, especially when the State expressly claimed that the United States should bear some responsibility for the expense of culvert repair. *See, e.g., Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995) (party may make any argument in support of a claim properly presented below).

In short, the court should have considered equitable factors in fashioning relief, but failed to do so. This constitutes an additional basis for remand.

## III.    CONCLUSION

The State respectfully asks the Court to reverse the district court's summary judgment decision and grant summary judgment to the State. If the Court affirms the summary judgment decision, the injunction should be vacated as an abuse of discretion and the case should be remanded to the district court for consideration of the State's waiver defense and counterclaims.

RESPECTFULLY SUBMITTED this 24th day of March, 2014.

ROBERT W. FERGUSON
Attorney General

By:  *s/ Noah Guzzo Purcell*
NOAH GUZZO PURCELL, WSBA #43492
*Solicitor General*
noahp@atg.wa.gov

By:  *s/ Laura J. Watson*
LAURA J. WATSON, WSBA #28452
*Deputy Solicitor General*
lauraw2@atg.wa.gov

By:  *s/ Jessica E. Fogel*
JESSICA E. FOGEL, WSBA #36846
*Assistant Attorney General*
jessicaf1@atg.wa.gov
PO Box 40100
Olympia, WA  98504-0100
360-664-0869

**Form 6.**      **Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

☒ this brief contains ___8280___ words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐ this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☒ this brief has been prepared in a proportionally spaced typeface using *(state name and version of word processing program)* ___Microsoft Windows 7 -- Word___ *(state font size and name of type style)* ___14 point Times New Roman___ , *or*

☐ this brief has been prepared in a monospaced spaced typeface using *(state name and version of word processing program)* _____ with *(state number of characters per inch and name of type style)*

_____

Signature | s/ LAURA J. WATSON

Attorney for | Appellant - State of Washington

Date | Mar 24, 2014

9th Circuit Case Number(s) | 13-35474

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) _____ .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | 

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | Mar 24, 2014 | .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

| | |
|---|---|
| Fawn R. Sharp | Raymond G. Dodge, Jr., Tribal Attorney |
| Quinault Indian Nation | Quinault Indian Nation |
| PO Box 189 | PO Box 189 |
| Taholah, WA 98587 | Taholah, WA  98587 |

Signature (use "s/" format) | s/ LAURA J. WATSON