Nos:  13-35474; 13-35519

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA, et al.,

Appellees,

v.

STATE OF WASHINGTON,

Appellant.

On Appeal From The United States District Court For The
Western District Of Washington

No. CV 70-9213
The Honorable RICARDO S. MARTINEZ
United States District Court Judge

## STATES OF IDAHO AND MONTANA'S BRIEF *AMICUS CURIAE* IN SUPPORT OF APPELLANT'S PETITION FOR REHEARING/REHEARING EN BANC

LAWRENCE G. WASDEN
ATTORNEY GENERAL
STATE OF IDAHO

CLIVE J. STRONG
Chief of Natural Resources

CLAY R. SMITH
Deputy Attorney General
Statehouse, Room 210
Boise, ID  83720
*Attorneys for Amicus Curiae*
  *State of Idaho*

TIMOTHY C. FOX
ATTORNEY GENERAL
STATE OF MONTANA

DALE SCHOWENGERDT
Solicitor
215 N. Sanders Street
P.O. Box 201401
Helena, MT  59620-1401
*Attorneys for Amicus Curiae*
  *State of Montana*

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* .............................................................. 1

INTRODUCTION ................................................................................. 2

ARGUMENT ........................................................................................ 5

    I.    *EN BANC* REHEARING TO RESOLVE THE "ENVIRONMENTAL ISSUE" IS NECESSARY GIVEN THE POTENTIAL IMPACT OF THE PANEL OPINION'S HOLDING ON GOVERNMENTAL AND PRIVATE RESOURCES AND THE PANEL OPINION'S MISAPPLICATION OF *FISHING VESSEL* .......................................5

    II.    *EN BANC* REHEARING SHOULD BE GRANTED TO DETERMINE THE PROPRIETY OF THE INJUNCTIVE RELIEF ORDERED BY THE DISTRICT COURT AND AFFIRMED IN THE PANEL OPINION ......................................... 10

CONCLUSION .................................................................................... 16

CERTIFICATE OF COMPLIANCE PURSUANT TO CIRCUIT RULE 32-1 .... 17

i

# TABLE OF CASES AND AUTHORITIES

## CASES

*Amoco Prod. Co. v. Gambell*, 480 U.S. 531 (1987) ...............................10

*Cayuga Indian Nation v. Pataki*, 413 F.3d 266 (2d Cir. 2005) .............................14

*City of Sherrill v. Oneida Indian Nation of New York*,
  544 U.S. 197 (2005).......................................................................... *passim*

*Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261 (1997) ...............................14

*Inst. of Cetacean Research v. Sea Shepard Conservation Soc'y*,
  725 F.3d 940 (9th Cir. 2013) ...............................................................10

*Nez Perce Tribe v. Idaho Power Co.*, 847 F. Supp. 791 (D. Idaho 1994)................6

*Oneida Cty v. Oneida Indian Nation*, 470 U.S. 226 (1985) ...................11

*Oneida Indian Nation of New York v. Cty. of Oneida*,
  617 F.3d 114 (2d Cir. 2010).................................................................14

*Pyramid Lake Paiute Tribe v. Dep't of Navy*, 898 F.2d 1410 (9th Cir. 1990) ........13

*United States v. Adair*, 723 F.2d 1394 (1983) ................................ *passim*

*United States v. Boylan*, 256 F. 468 (N.D.N.Y. 1919), *aff'd,* 265 F. 165
  (2d Cir. 1920).......................................................................................15

*United States v. Oregon*, No. 3:68-cv-513-KI (D. Or.) .............................1

*United States v. Washington*, 694 F.2d 1374 (9th Cir. 1982)...................2

*United States v. Washington*, 759 F.2d 1353 (9th Cir. 1985) (*en banc*).......... *passim*

*United States v. Washington*, 157 F.3d 630 (9th Cir. 1998)...................14

*United States v. Winans*, 198 U.S. 371 (1905) ............................... *passim*

*Wash. v. Wash. State Com. Passenger Fishing Vessel Ass'n*,
  443 U.S. 658 (1979) ......................................................................... *passim*

*Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7 (2008)................................10

*Winters v. United States*, 207 U.S. 564 (1908) ................................. *passim*

## AUTHORITIES

16 U.S.C. §§ 1531-1544 ......................................................................... 13

25 U.S.C. § 465 ......................................................................................... 12

33 U.S.C. §§ 1251-1388 ......................................................................... 13

## RULES

Fed. R. App. P. 35(a)(2) ........................................................................... 2

Fed. R. Civ. P. 65(a) ................................................................................. 10

## OTHER AUTHORITIES

1 D. Dobbs, *Law of Remedies* § 1.2 (1973) ........................................... 11

Dale T. White*, Indian Country in the Northeast*, 44 Tulsa L. Rev. 365 (2008)..... 15

Indian Trade and Intercourse Act, Act of July 22, 1790, ch. 33, 1 Stat. 137 .......... 4

John Tahsuda, *The Oneida Land Claim: Yesterday and Today*,
  46 Buff. L. Rev. 1001 (1998)............................................................... 15

Mary Christina Wood, *The Tribal Property Right to Wildlife Capital (Part II):
  Asserting a Sovereign Servitude to Protect Habitat of Imperiled Species*,
  25 F. L. Rev. 355 (2001) ...................................................................... 2

## TREATIES

Treaty with the Dwámish Indians, art. V, 12 Stat. 927 (Jan. 22, 1855) ................... 1

Treaty with the Flatheads, art. III, para. 2, 12 Stat. 975 (July 16, 1855).................. 1

Treaty with the Makah Tribe, art. IV, 12 Stat. 939 (Jan. 31, 1855) ......................... 1

Treaty with the Nez Percés, art. III, para. 2, 12 Stat. 957 (June 11, 1855)............... 1

Treaty with Nisquallys, art. III, 10 Stat. 1132 (Dec. 26, 1854) ................................ 1

Treaty with the Qui-Nai-Elts, art. III, 12 Stat. 971 (July 1, 1855) ........................... 1

Treaty with the S'Klallams, art. IV, 12 Stat. 933 (Jan. 26, 1855) ............................ 1

Treaty with the Tribes of Middle Oregon, art. I, para. 3,
    12 Stat. 963 (June 25, 1855) ................................................................. 1

Treaty with the Walla-Wallas, art. I, 12 Stat. 945 (June 9, 1855) ............................ 1

Treaty with the Yakamas, art. III, para. 2, 12 Stat. 951 (June 9, 1855)................... 1

# <u>INTEREST OF</u> *AMICI CURIAE*

Isaac I. Stevens and Joel Palmer, then Superintendents of Indian Affairs for Washington and Oregon Territories, entered into ten treaties with Pacific Northwest Indian tribes between December 1854 and July 1855, each of which reserved on- and off-reservation hunting, fishing and other usufructuary rights in largely comparable language.[1]  The reserved fishing rights exist in Idaho, Montana, Oregon and Washington.  The treaties have spawned not only this litigation but also the earlier filed *United States v. Oregon*, No. 3:68-cv-513-KI (D. Or.).

The panel decision's interpretation of "[t]he fishing clause of the Stevens Treaties" (Op. at 24) thus directly affects *amici curiae* States of Idaho and Montana ("*amici* States").  The panel's resolution of the "environmental issue" (*id.* at 17, 18, 19) left open three decades ago in *United States v. Washington*, 759 F.2d 1353 (9th Cir. 1985) (*en banc*) ("*Washington III*"), creates a new species of

---

[1] Isaac Stevens signed seven of the treaties alone.  Treaty with Nisquallys (Treaty of Medicine Creek), art. III, 10 Stat. 1132, 1133 (Dec. 26, 1854); Treaty with the Dwámish Indians (Treaty of Point Elliott), art. V, 12 Stat. 927, 928 (Jan. 22, 1855); Treaty with the S'Klallams (Treaty of Point No Point), art. IV, 12 Stat. 933, 934 (Jan. 26, 1855); Treaty with the Makah Tribe (Treaty of Neah Bay), art. IV, 12 Stat. 939, 940 (Jan. 31, 1855); Treaty with the Yakamas, art. III, para. 2, 12 Stat. 951, 953 (June 9, 1855); Treaty with the Qui-Nai-Elts (Treaty of Olympia), art. III, 12 Stat. 971, 972 (July 1, 1855); and Treaty with the Flatheads (Treaty of Hell Gate), art. III, para. 2, 12 Stat. 975, 976 (July 16, 1855).  Joel Palmer signed one treaty alone.  Treaty with the Tribes of Middle Oregon, art. I, para. 3, 12 Stat. 963, 964 (June 25, 1855).  They jointly signed two treaties.  Treaty with the Walla-Wallas, art. I, 12 Stat. 945, 946 (June 9, 1855); and Treaty with the Nez Percés, art. III, para. 2, 12 Stat. 957, 958 (June 11, 1855).  This brief refers to the treaties collectively as the "Stevens treaties."

regulatory control that promises to impose significant burdens on state and local governments and private resources. The decision is especially troublesome because the relief ordered is not truly prospective. It instead requires Washington to expend millions, perhaps billions, of dollars to remediate highway and road culverts constructed long ago in conformance with federally sanctioned standards.

Given the legal and practical importance of the panel opinion, this Court should conclude the process begun in *Washington III* and resolve *en banc* the serious issues raised by Appellant State of Washington in its appeal.

## INTRODUCTION

Fed. R. App. P. 35(a)(2) provides that *en banc* rehearing "is not favored and ordinarily will not be ordered unless . . . the proceeding involves a question of exceptional importance." The *amici* States understand the rule's stringent burden. The present appeal, however, meets that standard for at least two reasons. *First*, the panel opinion breaks new ground by interpreting the fishing clause of the Stevens treaties as both reserving to the tribes a share of "harvestable" fish and requiring governmental entities and (logically) private parties to take no action that adversely affects the amount of the "harvestable fish"—what a prior panel of this Court and commentators have referred to as an "environmental servitude."[2]

---

[2] *United States v. Washington*, 694 F.2d 1374, 1381 (9th Cir. 1982), *vacated on reh'g*, 759 F.2d 1353 (9th Cir. 1985); *e.g.*, Mary Christina Wood, *The Tribal Property Right to Wildlife Capital (Part II): Asserting a Sovereign Servitude to*

*Second*, the opinion goes further by requiring Washington to remediate projects completed long ago for the purpose of increasing the number of fish subject to apportionment between treaty and non-treaty harvesters.

The "environmental issue" analysis rests principally on extending the United States Supreme Court's analysis in *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658 (1979) ("*Fishing Vessel*"), far beyond its facts and holding. As in *United States v. Winans*, 198 U.S. 371 (1905), also examined in *Fishing Vessel*, the Court addressed only the treaty fishers' right to access and harvest otherwise available fish. Nothing in its analysis supports the proposition that the fishing clause implies a right to a fishery that provides tribal members a moderate standard of living. Nor does the panel's reliance on two reserved water right decisions—*Winters v. United States*, 207 U.S. 564 (1908), and *United States v. Adair*, 723 F.2d 1394 (1983)—support implying such a right. Those cases turned on the premise that the involved tribes impliedly reserved a water right adequate to effectuate their reservations' purposes; they did not require a State to create *more* water to achieve those purposes. Moreover, those cases found that an implied water right was absolutely necessary to achieve the purpose for which the reservation was created; here the question is not whether the purposes of the reservation will be defeated, but rather, whether a right to take fish

*Protect Habitat of Imperiled Species*, 25 Vt. L. Rev. 355, 363 (2001) (*Washington III* did "not foreclose an environmental servitude approach in the future").

from streams outside of a reservation provides a basis for implying an affirmative duty upon a non-party to the treaty to restore some unknown number of salmon to the ecosystem. Only this Court, sitting *en banc*, can cure the panel opinion's analytical shortcomings. Definitive resolution of the "environmental issue" will provide certainty for all parties as their respective rights and duties. It also bears remembering that non-Stevens treaties contain on- and off-reservation fishing and hunting provisions, and, therefore, the panel decision may give rise to similar claims beyond the Pacific Northwest.

The panel's affirmance of the remedy fashioned by the district court is not less problematic than its treaty interpretation. The remedy charts a novel and troubling path. Federal courts, to be sure, have discretion in exercising their equitable powers, but the panel gave short shrift to the closest analog, *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005), in exercising that discretion. Op. at 35-36. The Supreme Court reiterated there that "[t]he principle that time can preclude relief" applies "in various guises." *Id.* at 217. It then looked to factors such as reasonable expectations, belated assertion of rights, and the practical effect of the requested relief to reject a tribe's claim of sovereignty over land purchased in 1807 by a non-Indian in violation of the Indian Trade and Intercourse Act, Act of July 22, 1790, ch. 33, 1 Stat. 137, and reacquired by the tribe 190 years later. The mandatory injunction in this case—which

4

requires Washington to remediate hundreds of existing culverts over a 17-year period—demands precisely the same careful analysis with due regard to the acquiescence by the United States' active role in the culverts' construction and its delay in seeking that relief.

## ARGUMENT

I. *EN BANC* REHEARING TO RESOLVE THE "ENVIRONMENTAL ISSUE" IS NECESSARY GIVEN THE POTENTIAL IMPACT OF THE PANEL OPINION'S HOLDING ON GOVERNMENTAL AND PRIVATE RESOURCES AND THE PANEL OPINION'S MISAPPLICATION OF *FISHING VESSEL*

The panel conceded that no allegation existed "that in building and maintaining its barrier culverts the State . . . acted 'for the primary purpose or object of affecting or regulating the fish supply or catch in noncompliance with the treaty.'" Op. at 32 (quoting *Washington III*, 759 F.2d at 1357). It instead relied on the "'all facts presented' in the 'particular dispute'" prong of *Washington III*. *Id.* The controlling factors were (1) "Washington . . . acted affirmatively to build and maintain barrier culverts under its roads[;]" (2) "several hundred thousand additional mature salmon would be produced every year" with the culverts' remediation; and (3) "[s]almon now available for harvest are not sufficient to provide a 'moderate living' to the Tribes." *Id.* at 32-33. Only the second of those considerations is particularly case specific. One thus can envision myriad situations—ranging from perceived shortcomings in regulation of water quality or

habitat degradation, the effects of existing dams, to the impact on native stocks from state hatcheries—where the implied treaty right found by the panel may serve as a basis for suit. Nothing in the panel opinion, moreover, restricts its reasoning to state or local government actors; it presumably applies to private parties with equal force.[3]

The substantive breadth and attendant practical impact of the panel opinion alone weigh in favor of an *en banc* Court resolving the "environmental issue" identified in *Washington III*. But there is more. The panel extrapolated the implied treaty right in large measure from *Fishing Vessel*. The chief question there was "the character of th[e] treaty right to take fish." 443 U.S. at 662; *see also id.* at 674 (*certiorari* granted in part "to interpret this important treaty provision and thereby to resolve the conflict between the state and federal courts regarding what, if any, right the Indians have to a share of the fish"). The Supreme Court "agree[d] with the Government that an equitable measure of the common right should initially divide the harvestable portion of each run that passes through a 'usual and

---

[3] The panel opinion, to illustrate, casts doubt over the holding in *Nez Perce Tribe v. Idaho Power Co.*, 847 F. Supp. 791 (D. Idaho 1994). There, the district court granted summary judgment against a tribe that sought damages for a private utility's construction and maintenance of dams that negatively affected salmon and steelhead runs. *Id.* at 810 ("[T]he 1855 treaty does not provide a guarantee that there will be no decline in the amount of fish available to take. The only method that would guarantee such protection would be to prevent all types of development, whether or not it is discriminatory of Indian treaty rights. The Stevens treaties simply do not provide the Tribe with such assurance or protection.").

accustomed place' into approximately equal treaty and nontreaty shares, and should then reduce the treaty share if tribal needs may be satisfied by a lesser amount." *Id.* at 685. The Court established as the measure of the "lesser amount" ceiling the fish "necessary to provide the Indians with a livelihood—that is to say, a moderate living." *Id.* at 686. *Fishing Vessel*'s holding was straightforward; it interpreted the Stevens treaty fishing provision as apportioning "harvestable" fish. Conversely, the decision did not interpret the treaty to require, *via* implication, Washington or any other non-party to refrain from conduct that might decrease the amount of "harvestable" fish available to treaty and non-treaty fishers below a moderate standard of living for the former.

The discussion of *Winans* in *Fishing Vessel* underscores the Court's focus on the harvestable fish. The formal issue in *Winans* was the ability of treaty Indians to gain access to usual and accustomed fishing grounds through privately owned land. The Court resolved that issue by reference to the treaty right "'of erecting temporary buildings for curing [fish].'" *Winans*, 198 U.S. at 381. That provision, it held, anticipated "[t]he contingency of future ownership of the lands." *Id.* *Winans* therefore did not imply a treaty right of access; it found that right expressly contained in the involved Stevens treaty. *Fishing Vessel*, however, deemed "even more significant" than the access issue *Winans*'s "actual disposition" which involved, at least in the Government's briefing, proposed removal of fishing

7

wheels that captured virtually the entire harvestable run for the non-Indian fishers. 443 U.S. at 681. *Winans*, whether viewed as an access or harvest allocation decision, adds nothing to this case.

The panel's reliance on *Winters* and *Adair* for a generalized power to imply a treaty-based right to "food 'forever'" proves far too much from far too little. Op. at 30. It proves too much because giving life to such a promise by Isaac Stevens would require, at the least, assurance of enough fish for subsistence purposes. But *Fishing Vessel* makes clear the moderate standard of living is a *ceiling* on the tribal share of available harvest, not a guaranteed entitlement. *Winters* and *Adair* also are doctrinally and factually distinct from the situation here. *Winters* pivoted on the determination that the Fort Belknap Tribes reserved the right in the treaty cession to enough water to make their reservation "valuable or adequate." 207 U.S. at 576. *Adair* applied *Winters* and later precedent to conclude that the Klamath Tribe reserved a quantity of water flowing through its reservation for agricultural purposes and to maintain its fishing and hunting rights. 723 F.2d at 1410.

*Winters* and *Adair* did allocate use of a natural resource (water) within the framework of the prior appropriation doctrine among competing users. Thus, from that perspective, they perhaps parallel *Fishing Vessel*'s division of fish between treaty and non-treaty harvesters. The panel opinion nevertheless begs the question

insofar as it takes from those cases, which vindicated a right impliedly reserved under the involved treaties for on-reservation use, the conclusion that the off-reservation treaty fishing clauses impliedly preclude non-parties from taking actions that might impede sufficient fish to provide a moderate standard of living. Such an implied right could arise only if those clauses required maintaining a minimum level of harvestable fish. *Fishing Vessel* establishes the contrary.

The *amici* States do not suggest that resolving the "environmental issue" involves no difficulty. Plainly enough, the *Washington III* majority viewed it as significant enough to defer to future resolution in a more concrete setting. The panel opinion, however, lays down an essentially *per se* rule that would subject to challenge any action negatively affecting the amount of harvestable fish. This rule potentially imposes massive burdens on state and local governments and private resources and threatens to reorder economic development generally in the Pacific Northwest. The panel grounds its rule on, at best, a questionable reading of *Fishing Vessel* and even more questionable reliance on reserved water right decisions. These considerations, together or independently, warrant an *en banc* Court finishing the task begun in *Washington III* by definitively resolving the "environmental issue."

//

//

9

## II. *EN BANC* REHEARING SHOULD BE GRANTED TO DETERMINE THE PROPRIETY OF THE INJUNCTIVE RELIEF ORDERED BY THE DISTRICT COURT AND AFFIRMED IN THE PANEL OPINION

Washington's rehearing petition, like its briefing before the panel, details the flaws in the injunction issued by the district court and approved by the panel. DktEntry117 at 15-18; *see also* DktEntry 25 at 46-65; DktEntry 80-1 at 18-30. The *amici* States believe that one aspect of the remedial issue has special weight in determining the appropriate relief: the United States' active role in the State's culvert construction activities and the attendant delay in challenging the culverts' adequacy under the implied treaty right. The Supreme Court's decision in *Sherrill* provides substantial guidance on this issue.

This Court recognizes that "[a]n injunction is an equitable remedy." *Inst. of Cetacean Research v. Sea Shepard Conservation Soc'y*, 725 F.3d 940, 947 (9th Cir. 2013). "[T]raditional equitable considerations such as laches, duress and unclean hands may militate against issuing an injunction that otherwise meets" the requirements in *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7 (2008). 725 F.3d at 947.[4] In *Sherrill*, the Supreme Court applied comparable "equitable considerations" to reject a tribe's claim seeking immunity from taxation of a parcel of land that it acquired over a century and a half after it had been transferred in

---

[4] *Winter* applied Fed. R. Civ. P. 65(a), but the standards for a permanent injunction do not differ other than the duty to show actual success on the merits. *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 546 n.1 (1987).

violation of federal statute. The Court began by reiterating the principle that "'[t]he substantive questions whether the plaintiff has any right or the defendant has any duty, and if so what it is, are very different questions from the remedial questions whether this remedy or that is preferred, and what the measure of the remedy is.'" 544 U.S. at 213 (quoting 1 D. Dobbs, *Law of Remedies* § 1.2, at 3 (1973)). Consequently, the fact that reunification of aboriginal title with current title might justify a claim to tribal sovereignty over the affected land (*Oneida Cty. v. Oneida Indian Nation*, 470 U.S. 226, 235-36 (1985)) did not answer the question whether the tax immunity sought was appropriate "in light of the long history of state sovereignty over the territory." 544 U.S. at 214.

The *Sherrill* Court resolved this remedial question by relying on several considerations. It first observed that "laches, a doctrine focused on one side's inaction and the other's legitimate reliance, may bar long-dormant claims for equitable relief." 544 U.S. at 217. It then cited as "a helpful point of reference" disputes between States in which "long acquiescence may have controlling effect on the exercise of dominion and sovereignty over territory" where "longstanding observances and settled expectations are prime considerations." *Id.* at 218. Third, the Court discussed its reservation diminishment decisions that have "recognized the impracticability of returning to Indian control land that generations earlier passed into numerous private hands." *Id.* at 219. These considerations weighed

11

against the tribe's claim because of the "disruptive practical consequences"—the serious burden on "'the administration of state and local governments'" arising from the resulting "checkerboard of state and tribe jurisdiction" and the possibility of "a new generation of litigation to free the parcels from local zoning or other regulatory controls that protect all landowners in the area." *Id.* at 218-19. The Court added that the land-into-trust process under 25 U.S.C. § 465 offered an express statutory remedy to achieve the objective that the Nation sought through federal common law. *Id.* at 221.

The present facts, of course, differ. But they raise similar equitable concerns. To begin with, the Washington State Department of Transportation ("WSDOT") adhered to hydraulic culvert designs published by the Federal Highway Administration ("FHWA") until Washington itself developed a stream simulation design that improved upon the federal model. DktEntry 25 at 16-17. Federal agencies thereafter used the Washington design to modify their own practices. *Id.* at 17. WSDOT also has an ongoing program to remediate its barrier culverts for which it has received excellence awards from FHWA. *Id.* at 17-18.

There is, as well, no dispute that Washington's road building activities, including culvert construction, have been ongoing for many decades. Until the filing of the request for determination in 2001, 16 years after *Washington III*'s issuance, no treaty-based claim had been raised as to those activities. To the

12

contrary, given the federal government's fiduciary obligation to the Tribes, Washington had every reason to believe that the federal government—in designing, funding, and approving these culverts—had concluded that these culverts complied with the federal government's treaty obligations. *Pyramid Lake Paiute Tribe v. Dep't of Navy*, 898 F.2d 1410, 1420 (9th Cir. 1990) (fiduciary obligations to tribes apply to all federal actions). Moreover, all state residents, including the Tribes' members, directly benefitted, and continue to benefit, from this road infrastructure. The United States and the Tribes each had the opportunity to challenge Washington's actions as they were being undertaken or to bring proposed ameliorative measures to the state agencies' attention either through sovereign-to-sovereign collaboration or resort to claims under Congressionally-sanctioned remedies such as the Clean Water Act, 33 U.S.C. §§ 1251-1388, or the Endangered Species Act, 16 U.S.C. §§ 1531-1544.

The panel nevertheless deemed *Sherrill* "radically different" from this dispute. Op. at 36. Ignoring the United States' acquiescence or actual support, it concentrated instead on the Tribes, who had "done nothing to authorize the State to construct and maintain barrier culverts." *Id.* It also adhered without change to prior Ninth Circuit decisions saying flatly that "laches or estoppel is not available to defeat Indian treaty rights." *Id.* at 35 (quoting *United States v. Washington*, 157 F.3d 630, 649 (9th Cir. 1998)). And it further reasoned that *Sherrill*-like dormancy

13

was absent because "Washington and the Tribes have been in a more or less continuous state of conflict over treaty-based fishing rights for over one hundred years." *Id.*

This analysis misses the mark for three reasons. First, Washington's argument was not that the Tribes' claim is barred by waiver; rather, it was that the federal government's claim was barred by waiver, and "[i]f the United States is barred, then the suit must be dismissed because the State has sovereign immunity from claims brought solely by the Tribes." DktEntry 25 at 40-43 & n.11 (citing *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 268-69 (1997)).

Second, the panel's focus on distinguishing the facts in *Sherrill* led it to ignore one of the decision's core teachings. *Sherrill* makes clear that it is no longer tenable to say that equitable defenses are unavailable in cases involving "Indian treaty rights." Op. at 35. The Second Circuit has recognized this in several decisions, creating a clear circuit split with the panel's holding here that the United States is not subject to equitable defenses when it brings Indian treaty claims. *Compare* Op. at 34-35, *with Cayuga Indian Nation v. Pataki*, 413 F.3d 266, 273, 278-79 (2d Cir. 2005) ("In light of *Sherrill*, which . . . we read to have substantially altered the legal landscape in this area, we conclude that the federal law of laches can apply against the United States in these particular circumstances."); and *Oneida Indian Nation of New York v. Cty. of Oneida*, 617

14

F.3d 114, 129 (2d Cir. 2010) (equitable defenses barred claims asserted by the United States and Oneida Indian Nation).

Finally, to suggest that the Oneida Nation and New York State have not been in long-term conflict concerning territorial claims overlooks the historical record. "From the very beginning of their dispossession in the nineteenth century, the Oneidas unsuccessfully sought federal intervention to recover lands illegally taken by the State of New York." John Tahsuda, *The Oneida Land Claim: Yesterday and Today*, 46 Buff. L. Rev. 1001, 1004 (1998). The Oneida Nation filed its action seeking recovery of 250,000 acres of treaty-reserved land in 1970, the same year as this case began and over 30 years before the request for determination resulting in the present appeal. *See generally* Dale T. White, *Indian Country in the Northeast*, 44 Tulsa L. Rev. 365, 375 & n.69 (2008). Fifty years earlier, the United States on behalf of certain Oneida Nation members had filed successful ejectment action to recover 32 acres of improperly conveyed land. *United States v. Boylan*, 256 F. 468 (N.D.N.Y. 1919), *aff'd*, 265 F. 165 (2d Cir. 1920). The panel opinion's "continuous state of conflict" comment simply failed to take account of the contentious relationship between the Oneidas and New York since the late Eighteenth Century.

*Sherrill*'s equitable considerations' analysis, in sum, has immediate relevance to whether the district court abused its discretion in issuing all or

portions of the expansive injunction. The panel's failure to analyze this issue thoroughly provides further grounds for *en banc* review.

## CONCLUSION

Appellant State of Washington's petition for rehearing/rehearing en banc should be granted.

DATED: August 22, 2016.

By /s/ *Clay R. Smith*
    CLAY R. SMITH
    Deputy Attorney General
    *Amicus Curiae* State of Idaho

By /s/ *Dale Schowengert*
    DALE SCHOWENGERDT
    Solicitor
    *Amicus Curiae* State of Montana

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO CIRCUIT RULE 32-1

I certify that:

The foregoing brief is

  XX    Proportionately spaced, has a typeface of 14 points or more and contains 3838 words.

or is

           Monospaced, has 10.5 or fewer characters per inch and contains _____ words or _____ lines of text

or is

           In conformance with the type specifications set forth at Fed. R. App. P. 32(a)(5) and does not exceed _____ pages

By /s/ *Clay R. Smith* _____

CLAY R. SMITH
Deputy Attorney General

17

| 9th Circuit Case Number(s) | 13-35474; 13-35519 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | Aug 22, 2016 | .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/ Clay R. Smith |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | | .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) | |